# Exhibit A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MAGGIE McNAMARA,            )   CIVIL ACTION - LAW
                           )
            Plaintiff       )
                           )
-vs-                        )
                           )
SUSQUEHANNA COUNTY, et      )
al,                         )
                           )
            Defendants   x   No. 3:17-CV-2182-MEM
_____

DEPOSITION TESTIMONY OF

**<u>MAGGIE McNAMARA</u>**

WEDNESDAY, JUNE 6, 2018

KREDER, BROOKS, HAILSTONE, LLP
220 PENN AVENUE - SUITE 200
SCRANTON, PENNSYLVANIA

TERESA A. CROSSIN, RMR
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.**
**4099 BIRNEY AVENUE, SUITE 9**
**MOOSIC, PA  18507**
**(570) 558-3011      (800) 570-3773**
**FAX  (570) 558-3014**



2

**COUNSEL PRESENT:**

**On behalf of the Plaintiff:**
        MAZZONI, KARAM, PETORAK & VALVANO
        BY:  CHRISTOPHER J. SZEWCZYK, ESQ.
        321 Spruce Street - Suite 201
        Scranton, PA 18503

**On behalf of the Defendant:**
        KREDER, BROOKS, HAILSTONE, LLP
        BY:  A. JAMES HAILSTONE, ESQ.
        220 Penn Avenue - Suite 200
        Scranton, PA 18503

## STIPULATIONS

It was stipulated and agreed by and between counsel that the reading, signing, sealing and filing of the deposition transcript be waived.

It was further agreed that all objections except as to the form of the question will be reserved until the time of trial.

## INDEX OF WITNESSES

EXAMINATION                        PAGE NUMBER
MAGGIE McNAMARA
By Mr. Hailstone     . . . . . . . . . . . .  3

## INDEX OF EXHIBITS

**DEFENDANT**

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | 12/30/15 Written warning | 19 |
| 2 | Rich Ely note | 22 |
| 3 | Rule 26 disclosures | 25 |
| 4 | McNamara resignation letter | 55 |
| 5 | Stoud resignation letter | 57 |
| 6 | Counseling session | 61 |
| 7 | 6/13/16 Stoud letter | 63 |

**M A G G I E     M c N A M A R A,**

WAS CALLED, AND HAVING BEEN DULY SWORN,

WAS EXAMINED AND TESTIFIED AS FOLLOWS:


**EXAMINATION BY MR. HAILSTONE:**

    Q.    Good morning, Ms. McNamara.  My name is

Jamie Hailstone.  I represent the Defendant,

Susquehanna County, in an action that you brought.

        Today we are going to take your

deposition.  I am going to be asking questions, you

are going to be answering.  Everything is going to be

taken down by the stenographer and, eventually, a

written transcript of our discussion today, the

questions and the answers, are going to be produced.

        My first question --

    MR. HAILSTONE:  Actually, more for

    Chris, is she going to sign, review and

    sign, or does she waive?

    MR. SZEWCZYK:  We will waive.

BY MR. HAILSTONE:

    Q.    Just a couple of ground rules before we

get started.  My first question is have you ever been

deposed before?

    A.    I have not.

    Q.    Okay.  So, basically, this is the

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

4

1   process.  I am going to ask questions; you are going

2   to answer.  I ask that you answer orally.  We can't

3   take down the nod of a head or shake of a head, so

4   everything has to be -- do you understand that?

5        A.     I do.

6        Q.     There might be objections during the

7   deposition.  We will pause and let your attorney and

8   I discuss them, but I am just warning you about that.

9             If I ask you anything that you don't

10  understand or is in any way confusing, please, don't

11  answer, ask me to rephrase it, and I can try and work

12  with you on it.  What we don't want you to do is we

13  want you to answer as truthfully as you can to the

14  question that I pose.  So, if you have any problem

15  with any of my questions, please, let me know.

16            Any time you have a problem and you

17  want to stop, consult with your attorney, that's fine

18  by me.  The only thing I ask is that if there is a

19  question that has been posed to you that you answer

20  before we take a break.  But if you have any issue

21  about taking a break at any time, I have no problem

22  with that.  You understand?

23       A.     I understand.

24       Q.     Okay.  Thank you.  Not to get personal,

25  but is there anything today, any medications or

**KEYSTONE COURT REPORTING AGENCY, INC.**

5

1    anything that might have happened that you can't

2    understand and answer questions?

3          A.    No, I am fine.

4          Q.    Okay.  So, could you state your name

5    for the record?

6          A.    Maggie McNamara.

7          Q.    Where do you live Ms. McNamara?

8          A.    5681 North Road, Friendsville,

9    Pennsylvania.

10          Q.    How long have you been there?

11          A.    11 years.

12          Q.    What is your educational background?

13          A.    I have an Associate's degree.

14          Q.    From?

15          A.    Broome Community College.

16          Q.    Prior to that?

17          A.    I went to Montrose Area High School.

18          Q.    When did you graduate?

19          A.    I finished in 1998.

20          Q.    Prior to working for Susquehanna

21    County, did you have any work experience?

22          A.    I did.

23          Q.    Where did you work, starting after you

24    graduated from Broome County, if you would?

25          A.    I worked for Lockheed Martin.

**KEYSTONE COURT REPORTING AGENCY, INC.**

6

1    Q.    Where are they located?

2    A.    Owego, New York.

3    Q.    Do you remember the dates off the top

4    of your head?

5    A.    I am sorry, I do not.

6    Q.    Was that right before you started

7    working for Susquehanna County?

8    A.    It was not.

9    Q.    So, you worked for someone between

10   Lockheed Martin and Susquehanna County?

11   A.    Yes, sir.

12   Q.    Who was that?

13   A.    Tioga County.

14   Q.    Is that in New York?

15   A.    Yes.

16   Q.    What did you do for them?

17   A.    Civil law clerk.

18   Q.    Did you work for the sheriff's office?

19   A.    I did.

20   Q.    Okay.  There came a time that you

21   applied for a job at Susquehanna County, correct?

22   A.    I did.

23   Q.    Why did you do that?

24   A.    Tioga County is in Owego, New York, I

25   live in Susquehanna County.  I was looking for a

**KEYSTONE COURT REPORTING AGENCY, INC.**

1  position a little closer to home.

2          Q.     Did you know anyone at Susquehanna

3  County before you applied?

4          A.     I knew a few people, no one very close.

5          Q.     So, you knew of people that worked

6  there?

7          A.     Correct.

8          Q.     So, no friends at that time?

9          A.     No.

10          Q.     When you first applied at Susquehanna

11  County, did anyone interview you?

12          A.     Yes.

13          Q.     Who was that?

14          A.     I was interviewed by Robert Stoud and

15  Richard Ely.

16          Q.     I am sorry, what was the position that

17  you were applying for at that time?

18          A.     Administrative Assistant to the Chief

19  Clerk.

20          Q.     And was Robert Stoud Chief Clerk at

21  that time, if you can recall?

22          A.     I believe he was the Chief Clerk or the

23  acting Chief Clerk.

24          Q.     Do you know when you were interviewed

25  by Mr. Ely what his position was at the time?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

8

1       A.     Human Resources.

2       Q.     You were eventually hired, correct?

3       A.     I was.

4       Q.     Is it safe to say that Mr. Stoud

5 recommended your employment with Susquehanna County?

6 Were you aware of that?

7       A.     Mr. Stoud and Mr. Ely interviewed me

8 and I was called by Mr. Ely sometime later with a job

9 offer.

10      Q.     Okay, that's fair.  So, you never heard

11 of any -- ultimately, you were hired by the

12 Commissioners, correct?

13      A.     Yes, sir.

14      Q.     But you never heard who might have made

15 a recommendation or anything like that?

16      A.     I did not.

17      Q.     Okay.  When you first started working,

18 you were hired as the Administrative Assistant to the

19 Chief Clerk, correct?

20      A.     Correct.

21      Q.     What were your duties?

22      A.     Administrative tasks for the Chief

23 Clerk, phones, processing incoming mail; I mean,

24 anything that I could do to assist the Chief Clerk.

25      Q.     Did you do typing?

**KEYSTONE COURT REPORTING AGENCY, INC.**

9

1          A.      I did typing, typed letters.  I was

2    responsible for the Commissioners' meeting for the

3    agenda and to take the minutes during that meeting

4    and, you know, all other duties as requested or asked

5    by either the Chief Clerk or any of the County

6    Commissioners.

7          Q.      Okay.  Just take a step back.  When you

8    were first hired, who were the County Commissioners,

9    if you recall?

10         A.      Alan Hall, Michael Giangrieco and Mary

11   Ann Warren.

12         Q.      Now, you indicated that you would type

13   letters for the Chief Clerk.  Would he dictate the

14   letters?

15         A.      No.

16         Q.      And, so, how would you go about

17   creating the content?

18         A.      Sometimes I had documents to go off of,

19   other times I was just asked to write a letter to

20   this person, it needs to address topics A, B, and C.

21         Q.      Would Mr. Stoud also type some of his

22   own work up?

23         A.      He typed almost all of his own work.

24         Q.      Okay, that's what I was getting at,

25   thank you.  Now, you said you also were in charge of

10

1   the Commissioners' meeting; what do you mean by that?

2          A.    Collect the backup documentation to go

3   with the motions that are put within the meeting, to

4   type the agenda, send it out for review, make

5   corrections to it.  The day of the meeting, you know,

6   make the copies, set up the room.  I sat in the

7   meeting room and took down the motions, like who made

8   the motion, who seconded it, whether it was carried

9   or not, and made sure that the supporting

10  documentation was there.

11         Q.    Would you attend all the Commissioners'

12  meetings?

13         A.    If I worked that day, I was there.

14         Q.    Was that part of your duty, though?

15  Was it something you did only because you were there

16  or were you required to be there?

17         A.    I was required to attend the meetings.

18         Q.    Okay.  Because you were taking the

19  minutes, correct?

20         A.    Yes, sir.

21         Q.    What was your understanding of Mr.

22  Stoud's duties?

23         A.    He had the job description of Chief

24  Clerk, which, basically, oversaw operations and

25  procedures for the County.

**KEYSTONE COURT REPORTING AGENCY, INC.**

11

1        Q.    Would he attend the Commissioners'

2  meetings, also?

3        A.    He did not.

4        Q.    Why was that, if you know?

5        A.    I don't know.

6        Q.    Okay, that's fine.  I am sorry, I

7  didn't -- if there is something you don't know, I

8  don't know is a fine answer going forward.  I don't

9  want you guessing.

10       Now, there came a time when your job

11  title changed, correct?

12        A.    Correct.

13        Q.    Do you consider that a promotion?

14        A.    It was, yes.

15        Q.    Okay.  And what did you become?

16        A.    The Deputy Chief Clerk.

17        Q.    Okay.  Do you remember when that was,

18  if you can remember?

19        A.    I don't remember the exact date.

20        Q.    Okay.  Do you know why you were

21  promoted to Deputy Chief Clerk?

22        A.    I believe I was promoted due to good

23  work performance and I was doing the tasks of the

24  Deputy Chief Clerk.

25        Q.    So, let's explain that to me.  So,

**KEYSTONE COURT REPORTING AGENCY, INC.**

12

1    there was a position of Deputy Chief Clerk that was

2    unfilled?

3              A.       No, sir.

4              Q.       Okay.

5              A.       I believe at the time Richard Ely was

6    the Director of Human Resources/Deputy Chief Clerk.

7    I believe he was preoccupied with the

8    responsibilities of Human Resources and I was doing

9    the responsibilities of the Deputy Chief Clerk.

10             Q.       What are those responsibilities, as you

11   understood them?

12             A.       Everything that the Chief Clerk is

13   responsible for.  I was also responsible for, in his

14   absence or to do alongside of him, basically, another

15   person in the office for seamless coverage and make

16   sure that the County operated smoothly.

17             Q.       When you were promoted to Deputy Chief

18   Clerk, did your duties change?  It certainly doesn't

19   seem like they could give you any more work, so, did

20   you basically continue to do with a new title?

21             A.       I continued to do my work with a new

22   title, obviously, a new set of responsibilities.  One

23   of the major things that changed was I had the

24   ability to sign as the Chief Clerk in his absence, if

25   needed.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

13

1        Q.      Did this promotion come with an

2   increase in your salary?

3        A.      It did.

4        Q.      Do you remember off the top of your

5   head how much?

6        A.      I don't recall an accurate figure.

7        Q.      Okay.  As Deputy Chief Clerk, who did

8   you report to?

9        A.      Robert Stoud, the Chief Clerk.

10        Q.      You make a claim in your Complaint

11   about an incident involving Mr. Richard Ely.  Could

12   you explain to me what happened in December of 2015

13   between yourself and Mr. Ely?

14        A.      It was at the day of the holiday party

15   at the County that was held during working hours.  At

16   the end of the day, I was sitting at my desk.

17   Richard Ely came out of his office into sort of the

18   center of the room.  I sat with two other women.  Was

19   saying good-bys, they kind of were hugging and saying

20   Merry Christmas.  I chose not to get out of my desk.

21   And he hugged a couple of the office ladies and it

22   ended.

23              A little while later, I was leaving for

24   the day.  I was one of the last ones to leave, me and

25   Richard Ely.  My car was parked directly outside the

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

14

1   back door.  I believe I was taking stuff, you know,

2   had taken stuff out to my car.  My last trip out, he

3   was behind me.

4           I got in my car, went to send a text

5   message, went to get my phone, and I heard a knock on

6   my window.  I looked over, it was Richard Ely.  I

7   rolled my window down about halfway just and he kind

8   of tilted his face sideways, stuck his face in the

9   window and made kissy lips at me and tried to kiss

10  me, followed by you won't get this offer again.  I

11  quickly sat back in my seat, declined.  He pulled

12  back and I rolled my window up and tried to leave the

13  parking lot as soon as I could.

14      Q.    That was the only contact you had with

15  him on that particular day?

16      A.    Correct.

17      Q.    I am just going to hand you what I will

18  tell you is the Complaint filed on your behalf.  Do

19  you recognize it?

20      A.    I do.

21      Q.    Could you turn with me to -- there is

22  no page number, so, I have to go by paragraph

23  number -- Paragraph No. 20.  I am going to read that.

24  "In December of 2015, at her workplace, Plaintiff was

25  approached by Director of Veterans' Affairs, Richard

**KEYSTONE COURT REPORTING AGENCY, INC.**

15

1    Ely, who attempted to kiss and hug her."

2              Did I read that correctly?

3         A.    You did.

4         Q.    Then Paragraph 21, "The Plaintiff moved

5    away from Ely's advances," correct?

6         A.    Correct.

7         Q.    And then Paragraph 22, "On that same

8    day, at the end of the workday, Plaintiff was in her

9    car preparing to go home for the evening," and I will

10   present to you that the rest of the paragraphs

11   involve the incident that you just described.

12             The Paragraph 20 incident, did Mr. Ely

13   approach you while you were still in your office and

14   attempt to hug and kiss you?

15        A.    He came over to my desk and I said, no,

16   I am good, but that was while he was hugging the two

17   other office ladies. (Indicating).

18        Q.    Okay, just for clarification, did he

19   say anything to you while you were still in the

20   office?

21        A.    No, sir.

22        Q.    How did he approach you?

23        A.    He came out of his office.  I believe

24   the other ladies were kind of standing around because

25   it was the end of the day.  One of the women was over

**KEYSTONE COURT REPORTING AGENCY, INC.**

1   there from Voter Registration, I believe, as well.

2   They all said Merry Christmas and kind of hugged.

3   Richard Ely came towards my desk, I said, no, I am

4   good.   (Indicating).

5        Q.     So, you assumed that he was attempting

6   to hug you?

7        A.     He was hugging all of them and then he

8   kind of came towards me and I says, no, I am good,

9   and the ladies laughed. (Indicating).

10       Q.     Now, after this incident in December,

11  did you report it to anyone?

12       A.     I did.

13       Q.     Who was that?

14       A.     Robert Stoud.

15       Q.     When did you report it, if you recall?

16       A.     The day it happened.

17       Q.     How did you report it to him?

18       A.     I called him when I left the parking

19  lot.

20       Q.     You called him on his cell phone?

21       A.     Yes.

22       Q.     That was after working hours, correct?

23       A.     Yes.

24       Q.     What did he tell you?

25       A.     He said to go home, enjoy the holiday,

**KEYSTONE COURT REPORTING AGENCY, INC.**

17

1  that he would take care of it and to not let it ruin

2  my holiday.

3       Q.     Did you talk to him at any time over

4  the holiday about the incident?

5       A.     I did.

6       Q.     When was that?

7       A.     Later that evening, Robert Stoud called

8  to let me know that he had spoken to the County

9  Commissioners to make them aware of what happened and

10 that it was going to be addressed and again told me

11 not to worry and to enjoy my holiday.

12      Q.     After that second call back, did you

13 talk to Mr. Stoud at all during the holiday weekend?

14      A.     I did not.

15      Q.     What happened when you came back in the

16 next working day with regard to this incident?

17      A.     I am sorry, I don't know exactly what

18 day it was taken care of.

19      Q.     Other than these two phone calls on the

20 day of the incident, did you ever talk to Mr. Stoud

21 again about the incident?

22      A.     Yes.

23      Q.     When was that, if you recall?

24      A.     I don't recall the exact date.  I did

25 speak with him, he let me know that the Commissioners

**KEYSTONE COURT REPORTING AGENCY, INC.**

18

1    had met and that the decision was to give him, I

2    believe, a final warning.

3           Q.     To give who?

4           A.     Richard Ely a final warning and that

5    was it.

6           Q.     Did you ever prepare a written

7    statement?

8           A.     I did.

9           Q.     Do you know where that written

10   statement is?

11          A.     I have a copy of it.

12          Q.     Okay.  I ask that you supply it to your

13   attorney.  I don't have it and I don't think it was

14   in any of the County documents that I had.

15                 Who asked you to prepare the written

16   statement?

17          A.     I prepared it myself just as an account

18   of what had happened so that I would have an accurate

19   recollection, if needed.

20          Q.     Okay.  Mr. Stoud never requested you to

21   prepare a written statement?

22          A.     He said it was a good idea that I have

23   one after I had made it.

24          Q.     Made the report?

25          A.     Yes.

**KEYSTONE COURT REPORTING AGENCY, INC.**

19

1      Q.     Did you ever give a copy of the written

2   statement to Mr. Stoud?

3      A.     I believe so.

4             (At this time Defendant's

5             Exhibit No. 1 was marked

6             for identification.)

7   BY MR. HAILSTONE:

8      Q.     I am going to show you what we are

9   going to label as Defendant Exhibit 1.  I will ask

10  you have you seen this document before?

11     A.     I have not.

12     Q.     So, you have never reviewed this

13  document?

14     A.     No, sir.

15     Q.     Okay.  I will submit that it is the

16  final writing warning.  I think it's supposed to be

17  written warning in the re at the top of the page.  It

18  is dated December 30, 2015, and it is a final written

19  warning to Mr. Ely from Mr. Stoud.

20             Is that, basically, your understanding

21  of what this is?

22     A.     Yes, sir.

23     Q.     I will ask that you read with me,

24  please, the second to last paragraph, the first

25  sentence.  I will just read it into the record.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

20

1          "Based upon the above events, please

2   consider this letter to be a final written warning.

3   Regardless of your motivation or intent, your conduct

4   on December 23, 2015, was unprofessional and

5   unacceptable and will not be tolerated at any level

6   in the future."

7          I read that correctly?  Did I read that

8   correctly?

9          A.    Yes, sir.

10         Q.    What was your understanding of what

11  happened to Mr. Ely after the incident?  Did Mr.

12  Stoud tell you what the County's decision was with

13  regard to him?

14         A.    He did.

15         Q.    Okay.  What did he tell you?

16         A.    He was getting a formal warning, final

17  warning and a letter in his file.

18         Q.    Okay.  What was your understanding of

19  the final warning?  What did that mean?

20         A.    That it was the final warning and he

21  wouldn't be given any additional, I guess, chances.

22         Q.    Okay.  Were you satisfied at that time

23  with the County's reaction to the incident?

24         A.    I was not.

25         Q.    What would you have rather them do?

**KEYSTONE COURT REPORTING AGENCY, INC.**

21

1   Why weren't you satisfied with the final written

2   warning?

3           A.      I think that maybe it deserved a little

4   bit more.  I don't know exactly what but something a

5   little bit more.

6           Q.      Did you ever approach Mr. Stoud with

7   your concerns?

8           A.      I did and his response was this is what

9   the County Commissioners felt was an acceptable

10  reprimand.

11          Q.      And sitting here today, is there

12  anything reflected on this that you think should have

13  been done?

14          A.      I am not sure I can answer that.

15          Q.      Okay.  No, that's fine.  Are you

16  familiar with the personnel handbook from Susquehanna

17  County?

18          A.      Yes, sir.

19          Q.      So, do you understand the severity of a

20  final written warning?

21          A.      I do.

22          Q.      Do you know of anything outside of

23  firing the person above or more severe than a final

24  written warning?

25          A.      I don't.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1        Q.     Now, looking at the letter, itself,

2   focusing on the first paragraph -- and, again, I

3   understand you have not seen this before and you

4   didn't get to review it before Mr. Stoud completed it

5   -- there is no mention in the first paragraph that

6   Mr. Ely approached you and attempted to hug and kiss

7   you, isn't that correct?

8        A.     I am sorry, what did you say.

9        Q.     The first paragraph deals with the --

10  the first paragraph doesn't mention Mr. Ely

11  approaching you inside the Susquehanna County

12  building and attempting to hug and kiss you, isn't

13  that correct?

14       A.     That is correct.

15       Q.     But you told Mr. Stoud that that

16  happened?

17       A.     I did.

18       Q.     So, him not including it is a mistake?

19       A.     I believe so.

20       Q.     And the written document that you said

21  you produced and gave to Mr. Stoud, did that include

22  that incident?

23       A.     I don't recall.

24              (At this time Defendant's

25              Exhibit No. 2 was marked

**KEYSTONE COURT REPORTING AGENCY, INC.**

23

1                     for identification.)

2     BY MR. HAILSTONE:

3          Q.     I am going to give you a document that

4     we will refer to as Defendant's Exhibit 2.   And I

5     will submit to you that it is an undated document and

6     there only is a reference to Steve and it is signed

7     by Rich Ely.   Have you seen this before?

8          A.     I have not.

9          Q.     Okay.   Take a second to review it.

10         A.     Okay.

11         Q.     Now that you have reviewed it -- and,

12    again, I understand you have never seen it before and

13    I will represent to you that the Steve at the

14    beginning of the letter is -- well, actually, I have

15    no idea who the Steve is.   Who is the Steve?   Do you

16    know who he would write the letter to?

17         A.     I believe Steve is referred to --

18    Robert Stoud goes by Steve.

19         Q.     Steve, correct.   And it is signed by

20    Richard Ely.   And I will submit to you that Mr. Stoud

21    asked Mr. Ely to prepare a written document of the

22    incident after it was reported to him.

23                Does Mr. Ely's recitation of the facts,

24    do you have any issue with what he writes here?

25         A.     Well, the "Maggie, I was just trying to

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    wish you a Merry Christmas.  That doesn't happen

2    every day" or "I hope you and your family have a

3    wonderful Christmas," I don't believe that those were

4    said.  I recall him saying you don't get this offer

5    every day and then, obviously, I was uncomfortable

6    and he pulled his head back.

7              And as far as my recollection, the

8    conversation pretty much stopped at that point.

9         Q.    Okay.  But you would agree that he does

10   admit that he attempted to kiss you, put his head in

11   the car, correct?

12        A.    Yes, sir.

13        Q.    He doesn't make any mention of

14   attempting to hug and kiss you while still in the

15   building, correct?

16        A.    Correct.

17        Q.    You stated earlier that you did witness

18   him hug Diane, Jeanne, and Sally, correct?

19        A.    I did.

20        Q.    And anyone else at that time, other

21   than those listed, that you can recall?

22        A.    I don't believe so.

23        Q.    You agree with me that Mr. Ely got a

24   final written warning but it was only for the

25   incidents involving him leaning into your car,

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

25

1    correct?

2         A.     Correct.

3         Q.     And you mentioned that there was a

4    document that you prepared and that you believe you

5    gave to Mr. Stoud.  And I am just going to have you

6    look at a document that we will refer to as

7    Defendant's Exhibit 3.

8                   (At this time Defendant's

9                   Exhibit No. 3 was marked

10                  for identification.)

11   BY MR. HAILSTONE:

12        Q.     Have you seen this document before?

13        A.     I believe so.

14        Q.     Okay.  I will submit that it is filed

15   on behalf of you by your attorneys and it's what they

16   refer to as Rule 24 disclosures.  And I would like to

17   bring your attention to Paragraph 2, which lists a

18   series of four documents in the possession, custody,

19   and control of the Plaintiff.

20               You mentioned earlier that there is

21   another document that you prepared regarding the

22   incident that's not in this list, but are there any

23   other documents that you are aware of that have

24   anything to do with your case?

25        A.     Not that I am aware of.

26

1          Q.     Okay.  And you reported the incident in

2    December of 2015; do you recall when Commissioner

3    Arnold took office?

4          A.     The first business day into the next

5    year.

6          Q.     What year?

7          A.     The following year.

8          Q.     2016?

9          A.     So, 2016.

10         Q.     Okay.

11         A.     I don't recall the exact date.

12         Q.     Had you had any contact with her prior

13    to her becoming Commissioner?

14         A.     Briefly.

15         Q.     Could you describe that?

16         A.     I knew who she was from working in the

17    Chief Clerk's office, helping with election night.  I

18    knew she was running as a member of the community.  I

19    didn't have any like real personal contact with her

20    but I knew who she was.  She was a candidate running

21    for County Commissioner in an office that I worked

22    in, so, I tried to make myself aware of who she was.

23         Q.     And do you know whether Mr. Giangrieco

24    resigned or did he lose his position to Commissioner

25    Arnold?

**KEYSTONE COURT REPORTING AGENCY, INC.**

27

1        A.      He chose not to run for an additional

2   term, so, his term ended.   Arnold was the person

3   elected to fill that vacancy.

4        Q.      So, she ran for a vacant spot?

5        A.      Yes, sir.

6        Q.      To your understanding?

7        A.      Yes.

8        Q.      Now, you allege in your Complaint that

9   Commissioner Warren and Commissioner Arnold subjected

10  you to unfair criticism.   What was the criticism that

11  you believed was unfair?

12        A.      It was the majority of the

13  Commissioners' agenda and critiquing the grammar in

14  it, the spelling.   They made comments that it was

15  sloppy work performance.   It was highly critiqued and

16  unjustly looked at.

17        Q.      When you say unjustly looked at, what

18  do you mean by that?

19        A.      The errors that I had were minimum,

20  comparatively speaking to the people who held my

21  position prior.   I was referring back to prior

22  approved Commissioner meeting minutes, pulling

23  verbatim motions that were approved by Commissioner

24  Warren for such motions that were recurring motions

25  that happened yearly, putting them into my current

**KEYSTONE COURT REPORTING AGENCY, INC.**

28

1    agenda, and then they weren't correct.

2         Q.    Other than the historic motions, was

3    there any other issues with your agenda items or

4    items that you presented?

5         A.    Yes.

6         Q.    What was that?

7         A.    She critiqued all of them, down to

8    minutes before the meeting was set to start.

9         Q.    What do you mean by minutes -- you

10   don't mean the written minutes, you mean prior to the

11   meeting?

12        A.    The agenda that goes into the meeting,

13   meetings start at 9:00 o'clock, I was making changes

14   to the agenda that goes out there -- attached to the

15   agenda are the written minutes from the prior meeting

16   to be approved, making changes up until minutes

17   before the meeting.

18        Q.    Now, this criticism from Commissioner

19   Warren, who was Commissioner in 2015, correct?

20        A.    Correct.

21        Q.    How long was this going on?

22        A.    She started critiquing my agendas as

23   soon as Elizabeth Arnold took office.

24        Q.    So, this happened in 2016?

25        A.    Yes, sir.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

29

1          Q.     So, she never criticized anything you

2   did prior to December of 2015?

3          A.     She had constructive criticism or

4   suggestions for wording on prior things that I had

5   done, you know, very professionally given, you know,

6   a word change here and add something there.  It was

7   absolutely not at the level that, unfortunately, it

8   spiraled up to be.

9          Q.     And as far as Commissioner Arnold, what

10  were her unfair criticisms?

11         A.     She felt the need to change an agenda

12  or critique an agenda after Commissioner Warren would

13  critique an agenda.  And then, unfortunately,

14  Commissioner Warren would not like the change that

15  Commissioner Arnold made and would want it changed

16  back.  That left me in the middle making changes to

17  one document that two people want separate changes to

18  up until right before the meeting starts.

19              The agenda is given a few days in

20  advance for changes and corrections with, you know, a

21  guideline to send it back, to, you know, stop making

22  corrections at a certain time so that way it is

23  finalized and ready.

24         Q.     What was that guideline?

25         A.     It changed a few times.  The best of my

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

30

1    ability that I can recall is I believe the agenda is

2    out -- the first draft is out by noon the Friday

3    before the meeting.  So, that gives them the rest of

4    Friday, Saturday, Sunday, Monday to make changes so

5    that on Tuesday, I am just putting the documentation

6    together, numbering it, all the documentation is

7    together, making copies so we are ready to go by

8    Wednesday morning.

9         Q.    Who imposed that Friday agenda

10   deadline?

11        A.    It was an agreement that the Chief

12   Clerk and the Commissioners came up with as what they

13   would like to see as the guideline.

14        Q.    When was that?

15        A.    I don't know exactly the one that went

16   into effect.

17        Q.    But the Chief Clerk had nothing to do

18   with the agenda, correct?

19        A.    That is not correct.  When the agenda

20   came out from myself before Friday at noon, I would

21   send it to the Chief Clerk and all three

22   Commissioners to be reviewed.

23        Q.    Would the Chief Clerk make changes?

24        A.    Absolutely.

25        Q.    Would Commissioner Hall make changes?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

31

1        A.        Yes, sir.

2        Q.        And you admit that some of the issues

3   were errors that you had made with the agendas?

4        A.        On occasion, on a rough draft, I would

5   have a grammatical error or a phrasing that they

6   didn't like.

7        Q.        You also allege in your Complaint that

8   Commissioner Warren was over-critical of you.  What

9   do you mean by that?

10        A.        I just couldn't make her happy.  You

11   know, as many times as I tried or different ways, you

12   know, there was always an issue, always something

13   that needed to be fixed.  She made a comment that she

14   stopped correcting my errors hoping that I would be

15   humiliated in a public meeting.

16        Q.        She made that comment to you?

17        A.        I believe she made that comment -- I

18   heard it from the Chief Clerk.

19        Q.        So, she didn't say that to you?

20        A.        No, I believe she said it in a meeting

21   with the Chief Clerk and some other Commissioners.

22        Q.        Now, Mr. Stoud repeated it to you?

23        A.        Yes, sir.

24        Q.        You also allege that Commissioner

25   Warren publicly humiliated you.  When did that

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

32

1    happen?

2          A.      During the Commissioners' meetings when

3    she would either say that I made an error or this

4    wasn't written right.

5          Q.      Was this every meeting?

6          A.      Just about.

7          Q.      What would she say?

8          A.      I don't exactly know what she said

9    every time, I am sorry.

10         Q.      Who would have been a witness to these

11   incidents?

12         A.      The other Commissioners and any member

13   of the public who came.  And, also, at one point we

14   started taping the Commissioners' meetings and

15   streaming them on YouTube.

16         Q.      But you don't know anyone, other than

17   to name the Commissioners, you don't know anyone else

18   who would have been a witness?

19         A.      Any member of the public who was in

20   that meeting, you know.  And the amount of -- the

21   public individuals vary from meeting to meeting.

22         Q.      Did you ever speak to any of these

23   members of the public regarding this issue?

24         A.      No, sir.

25         Q.      On the subject of witnesses, I am going

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

33

1    to turn your attention back to what is right in front

2    of you, the Rule 26 disclosures.  And I am going to

3    ask you to turn to the very first page and there is a

4    list of witnesses, potential witnesses that was

5    provided by your attorney.  I just want you to look

6    at all of them and I have some questions.

7            A.      Okay.

8            Q.      Do you know of anyone not listed here

9    that has relevant testimony regarding your claim

10   against Susquehanna County?

11           A.      I don't believe so.

12           Q.      Okay.  I am going to ask what

13   testimony, what relevant testimony do you believe

14   Jeanne Conklin has with regard to your claim against

15   Susquehanna County?

16           A.      Jeanne Conklin became the new Director

17   of Human Resources.  I believe she can tell you that

18   Commissioner Warren and/or Commissioner Arnold had

19   both been in her office indicating that Robert Stoud

20   and myself need to be separated, alleged that there

21   was possibly an affair going on between us, and then

22   also came in and said I just want them fired.

23           Q.      Okay.  And did Ms. Conklin tell you

24   this?

25           A.      Ms. Conklin did not tell me this.  She

**KEYSTONE COURT REPORTING AGENCY, INC.**

34

1   did, in fact, go to Commissioner Alan Hall and Robert

2   Stoud.

3        Q.    And, so, you learned this information

4   through whom?

5        A.    Commissioner Hall and Robert Stoud.

6        Q.    What did Commissioner Hall tell you?

7        A.    I don't recall exactly word-for-word

8   what he told me.

9        Q.    But what you just testified to, the

10  incidents when Commissioners Warren and Arnold sought

11  to have you fired, claimed that you were having an

12  affair and that you needed to be broken up, did that

13  information come from Commissioner Hall?

14       A.    Yes, but I believe Robert Stoud told me

15  first.

16       Q.    Okay.  So, the information regarding a

17  claim of an affair, the demand that you and Mr. Stoud

18  be broken up and that you should be fired, you heard

19  that from Mr. Stoud, correct?

20       A.    Yes, sir.

21       Q.    And he indicated that he heard it from

22  Commissioner Hall, correct?

23       A.    He heard it from Jeanne Conklin.

24       Q.    Oh, Mr. Stoud heard this from Ms.

25  Conklin?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1      A.      I believe Ms. Conklin told Mr. Hall and

2  Mr. Stoud.  I don't know whether it was together or

3  separate.

4      Q.      Okay.  When you spoke to Commissioner

5  Hall, you don't recall what he told you regarding

6  these incidents?

7      A.      Commissioner Hall told me that Mary Ann

8  was unhappy and Betsy was unhappy.  They wanted Mr.

9  Stoud and myself split, thought that there was too

10  much of us -- time of us being together.  Didn't

11  understand why we spent so much time together, even

12  though they were assured that it was for County

13  business.  And I believe Elizabeth Arnold made the

14  comment that she needs to split us up to save his

15  marriage, because there either was or there was going

16  to be something that happened between us.

17      Q.      Do you remember when Commissioner Hall

18  told you this?

19      A.      Late May, early June.

20      Q.      Of 2016?

21      A.      Yes, sir.

22      Q.      Do you need to take a break?  I see you

23  looking at your attorney.  That's okay.  There is no

24  question on the table.

25              MR. SZEWCZYK:  If there is no

**KEYSTONE COURT REPORTING AGENCY, INC.**

36

1        question, we can take a break, if you

2        want.

3                MR. HAILSTONE:  Do you want to

4        take a break?

5                MR. SZEWCZYK:  It is up to you.

6                THE WITNESS:  I am okay, I think.

7                MR. HAILSTONE:  Okay.  I just ask

8        that you don't look to your attorney for

9        answers.

10               THE WITNESS:  Oh, sorry.

11               MR. HAILSTONE:  That's okay.

12   BY MR. HAILSTONE:

13       Q.     So, you spoke to Commissioner Hall

14   sometime in May or June of 2016 and he told you these

15   things, correct?

16       A.     Yes.

17       Q.     But prior to that, you had also heard

18   this from Mr. Stoud; is that your testimony?

19       A.     Yes.

20       Q.     As far as Lana Adams, what relevant

21   testimony do you believe that she can provide?  First

22   of all, who is Lana Adams?

23       A.     She was the County Chief Clerk sometime

24   after Steve left being the Chief Clerk.

25       Q.     Steve Stoud, correct?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

37

1      A.      Steve Stoud, sorry.

2      Q.      That's okay.  What relevant evidence

3 does she have or relevant testimony?

4      A.      I don't know.

5      Q.      Okay.  That's fine.  Sometimes

6 attorneys add names just to be on the safe side and

7 that's why I am going through it because I didn't

8 know what she would have.

9             And, finally, Stephen Janoski, who is

10 that?

11      A.      Stephen Janoski works in the County IT

12 department.

13      Q.      What relevant testimony do you believe

14 Mr. Janoski would have regarding any of your claims?

15      A.      I know that after I left the County

16 Commissioners' office and transferred to a different

17 department, some months later the Commissioners put

18 in a request to pull all of my E-mails between myself

19 and Robert Stoud.  I would assume that Stephen

20 Janoski was the person who would have gathered those

21 E-mails.

22      Q.      Okay.  Explain this to me.  What

23 happened?  What E-mails are you referring to?

24      A.      Some time a few months after I was in

25 the District Attorney's office -- and I only heard

**KEYSTONE COURT REPORTING AGENCY, INC.**

38

1    this through Mr. Stoud -- I was informed that

2    Commissioner Warren and Commissioner Arnold asked the

3    IT department to pull all E-mail exchanges between

4    myself and Robert Stoud.   And this was months after I

5    left that position.   I was never informed that they

6    were pulling my E-mails or anything like that, but

7    that would be the reason that I would think that he

8    might be on the list.

9         Q.     Now, your E-mails, are you talking

10   about your County work E-mails?

11        A.     Yes, sir.

12        Q.     But this wasn't any personal E-mails?

13        A.     No, no, just County.   I don't know,

14   like County E-mail address to County E-mail.

15        Q.     You didn't have a problem with them

16   looking at your E-mails, correct?

17        A.     There is nothing non-work-related or

18   nothing bad in those E-mails.

19        Q.     But, also --

20        A.     I just didn't know that it was

21   happening.   No one told me ahead of time -- actually,

22   nobody, except for Steve, letting me know.   I was

23   never informed by the IT department or the

24   Commissioners that they had pulled my E-mails.

25        Q.     Do you think they would have to inform

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    you?

2         A.    I don't know.

3         Q.    Okay.  Other than being a little

4    annoyed, you don't know if they did anything wrong;

5    is that what you are saying?

6         A.    Correct.

7         Q.    Now, you allege in your Complaint that

8    you spoke to Commissioner Hall about the criticisms

9    of Commissioners Warren and Arnold.  Do you recall

10   when you talked to him about that?

11        A.    I don't.  Commissioner Hall and myself

12   had many conversations.

13        Q.    Conversations specifically about

14   Commissioners Warren and Arnold?

15        A.    Yes, sir.

16        Q.    And what was the tone of these

17   conversations?

18        A.    In the beginning, it was just how do we

19   make it stop, how do we fix this to make them happy.

20   By the end of our conversations, Commissioner Hall

21   was talking to me telling me -- agreeing with me that

22   there was a position open in the District Attorney's

23   office and that I should strongly consider applying

24   for it.  Because they were going to fire me and at

25   some time he would not be there to put a ruling in,

40

1   and if the two of them voted, there wasn't anything

2   he could do about it.

3          Q.     So, it was Commissioner Hall that

4   suggested you transfer to the District Attorney's

5   office?

6          A.     He felt that it was a good idea that I

7   apply for it.

8          Q.     And Commissioner Hall indicated that it

9   was his understanding that Commissioner Warren and

10  Commissioner Arnold were going to fire you?

11         A.     Yes.

12         Q.     And why did he tell you that?

13         A.     Prior to that, there was a meeting or

14  multiple meetings between the Commissioners and the

15  Chief Clerk.  I was not an attendee at any of those

16  meetings.  I know that they wanted me fired at that

17  point.

18         Q.     Do you know what time frame this was?

19         A.     It had to have been early June.

20         Q.     Of 2016?

21         A.     2016.  I am sorry, I keep leaving the

22  year out.

23         Q.     That's okay.

24         A.     It goes back and forth with just, it

25  seems, meeting after meeting of them talking.  Now, I

41

1    am not invited to any of these meetings, I only hear

2    the secondhand either from Commissioner Hall or Steve

3    Stoud.   And at one point, because Steve would not do

4    what they requested, the response was, well, if you

5    are not going to do this, we are going to fire her.

6    I am not in the room and I am not a party to that

7    action.

8         Q.    And Steve told you that?

9         A.    And Steve told me that.

10        Q.    Do you know what they wanted him to do?

11        A.    I don't know a hundred percent, I am

12    sorry.

13        Q.    Did it have anything to do with his

14    work, if you recall?

15        A.    I don't know exactly what.   I just know

16    that after the meeting, the tone was if he didn't do,

17    A, then it was to fire me.

18        Q.    Did he do whatever it was he was being

19    demanded?

20        A.    I don't know.

21        Q.    So, it could have been he was supposed

22    to help you with your work, but you have no idea?

23        A.    I don't exactly know.   I know at the

24    end, I had to have a counseling session with him

25    about possible, I think, laughter in the office.

**KEYSTONE COURT REPORTING AGENCY, INC.**

42

1        Q.      Okay.  You also allege that

2   Commissioners Warren and Arnold complained about your

3   interaction with other employees.  How did you learn

4   this?

5        A.      I learned that through Chief Clerk

6   Stoud after one of the meetings that he attended that

7   I was not a party to and then when I responded back

8   to him who are the employees, he said he did not

9   know, because when he asked, I believe Commissioner

10  Arnold said I don't have to give you the names.

11       Q.      Okay.  So, in sitting here today, you

12  have no idea what that allegation was?

13       A.      For those employees, I do not.

14       Q.      And no one ever approached you to say

15  there was an issue with your interaction?

16       A.      One employee's name surfaced.  Her name

17  was Mary Noldy.  And when Robert Stoud, as my

18  supervisor, reached out to Mary, she said that that

19  was a non-issue and that she never had an issue.

20       Q.      Did you ever talk to Ms. Noldy about

21  this issue?

22       A.      No.

23       Q.      Is it your understanding that Mr. Stoud

24  talked to her about this issue?

25       A.      Yes, sir.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

43

1        Q.      You have alleged that you were assigned

2  to work with Mr. Ely.  Could you explain that to me?

3        A.      What part?

4        Q.      After the December 2015 incident, you

5  allege that you were assigned to work with Mr. Ely?

6        A.      How?

7        Q.      What were you doing?  When was this?

8        A.      I am sorry, I don't remember the exact

9  date.

10        Q.      Okay.

11        A.      At some point Richard is no longer the

12  Director of Human Resources, he becomes the Director

13  of Veterans' Affairs.  Either right before that

14  happens or right after that happens, the woman who

15  worked in the Veterans' Affairs office quits.

16               The next day, there is no one in

17  Veterans' Affairs.  The Commissioners assigned me

18  over to Veterans' Affairs to just assess the

19  situation, you know, trying to make phone calls, call

20  the state, figure out where claims are.  I am not

21  familiar with Veterans' Affairs but, you know, trying

22  to see what I can do.

23               At some point -- Rich is now the

24  Director of Veterans' Affairs.  So, now, I am trying

25  to learn the office.  I am trying to teach him the

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

44

1    office or give him whatever information I have

2    managed to secure and pass it on to him.  And that

3    happens for a couple of weeks, you know.

4         Q.    So, you started working at Veterans'

5    Affairs before Mr. Ely became the director?

6         A.    I believe he was the director, but he

7    was still in his Director of Human Resources office

8    across the street.  I believe he was trying to help

9    do stuff over there and sort of transition.  But we

10   are going into an office that the prior director had

11   been let go and then within a very short amount of

12   time, the other woman had -- was there one day and

13   quit and did not come in the next day.  So, just

14   trying to figure out with work in progress where

15   everybody is.

16        Q.    Was that Ms. Minarski who left, if you

17   can recall?  If you can't, that's okay.  You said the

18   Commissioners assigned you to Veterans' Affairs,

19   correct?

20        A.    Um-hum, yes.

21        Q.    You still had your duties of Deputy

22   Chief Clerk?

23        A.    Yes, sir.

24        Q.    Now, did Commissioner Hall ever ask you

25   if this was going to be a problem?

**KEYSTONE COURT REPORTING AGENCY, INC.**

45

1        A.      I don't recall.

2        Q.      And Commissioner Warren also asked you

3    whether this was going to be a problem?

4        A.      Commissioner Warren just sent me over.

5        Q.      What do you mean by that?

6        A.      She came in the next day, the office

7    was empty, you know, and said can you go over and see

8    what is going on.

9        Q.      So, she asked you to go?

10       A.      It was a directive.

11       Q.      Do you recall what she said?

12       A.      Not exactly.

13       Q.      So, when you said she said can you go,

14   that was a mistake on your part?

15       A.      Yes.

16       Q.      And she never asked you if this was

17   going to be a problem?

18       A.      No, sir.

19       Q.      And as regard to Commissioner Hall, he

20   never asked you whether this was going to be a

21   problem, either?

22       A.      Once he was aware of it, I don't

23   believe that he was very happy with it.  But I was

24   trying to do the very best I could to help the

25   veterans of our community by returning phone calls

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

46

1    and trying to secure things for them.  Because while

2    no one is in the office, claims aren't being filed

3    and they are not getting monetary checks coming to

4    them.  Funerals aren't paid for.

5          Q.    Why was Commissioner Hall not happy

6    about this?

7          A.    Because it directly put me back working

8    in a very small office with Richard Ely, who I had

9    already had an incident with very shortly beforehand

10   and I was still uncomfortable with him.

11         Q.    Did you tell the Commissioners you were

12   uncomfortable?

13         A.    I reported it to my supervisor that I

14   was uncomfortable.

15         Q.    Who was that?

16         A.    Robert Stoud.

17         Q.    Do you know if he ever reported it to

18   the Commissioners?

19         A.    He did.

20         Q.    Then what happened?

21         A.    I was told I still needed to stay over

22   there.

23         Q.    And how long were you in the same

24   office with Richard Ely?

25         A.    Only a couple of weeks.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

47

1       Q.    Well, you mentioned there was a

2    transition period that he wasn't actually in the

3    office, so, how long were you in the Veterans'

4    Affairs office the entire time?

5       A.    I never spent an entire day there

6    because I still had a desk across the street and I

7    still had other responsibilities.  Some days I would

8    spend a large majority of my day over in the

9    Veterans' Affairs office physically being there,

10    other times, I believe until we had it figured out, I

11    think we had the phones transferred to roll over to

12    my desk across the street so that I could try to

13    field phone calls from over there.  Because I still

14    had responsibilities on the other side of the street

15    to attend to.  Rich was doing much of the same thing,

16    you know, I would either talk to him while I was on

17    the courthouse side or while we were on the County

18    office side, which the offices are across the street

19    from each other.

20       Q.    Now, you allege that you reported your

21    concerns to the Commissioners in the Complaint, but

22    here today, you are telling me that, actually, you

23    reported it to Mr. Stoud, correct?

24       A.    I reported it to Mr. Stoud.

25    Commissioner Hall would come and speak to me, I would

48

```
1    convey the same concerns to him.  My initial report

2    has always been to my direct supervisor.  You know,

3    if a Commissioner came to ask me, specifically,

4    Commissioner Hall, I would tell him the same thing.

5          Q.     And did you ever report it to any of

6    the other Commissioners?

7          A.     That I was uncomfortable with Mr. Ely?

8          Q.     Correct.

9          A.     I did not, I don't believe.

10         Q.     You also allege that Mr. Ely was

11   yelling and getting angry at you, correct?

12         A.     On occasion, he did have a temper and

13   would yell and get angry.

14         Q.     Did you report that to Mr. Stoud?

15         A.     Yes.

16         Q.     And what happened?

17         A.     Nothing.

18         Q.     Now, in the Complaint, which I am going

19   to bring you back to, I would ask you to look at

20   Paragraph 37.  It states, "In 2015, the harassment

21   and criticism from the Defendant Commissioners

22   continued."  I am assuming that's supposed to be May

23   of 2016?

24         A.     Yes, sir.

25         Q.     I wanted to make sure we were -- that
```

**KEYSTONE COURT REPORTING AGENCY, INC.**

49

1    was correct.  What do you mean by in May of 2015 it

2    continued?  Had something happened prior to May?

3         A.     Could we take a break for a second?

4         Q.     Sure.  But I am only going to caution

5    you, I understand you didn't write this and I really

6    just am a little confused about why the May is there

7    and if there is something that happened.  That's

8    really what I am looking for, if you could answer

9    that before you break.  It might just be the way it

10   was prepared and that's fine, too.

11              MR. SZEWCZYK:  Could she read

12         maybe the preceding paragraphs and maybe

13         that will put it in perspective of what

14         you are asking, because the context

15         would help.

16   BY MR. HAILSTONE:

17        Q.     Yes.

18        A.     I don't know exactly when everything

19   happens.  I just know that I make the complaint about

20   Richard Ely and then afterwards, everything just goes

21   to such a heightened level of criticism and then I

22   have to go to Veterans' Affairs, you know, and I am

23   trying to help there and come back.  In the meantime,

24   I am still trying to do the agenda and there is

25   criticism and complaint.  And I am pulling old

**KEYSTONE COURT REPORTING AGENCY, INC.**

50

1    motions and verbatim of what has been done prior that

2    has been A-okay and now all of a sudden it is a

3    hundred percent wrong and the same motion that you

4    have approved for the last five years.  And I am

5    trying to figure out why all of a sudden it is wrong,

6    how I can fix this.

7              You know, there is -- they are making

8    complaints that I am being unprofessional to County

9    employees or department heads.  I have never had a

10   complaint of being unprofessional or not courteous.

11   I have always gone out of my way to help whoever is

12   needed.

13             By May of 2016, it just keeps

14   happening, and I think that's why it is written in

15   there.  And at this point I am talking to Robert

16   Stoud, I am talking to Commissioner Hall just about

17   every single day of what is happening next.  The

18   instances are starting to kind of just go day-to-day

19   and it's just been getting really hard and just very

20   stressful.

21             At some point here, I guess that's

22   where it is alleged that I -- you know, I am going to

23   ruin his marriage, that I am either having an affair

24   or I am going to have an affair.

25        Q.    With Mr. Stoud?

**KEYSTONE COURT REPORTING AGENCY, INC.**

51

1          A.      With Mr. Stoud, who has been nothing

2    but a fantastic mentor to me, someone who is a

3    decorated State Trooper, who was willing to share all

4    of the knowledge that he had as far as management

5    skills, how to talk to employees, and was passing

6    that information on to me so that I could succeed

7    within the County.  So, it just keeps happening.

8                  And then there is meetings that I am

9    not a party to that when the meetings are done, they

10   are asking that I be fired or they have gone in to

11   see the current director of H. R. asking for me to be

12   terminated.  I don't really have a way to defend

13   myself.  And that's pretty much what is happening in

14   May of 2016 right into June.

15               MR. SZEWCZYK:  Do you still want

16          to take that break or are you good?

17               THE WITNESS:  Just a break for a

18          minute.

19               (At this time there was a brief

20                recess taken.)

21               MR. HAILSTONE:  Back on the

22          record.

23   BY MR. HAILSTONE:

24          Q.      Ms. McNamara, you allege in your

25   Complaint that Mr. Stoud spoke to Commissioner Hall

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    and County Solicitor Giangrieco about the complaints

2    you had made about Commissioners Warren and Arnold;

3    how do you know that he spoke to them?

4           A.    He told me he spoke to them.

5           Q.    Okay.  Did he tell you -- we have

6    talked extensively about Commissioner Hall but did he

7    tell you anything that County Solicitor Giangrieco

8    told him in response?

9           A.    Solicitor Giangrieco was of the opinion

10   that Commissioner Warren and Commissioner Arnold were

11   singling me out and that the treatment needed to

12   stop.  I believe he met with the Commissioners and

13   told them to make it stop, knock it off, what are you

14   doing.  It did not help.

15          Q.    Let's take a step back.  Two questions

16   from your response.

17                Did you talk to former Solicitor

18   Giangrieco at any time regarding these incidents?

19          A.    I don't believe we had a conversation

20   directed on just these.

21          Q.    Okay.

22          A.    I mean, I worked with him as the

23   Commissioner and then I worked closely with him as

24   our County Solicitor as, you know, day-to-day

25   business operations.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

53

1          Q.      So, when you say that Solicitor

2    Giangrieco had an opinion, how did you surmise that?

3    How did you get that information?

4          A.      I was told from Robert Stoud that they

5    had a meeting, they met.  The Solicitor was going to,

6    you know, meet with the Commissioners, you know, tell

7    them to stop.

8          Q.      Do you know if that meeting ever

9    happened?

10         A.      I don't believe it was a formal

11   meeting.  The Solicitor sort of stops in every

12   morning to see if there is anything brewing at the

13   County, is anything is new, and I think during those

14   times is when he would come through and had

15   conversations of stop.  I don't recall that it was an

16   actual scheduled meeting.

17         Q.      And you only heard about it secondhand

18   through Mr. Stoud?

19         A.      Through Mr. Stoud or because I was in

20   the office.  You know, on occasions, the

21   Commissioners were in the Commissioners' meeting room

22   with the Solicitor and the door closed.

23         Q.      But you didn't know what they were

24   discussing?

25         A.      I don't know always know what they were

**KEYSTONE COURT REPORTING AGENCY, INC.**

54

1  discussing, no.

2          Q.      Do you know if Mr. Stoud has some kind

3  of a family relationship with Mr. Giangrieco?

4          A.      Not that I am aware of.

5          Q.      Okay.

6          A.      Like are they related?

7          Q.      Correct, through marriage or anything

8  like that.  You don't know?

9          A.      I don't know, I am sorry.

10          MR. SZEWCZYK:  If you don't know,

11      you don't know.

12  BY MR. HAILSTONE:

13          Q.      I am trying to confirm something,

14  that's all.

15              You also indicate after Mr. Stoud spoke

16  to Commissioner Hall and then the County Solicitor

17  that no remedial action was taken.  What do you mean

18  by that?

19          A.      Just that they didn't stop.

20          Q.      Did you seek some kind of remedial

21  action?

22          A.      I don't understand the question, I am

23  sorry.

24          Q.      On Paragraph 39 of your Complaint --

25  and, again, you didn't write it, I understand it was

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

1    written by your counsel -- it just says no remedial

2    action was taken.   I was just curious as to whether

3    you had requested something specific that didn't

4    happen.

5         A.    I mean, I am sure that I requested to

6    not have my agendas torn apart or what can I do

7    better or what is the issue.   I am sure that I

8    asked -- you know, the Commissioners' meeting is held

9    twice a month.   Starting the week beforehand is when

10   the agenda starts.   So, it is a good majority of the

11   month is just prep, do the meeting, clean up from the

12   meeting, and there is always a critique.

13              And then there is things going on in

14   the meantime in trying to get information and, you

15   know, complaints of why don't I know this

16   information.   You know, some of it is beyond my

17   control.

18              (At this time Defendant's

19               Exhibit No. 4 was marked

20               for identification.)

21   BY MR. HAILSTONE:

22        Q.    I am going to give you Defendant's

23   Exhibit 4.   Have you seen this document before?

24        A.    I have seen it before.

25        Q.    You prepared this document, correct?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

56

1      A.      I did.

2      Q.      It is your resignation letter, correct?

3      A.      Yes.

4      Q.      It is dated June 21st, 2016, correct?

5      A.      It is.

6      Q.      And who did you supply this to?

7      A.      I don't remember exactly who I gave it

8  to.  Human Resources would have needed it.

9      Q.      And it states that you intend to resign

10 from your position as Deputy Chief Clerk and upon

11 approval, transfer to the District Attorney's office

12 as the Victim Witness Coordinator, isn't that

13 correct?

14     A.      Correct.

15     Q.      You didn't mention in your letter any

16 of the issues you were having with the Commissioners

17 Arnold and Warren, correct?

18     A.      I did not.

19     Q.      On June 21st and thereafter of 2016,

20 Mr. Stoud was also in the District Attorney's office,

21 correct?

22     A.      I don't know exactly when he was in the

23 District Attorney's office.  I believe that he is a

24 member of the task force, which is overseen by the

25 District Attorney, but I think he was a member of

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

57

1    that since maybe he has been a County employee, you

2    know, so.

3          Q.      Did there come a time that he became

4    Chief Detective of Susquehanna County?

5          A.      There was, yes.

6          Q.      Do you recall when that was?

7          A.      I don't recall the exact date.  It was

8    quite a few months after I was in the District

9    Attorney's office.

10         Q.      But Mr. Stoud resigned before you did

11   from the position of Chief Clerk, correct?

12         A.      I don't believe so.  I am sorry.

13              MR. SZEWCZYK:  You can only

14           testify to what you recall.

15              (At this time Defendant's

16               Exhibit No. 5 was marked

17               for identification.)

18   BY MR. HAILSTONE:

19         Q.      Just for your recollection, I am going

20   to give you what we will mark as Defendant's

21   Exhibit 5.  Have you seen this document before?

22         A.      I have not.

23         Q.      Okay.  I will represent to you that it

24   is Mr. Stoud's resignation letter dated June 14,

25   2016.  Were you aware that he had resigned before you

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

58

1   did?

2       A.    No.  I believe he turned this in, but

3   it does say as soon as practical; so, I believe they

4   would have had to have put an ad out, advertised and

5   hired somebody before he could leave; where I was

6   able to just transfer and go.  So, I am sorry, I

7   never seen this before.

8       Q.    He never told you that he resigned?

9       A.    We had some conversations about him

10  possibly just going back over to be the Director of

11  Public Safety.  I guess I didn't know the exact

12  timeline.

13      Q.    Okay.  You mention in your Complaint

14  that you suffered a loss of pay as a result of the

15  transfer.  How much was that?

16      A.    I don't have an exact dollar figure

17  with me.

18      Q.    Do you recall how much you were making

19  as Deputy Chief Clerk?

20      A.    I don't, I am sorry.  It has been

21  awhile.

22      Q.    You don't recall how much you made when

23  you became the Victim Witness Coordinator?

24      A.    I went from a salaried position with a

25  set salary and a nonunion position to an hourly

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

59

1    position that became a union position; so, I don't

2    have the documentation with me to show what the

3    breakdown was between leaving a salaried position and

4    going to an hourly union versus nonunion.

5         Q.    At least for today, do you recall

6    whether it was a significant loss of income?

7         A.    Any loss of income to me would have

8    been significant.

9         Q.    That's fine.  Were you able to still

10   pay your bills?

11        A.    We did.

12        Q.    It was significant but you don't recall

13   exactly how severe it was?

14        A.    I am sorry, I don't.

15        Q.    When you became an hourly worker, were

16   you eligible for overtime?

17        A.    If the position required it, I was.

18        Q.    Did you ever have overtime?

19        A.    I did.

20        Q.    You also mentioned that you went from a

21   nonunion to a union position, correct?

22        A.    Correct.

23        Q.    After you became the Witness Victim

24   Coordinator, did you have any more contact with the

25   Commissioners?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

60

1          A.     I did.

2          Q.     In what capacity?

3          A.     They are still the head elected

4    officials to the courthouse.  I worked for a

5    different elected official, the District Attorney,

6    Robert Klein.  You know, they still work together.

7               After I took my position, Commissioners

8    Warren and Arnold went to District Attorney Robert

9    Klein and asked him not to hire me or to get rid of

10   me, and I believe he asked them to leave his office.

11         Q.     Okay.  Who told you this?

12         A.     Robert Klein told me this after the

13   fact and I also heard it from Robert Stoud, as well.

14         Q.     What exactly did Mr. Klein tell you, if

15   you can recall?

16         A.     DA Klein just kept reassuring me not to

17   worry about it, that I was a great employee and that

18   I was working for him and that they had come up to

19   tell him either to get rid of me or to not hire me

20   and he said that he wouldn't have it in his office

21   and asked them to leave.

22         Q.     Now, this was after they approved your

23   transfer?

24         A.     Yes.

25         Q.     And Mr. Stoud also told you this?

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

61

1      A.      Yes.

2      Q.      How did he know about this?

3      A.      Through DA Klein.

4              (At this time Defendant's

5               Exhibit No. 6 was marked

6               for identification.)

7   BY MR. HAILSTONE:

8      Q.      I am going to give you what we will

9   refer to as Defendant's Exhibit 6.  Review this

10  document, if you would.

11     A.      I have seen this.

12     Q.      And what is it, in your understanding?

13     A.      It was a counseling session that I had

14  with the Deputy -- or the Chief Clerk, as I was the

15  Deputy Chief Clerk.

16     Q.      So, that would be Robert Stoud,

17  correct?

18     A.      Yes.

19     Q.      What were the circumstances of that

20  counseling session?

21     A.      I am sorry?

22     Q.      What were the circumstances?  What led

23  to this counseling session?  What were you told?

24     A.      This counseling session with me

25  resulted in multiple conversations between the Chief

62

1    Clerk and the three Commissioners.  And I believe the

2    Chief County Solicitor was in on some of those

3    meetings, as well.  I was counselled by Robert Stoud.

4         Q.    We are to assume it happened sometime

5    around June 10, 2016?

6         A.    Yes.

7         Q.    And you signed this document, correct?

8         A.    I did.

9         Q.    From my own curiosity -- did you

10   prepare this document?

11        A.    I did not.

12        Q.    Then maybe you don't know why Mr. Stoud

13   decided to put (sic) after each of the headings?

14        A.    He put (sic) to say that it was a

15   direct quote from the back page, I am assuming.

16        Q.    Oh, okay.  There is numbered paragraphs

17   starting with Lack of Communication and ending

18   Paragraph 5, Deputy Chief Clerk Has No Respect For

19   Department Heads.

20              Were these the subjects of conversation

21   that you had with Mr. Stoud?

22        A.    We did go over this document, yes.

23        Q.    And you gave him your reaction to this,

24   to those issues?

25        A.    Yes.  I believe this counseling session

**KEYSTONE COURT REPORTING AGENCY, INC.**

63

1   was held with me as a directive that if he did not

2   have a counseling session with me, they were, A,

3   either going to fire him or, B, going to fire me.

4          Q.     And when you say "they", that's the

5   County Commissioners?

6          A.     The County Commissioners.

7                 (At this time Defendant's

8                 Exhibit No. 7 was marked

9                 for identification.)

10  BY MR. HAILSTONE:

11         Q.     I show you what we are going to refer

12  to as Defendant's Exhibit 7, if you could review that

13  for a moment.

14         A.     Okay.

15         Q.     I will ask you have you ever seen this

16  document before?

17         A.     I have.

18         Q.     In fact, on the last paragraph, it

19  states that you reviewed it and verified the

20  accuracy, correct?

21         A.     Yes, sir.

22         Q.     Now, it says that on June 14, 2016, you

23  verified it?  Just directing your attention to the

24  final paragraph, do you see where I am?

25         A.     I do.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

64

Q.     But the letter is actually dated
June 13th, correct?

A.     Yes, sir.

Q.     Do you know why there is that
discrepancy?  Is it just a mistake?

A.     I don't know why.

Q.     But you have no reason to doubt the
fact that on June 14, 2016, you checked the content
of the letter?

A.     I don't have any doubt.

Q.     And you chose not to provide a letter,
according to Mr. Stoud, correct?

A.     That is correct.

Q.     In Paragraph 2 of the June 13th letter
it states that -- and I am starting on the second
paragraph -- "She stated," referring to you, "that
she felt that the issue seemed to go unnoticed and
unaddressed, except for her discussion with myself,"
referring to the Rich Ely incident, correct?

A.     Correct.

Q.     It is your understanding, though, that
Mr. Stoud was tasked with having to discipline Mr.
Ely, correct?

A.     Either Mr. Stoud disciplined him or the
County Commissioners, themselves.  I believe Mr. Ely

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

65

1      is a direct report to the County Commissioners.

2              Q.      Did you ever express your complaints

3      regarding Mr. Ely's treatment to Mr. Stoud?

4              A.      I am sorry, what did you say?

5              Q.      This indicates that you believe that

6      the incident went unnoticed and unaddressed.  You

7      testified earlier that Mr. Stoud gave him a final

8      written warning, correct?

9              A.      He did.

10             Q.      Did you ever tell Mr. Stoud that you

11     thought that wasn't enough?

12             A.      I believe I voiced that it wasn't

13     enough.  I don't know that I came out and said that.

14     I was just disappointed.

15             Q.      And we talked earlier -- and I am not

16     going to get back into it about what you think should

17     have been done, but did Mr. Stoud ever tell you what

18     he thought should have been done?

19             A.      No, sir.

20             Q.      Now, you are no longer with Susquehanna

21     County, correct?

22             A.      No, sir, I am not.

23             Q.      When did you leave?

24             A.      March 28th of 2018 was my last day with

25     Susquehanna County.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

66

1    Q.    Where do you currently work?

2    A.    Security Mutual Life.

3    Q.    What do you do there?

4    A.    I am an Executive Administrator.

5    Q.    What are your duties -- is it an

6    insurance company?

7    A.    It is.  They do life insurance.

8    Q.    Why did you leave the County?

9    A.    With the passing of District Attorney

10   Klein, the office entered into some litigation issues

11   over who was going to be the District Attorney; so,

12   being unsure of the position, I put my resume

13   together and branched out for other opportunities.

14   And this one came along, it was a good opportunity

15   for myself and my family, so, I took that

16   opportunity.

17   Q.    Now, did you take any position outside

18   of the County before Security Mutual Life Insurance?

19   A.    Yes.

20   Q.    What was that?

21   A.    I originally left Susquehanna County to

22   go to Family Design Resource.

23   Q.    What is that?

24   A.    I don't know how to explain it.  They

25   take care of dependency hearings for Children &

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

67

1    Youth.

2        Q.     When did you leave Susquehanna County

3   to work for them?

4        A.     I left Susquehanna County on

5   March 28th.

6        Q.     Okay.

7        A.     I don't know in my resignation, I am

8   not sure that I said where I was going. That was

9   before Easter. The following -- sometime later that

10   week I was supposed to start my new position. In the

11   meantime, Security Mutual called to offer me a better

12   position. So, I reached out to Family Design and

13   told them, unfortunately, that I would not be joining

14   their team, that I was interested in another

15   position. So, then I went to Security Mutual.

16        Q.     But you left the County because of the

17   issues with the DA. The first job -- you never even

18   started working at Family Design, is the bottom line?

19        A.     No, I didn't start there at all.

20        Q.     I understand. What is your current

21   salary?

22        A.     42,000 a year, I think.

23        Q.     What was it your last year with the

24   County?

25        A.     I might have said 32, 31. Again, I am

**KEYSTONE COURT REPORTING AGENCY, INC.**

68

1    not a hundred percent sure on these facts.

2         Q.     Do you still have any contact with Mr.

3    Stoud?

4         A.     Yes, I do.

5         Q.     What is that?

6         A.     He is still a mentor, still a friend.

7         Q.     Do you still discuss your lawsuit

8    against the County with him?

9         A.     Not really.

10        Q.     Do you have any contact with any of the

11   County Commissioners since you left in March?

12        A.     I have sent a text to Commissioner

13   Hall, his birthday was recently, I said happy

14   birthday; he responded back, thank you.

15        Q.     What about Attorney Giangrieco?

16        A.     I haven't seen him.

17        Q.     Any other County employees that you

18   still have contact with?

19        A.     Not really.  You know, I am Facebook

20   friends with a few of them, but there is no in-depth

21   conversations.

22        Q.     Is there anyone that you have discussed

23   your lawsuit against the County with that you can

24   recall?

25        A.     I don't believe so.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

69

1      Q.     Are you married?

2      A.     I am.

3      Q.     How long?

4      A.     I was married 13 years this past May.

5      Q.     Any children?

6      A.     I have two.

7      Q.     Ages?

8      A.     19 and 12.

9      Q.     Other than the people we have talked

10 about already and County employees, have you

11 discussed this, your case against Susquehanna County,

12 other than your attorney, with anyone else?

13      A.     Yes, sir.

14      Q.     Who is that?

15      A.     No one in particular, but this was

16 picked up by the -- what is the newspaper called, The

17 Independent and it was on the front page. So,

18 obviously, my parents said are you okay. I had some

19 community members that knew me reach out and say,

20 like, are you okay, you know. But when it hit the

21 paper to when it actually transpired to was quite a

22 gap. But, I mean, there was no in-depth details,

23 just I am okay, that's it.

24      Q.     Okay.

25      A.     But there is no long, drawn out

**KEYSTONE COURT REPORTING AGENCY, INC.**

70

1    conversations about it.

2              MR. HAILSTONE:   That's fine.

3         That's all I have.

4              MR. SZEWCZYK:   I have nothing.

5

6              (At this time the deposition

7               in the above-captioned matter

8               was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

## C E R T I F I C A T E

     I, Teresa Crossin, a Notary Public in and for Luzerne County, Pennsylvania, do hereby certify that the deposition was reported in machine shorthand by me, that the said witness was duly sworn/affirmed by me, that the transcript was prepared by me or under my supervision and constitutes a complete and accurate record of same.

     I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.


TERESA CROSSIN
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507

# Susquehanna County Commissioners



Alan M. Hall, *Chairman*
Michael J. Giangrieco, *Vice Chairman*
MaryAnn Warren, *Commissioner*

570-278-4600
Fax 570-278-9268

R.S. Stoud, *Acting Chief Clerk*
Thomas F. Meagher III, *Solicitor*

SUSQUEHANNA COUNTY COURTHOUSE
MONTROSE, PENNSYLVANIA

PO Box 218 - Courthouse – Montrose, Pennsylvania 18801

December 30, 2015

Richard Ely, Director
County Office of Veterans' Affairs

Re:     **Final Writing Warning**

Dear Mr. Ely:

On behalf of the Commissioners, I am writing to follow up with you on the events which occurred on December 23, 2015. After reviewing your statement, as well as the statements of other individuals who witnessed the events, it appears that the facts are not in dispute. On December 23, toward the end of the workday, you were in the County's Offices wishing several employees a Merry Christmas. At this time, you hugged several employees, apparently after they wished you a Merry Christmas and reached out for a hug. At this time, Maggie McNamara was present and observed the above events. She made no effort to be involved, nor did she wish you a happy holiday or attempt to initiate any physical contact with you.

You then exited the area and spoke with several other employees who you wished happy holidays. Thereafter, you exited the building and observed Ms. McNamara sitting in her vehicle preparing to leave. Without any prompting or direction from Ms. McNamara, you approached her vehicle and motioned for her to roll down her window. When she did so, you leaned and attempted to kiss her on the cheek during which you indicated that you were attempting to wish her a Merry Christmas. Ms. McNamara withdrew from you and, by your own admission, immediately appeared very uncomfortable about your actions. You apologized to her then, and subsequently apologized a second time on Monday, December 28, 2015.

I spoke with you on December 28, 2015, regarding the above events. Although you provided the above information to me during that meeting, you also seemed to question the seriousness of the issues as well. For instance, you questioned whether anyone had complained about the incident, and, if so, who and whether or not anyone had indicated that they felt uncomfortable by your actions. At the end of the conversation, I directed you to write a statement describing the events on December 23 and include any other information that you wished to provide.

**DEFENDANT'S EXHIBIT**
1
6-6-18 TAC

On December 29, 2015, you submitted a written statement in which you detailed the events which occurred on December 23. In contrast to our meeting the previous day, you accepted full responsibility for your actions and indicated that, although they were "well intentioned" in your mind, that they nonetheless constituted a lapse in judgment on your part. You further indicated that you would never again place yourself in a position where your conduct or motivation could be questioned.

Based upon the above events, please consider this letter to be a Final Written Warning. Regardless of your motivation or intentions, your conduct on December 23, 2015, was unprofessional and unacceptable and will not be tolerated at any level in the future. You are currently a Department Head, but you were also the County's Human Resource Director before that. As a seasoned human resources professional, you obviously are aware that workplace touching and statements are not viewed through the actor's eyes or with regard to their intentions, but rather, through the eyes of the individual to whom the actions are being directed. Thus, regardless of your stated good intentions of sharing holiday greetings, it should have been extremely obvious to you that attempting to kiss a co-worker *for any reason* was problematic and in violation of the County's policy regarding workplace harassment.

To the extent that this or any similar conduct occurs in the future, or the County receives additional substantive information about this incident, the County will terminate your employment immediately. You should take full advantage of this additional opportunity to ensure that your conduct is beyond question in the future and you handle yourself in a professional manner moving forward.

Sincerely,

R.S. Stoud
Acting Chief Clerk

I hereby acknowledge receipt and a copy of this correspondence.

Date: 12 - 30 - 2015

Steve:

As instructed here is my summary of the events which took place that resulted in the complaint filed by Maggie McNamara.

On Dec. 23rd the following took place at approximately 4:30 P.M. The members of the Commissioner's Office staff were preparing to leave work for the Christmas break. Diane Quattracchi was in the office area and was wishing people a Merry Christmas. She came up to me and gave me a hug and a kiss on the cheek and wished me a Merry Christmas. I thanked her and wished her the same. Jeanne Conklin observed this and said to me, can I wish you a Merry Christmas? I said of course, or something like that and she reached out for a hug. We hugged and wished one another a Merry Christmas. If I recall Sally Hawley who was also preparing to leave also gave me a hug and wished me a Merry Christmas. Sally had given me a hug and I believe a kiss on the cheek earlier that morning when I gave her a Christmas card with a lottery ticket as I had done for all the other members of the Commissioner's Office staff. Each of these Christmas well wishes took place in front of Maggie who was seated at her desk.

I returned to the Veterans Affairs Office to wish Tara Kennedy a Merry Christmas as she left. We also exchanged hugs and wished each other a Merry Christmas. I closed out my computer, put things away, put on my coat and shut and locked the doors to the area. As I did so I noticed that the lights in the Commissioner's area were also off. It appeared that Maggie had left. I felt bad since I had not yet wished her a Merry Christmas and did not want her to feel I was ignoring her.

When I exited the building Maggie was still in her parking space which is right next to mine. I tapped on the window which she rolled down. I told her I just wanted to wish her a Merry Christmas and began to move my head toward her intending to give her a peck on the cheek along with my well wishes for a Merry Christmas. As I began to do so she moved away and it was apparent that she felt awkward. Realizing this, I immediately stepped back from her car not wanting to make her uncomfortable. I was very surprised at her unexpected reaction. I was embarrassed and felt bad. I believe I put my hands up and said, "Whoa, sorry Maggie, I was just trying to wish you a Merry Christmas that doesn't happen every day", or something to that effect. With that I said, "I hope you and your family have a wonderful Christmas" and then I immediately went to my car.

I felt bad that I had made Maggie uncomfortable and beat myself up over the holiday weekend at my well intended yet ill advised attempt to wish her a Merry Christmas. As you are aware I made it a point to speak to Maggie at my first opportunity on Monday to apologize and I told her I was sorry if she was offended and that I had no intention of making her uncomfortable with my efforts to wish her a Merry Christmas. I did this and also told you and Maryann about what had taken place before I even knew Maggie had expressed concern.

Later in the afternoon you called me into your office with Jeanne Conklin and told me you were investigating this incident. I shared with you the information as described above and you told me I should put this written summary together. I want to assure you, and the Commissioner's, that I had absolutely no intention of offending Maggie. Furthermore I can promise you that such an occurrence will never happen again with Maggie or any other individual. In hind sight, obviously my Christmas spirit and best intentions clouded my judgment & had an unintended consequence. I apologize.

PAGE 1 of 2

DEFENDANT'S
EXHIBIT
2
6-6-18  TAC

Naturally I am concerned about the ramifications of this incident. In our conversation you brought up several times the pending matter regarding Shari Minarsky. I understand your concerns however being totally familiar with that case I feel it is extremely important to consider that those allegations were for multiple and significant indiscretions on numerous occasions and continued after she had informed the individual that she was uncomfortable with his conduct and that he should stop. By comparison my own intentions were motivated by good will and had I had any idea that my efforts at wishing Maggie a Merry Christmas as I had the other staff members, would result in her discomfort I most certainly would not have done so. As I stated before I will learn from this unfortunate incident and will not place myself or others in a position to question my conduct or intentions ever again.

In closing, as you are well aware December has been a very stressful month with all the changes and the significant challenges I now face in the Veterans Affairs Office. I hope that the intentions and full context in which this event took place will be considered and that we can move on with helping our County's veterans. Thank you for your understanding and compassion.


Contritely & Most Sincerely,

Rich Ely


PAGE 2 of 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MAGGIE MCNAMARA

       Plaintiff

       v.

SUSQUEHANNA COUNTY,
COMMISSIONER
ELIZABETH ARNOLD,
COMMISSIONER
MARYANN WARREN,
SUSQUEHANNA CO.
DIRECTOR OF VETERANS
AFFAIRS RICHARD ELY

       Defendants

CIVIL ACTION

No. 3:17-CV-2182

JURY TRIAL DEMANDED

## PLAINTIFF'S INITIAL DISCLOSURES

Pursuant to the requirements of Fed.R.Civ.P. 26(a), Plaintiff, Maggie

McNamara, by her counsel, hereby provides the initial disclosure information.

1. **Pursuant to Fed.R.Civ.P. 26(a)(1)(A), the following are names of**

    **individuals who may have information relevant to the current matter:**

Robert Stoud
324 Maple Street
Montrose, PA

Maggie McNamara
5681 North Road
Friendsville, PA 18818

Commissioner Elizabeth Arnold
P.O. Box 218



DEFENDANT'S
EXHIBIT
5
6-6-18 TM

31 Lake Avenue
Montrose, PA 18801

Commissioner MaryAnn Warren
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Commissioner Alan Hall
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Michael Giangrieco, Esquire
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Richard Ely
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Jeanne Conklin
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Lana Adams
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

Stephen Janoski
P.O. Box 218
31 Lake Avenue
Montrose, PA 18801

2.  **Documents in the possession, custody, or control of Plaintiff that may be used in support of her case:**

   A.  12/30/15 Final Warning Letter from Stoud to Ely

   B.  6/10/16 Letter from Stoud to Commissioners

   C.  6/10/16 Memo from Stoud to Commissioners (RE: McNamara)

   D.  6/13/16 Letter from Stoud to Commissioners

3.  **Damages Claimed by Plaintiff:**  See Complaint for damages sought.  A full computation has not yet been calculated.

4.  **Insurance Agreements:**  Unknown by Plaintiff.

Plaintiff may supplement this information, as necessary and appropriate, prior to trial.

Respectfully Submitted:

s/ Gerard M. Karam, Esquire
Gerard M. Karam, Esquire
Atty. ID# PA 49625

s/ Christopher J. Szewczyk, Esquire
Christopher J. Szewczyk, Esquire
Atty. ID # PA 306689
Mazzoni, Karam, Petorak, and
Valvano
321 Spruce Street
Suite 201
Scranton, PA 18503
P:  (570) 348-0776
F:  (570) 348-2755

## CERTIFICATE OF SERVICE

I, Christopher J. Szewczyk, Esquire, hereby certify that on January 8, 2018, I

served a true and correct copy of the foregoing document to the following via US

Mail:


A. James Hailstone, Esquire
Kreder Brooks Hailstone LLP
220 Penn Avenue, Suite 200
Scranton, PA 18503



/s/ Christopher J. Szewczyk, Esquire
Christopher J. Szewczyk, Esquire
Mazzoni, Karam, Petorak, and
Valvano
321 Spruce Street
Suite 201
Scranton, PA 18503

June 21, 2016

Re: Resignation of Maggie McNamara

It is my intention to resign from my current position as Deputy Chief Clerk upon approval to transfer to the District Attorney's Office as the Victim Witness Coordinator.

Thank you,

Maggie McNamara

DATE, INITIAL, PASS & RETURN

| DATE | INITIAL | COPY ME |
|------|---------|---------|
|      |         |         |
|      |         |         |
|      |         |         |

DEFENDANT'S
EXHIBIT
4
6-6-18 TAr

# SUSQUEHANNA COUNTY COMMISSIONERS



Alan M. Hall, Chairman
Elizabeth M. Arnold, Vice Chairman
MaryAnn Warren, Commissioner

570-278-4600 (Phone)
570-278-9268 (Fax)

R.S. Stoud, Chief Clerk
Michael J. Giangrieco, Solicitor

PO Box 218
105 Maple Street
Montrose, PA 18801

---

June 14, 2016

To:        Susquehanna County Commissioners
From:      R. S. Stoud
Subject:   Letter of Resignation

Dear Commissioners,

It is with no small amount of consideration that I have come to the decision that I wish to resign from the additional position and responsibilities of Susquehanna County Chief Clerk and request that you honor your agreement to allow me to return to the position of Director of Public Safety, under the terms previously agreed to, as soon as is practical. I have enjoyed my time serving as Chief Clerk and appreciate the opportunity to have served in this position. It is my hope that the positive forward momentum and accomplishments for Susquehanna County continue. Unfortunately, some recent management directional and operational changes have resulted in a working environment where I feel that I cannot effectively continue within the position of Chief Clerk. I wish everyone the best in their future professional and personal endeavors.

Regards,

R.S. Stoud

CC:   Commissioner Alan M. Hall
      Commissioner Elizabeth M. Arnold
      Commissioner MaryAnn Warren



DEFENDANT'S EXHIBIT
6-6-18 70



# Susquehanna County Commissioners

Alan M. Hall, *Chairman*
Elizabeth M. Arnold, *Vice Chairman*
MaryAnn Warren, *Commissioner*

570-278-4600
Fax 570-278-9268

R.S. Stout, *Chief Clerk*
Michael J. Giangrieco, *Solicitor*

SUSQUEHANNA COUNTY COURTHOUSE
MONTROSE, PENNSYLVANIA

PO Box 218 - Courthouse – Montrose, Pennsylvania 18801

June 10, 2016

### Re: Counseling Session with Deputy Chief Clerk McNamara

Dear Commissioners:

As directed, I spoke with Deputy Chief Clerk McNamara this date relative to the issues that were presented in list form to myself, but that it was determined that Deputy McNamara needed to be made aware of, and ensure compliance with.

1. **Lack of Communication [sic]**
   This was discussed and is understood that communication flow is very important.

2. **Tone Of Voice With Disrespect [sic]**
   McNamara stated that she does not believe that in her position that she has been rude or disrespectful to anyone, but related that she understands the importance of treating all with proper respect.

3. **Unnecessary personnel chatting in office with ongoing laughter and giggling non business related for very long periods of time [sic]**
   I related to Deputy McNamara we must remain on guard to avoid the appearance of impropriety so as not to create a misperception, regardless of the truth. Deputy McNamara related that she conducts herself professionally and that working closely together provides the ability for seamless transition on work related information passing and work requirements, as well as facilitating the learning process of different job responsibilities and tasks. She stated that she viewed laughter as being just part of who she is and viewed it as a tension release. She went on to state that she resents the implication that she should have to clarify that she is not having an unprofessional relationship with her boss. I informed her that I agree. She also asked if this comment applied to everyone, or just my office. I advised her there was no specificity provided, other than my office, save the comment above.



DEFENDANT'S
EXHIBIT
6
6-6-18 MC

4. <u>Lack of priority of minutes and agenda being correct for content and grammar [sic]</u>
This matter was discussed with Deputy McNamara to ensure that she understands the importance of attention to detail as it relates to these items.

5. <u>Deputy chief clerk has no respect for department heads [sic]</u>
Deputy McNamara related that she treats all with respect and will ensure that she continues to do so.

I acknowledge that I have discussed and understand the above items.

Maggie R. McNamara
Deputy Chief Clerk

Respectfully submitted,

R.S. Stoud,
Chief Clerk

Lack of communication

Tone of voice with disrespect

Unnecessary personnel chatting in office with ongoing laughter and giggling non business related for very long periods of time

Lack of priority of minutes and agenda being correct for content and grammar

Enraged behavior in defense of certain employees

Deputy chief clerk has no respect for department heads

## SUSQUEHANNA COUNTY COMMISSIONERS



Alan M. Hall, Chairman
Elizabeth M. Arnold, Vice Chairman
MaryAnn Warren, Commissioner

570-278-4600 (Phone)
570-278-9268 (Fax)

R.S. Stoud, Chief Clerk
Michael J. Giangrieco, Solicitor

PO Box 218
105 Maple Street
Montrose, PA 18801

June 13, 2016

Re: Personnel Matter as related by Deputy Chief Clerk McNamara

Dear Commissioners:

As instructed, I met with and related the issues of concern on the list that was provided. Upon completion of same, Deputy McNamara related the following to me. Deputy McNamara related that she had concerns about a number of issues, some related to the issues discussed in the meeting that I had with the Commissiners and some not. She went to state that she does not believe that she acts in a manner that is rude or unprofessional. She went on to state that the majority of the time she goes out of her way to be more caring and sympathetic. She related that she feels like she is constantly working under a microscope and no matter how much or hard she works, it does not appear to make a difference. Deputy McNamara related that whether she has tried to be completely professional or friendly, nor how many times she has gone above and beyond to assist Commissioners Warren and Arnold that it has not made a difference, and has only gotten worse. She related that she believes that Commissioners Warren and Arnold do not like her personally and she would just prefer them to stop being unfair and singling her out. Deputy McNamara related that Commissioner Warren can be very nice one minute and in the next, very mean, and she never knows what to expect from day to day.

Deputy McNamara referred to an unprofessional incident that occurred with Rich Ely, where he attempted to hug and kiss her during December of 2015. She stated that she felt that this issue seemed to go unnoticed and unaddressed except from her discussion with myself. Deputy McNamara related that she continued to work in proximity with him and that when Veterans Affairs had issues; the Commissioners temporarily assigned her to the office to assist along with him, making her feel uncomfortable. She related that since this incident she again stated that she feels like a victim of excessive criticism relative to her work. Deputy McNamara ended by stating that she is very afraid that once she states this information and its read by the Commissioners, that she will be terminated without cause. Deputy McNamara stated that this excessive criticism began increasing after the incident with Ely and was left with no alternative but to believe that this is retaliatory type behavior.

( I would add that, although Commissioner Arnold began her term after the incident with Ely, she was made aware of same and commented in front of myself and Commissioner Hall that, concerning the incident, she did not see what the big deal was, it was only a hug at Christmas.)

DEFENDANT'S
EXHIBIT
7
6-6-18 TA

7

11:56:55    05-24-2017    13/14

I informed her that I would document her responses and have her review same prior to signing the document. I additionally asked her to author her own letter regarding the above additional matters and submit same to me on her own without being rushed. Deputy McNamara signed the counseling letter document on 06/10/2016.

On 06/14/2016, Deputy McNamara checked the content of this letter, verified it's accuracy and informed me that she would not be offering her own letter, that she felt that the information provided to me at this point would suffice as being that of a formal complaint, but that she would participate and answer any questions or take part in any meetings desired. I informed her that I would forward her concerns with her counseling letter response.

Respectfully submitted,

R.S. Stoud,
Chief Clerk