# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT STOUD,                    :
                                 :          CIVIL ACTION--LAW
            Plaintiffs           :
                                 :
       vs.                       :
                                 :
SUSQUEHANNA COUNTY, ET AL.       :
                                 :
            Defendants           :      NO. 3:17--2183--MEM

# T E S T I M O N Y

Transcript of testimony taken at the Deposition of

## ROBERT STOUD

on Monday, October 1, 2018 at 10:25 A.M. at Law Offices located
at 220 Penn Avenue, Suite 200, Scranton, Lackawanna County, PA

* * * * * * * *

COPY

*Patricia Fumanti*
*Court Stenographer*
*110 South Highland Drive*
*Pittston, PA   18640*
*(570) 655-6629*

**A P P E A R A N C E S:**

For the Plaintiff,                    CHRISTOPHER J. SZEWCZYK, ESQUIRE
                                      Mazzoni Karam Petorak & Valvano
                                      201 Bank Towers Building
                                      321 Spruce Street
                                      Scranton, PA    18503


For the Defendant,                    A. JAMES HAILSTONE, ESQUIRE
                                      220 Penn Avenue, Suite 200
                                      Scranton, PA    18503


* * * * * * *



**S T I P U L A T I O N:**

**IT IS HEREBY STIPULATED AND AGREED**

by and between Counsel for the respective parties that this

Deposition is being taken pursuant to the Rules of Civil

Procedure; that all objections, except as to the form of the

question, are reserved until the time of trial.

The Witness reserves the right of reading and

signing the transcript of testimony.


* * * * * * *


(a)

I N D E X:
Examination by A. James Hailstone, Esquire. . . . . 1

\* \* \* \* \* \* \*

**E X H I B I T S:**

N O N E

\* \* \* \* \* \* \*

(b)

R O B E R T    S T O U D,

PLAINTIFF, CALLED AND SWORN ACCORDING TO LAW:


**EXAMINATION BY A. JAMES HAILSTONE, ESQUIRE:**

Q.    Good morning, Mr. Stoud.  Also, for clarification, you also go by Steve...

A.    I do.

Q.    ...or Robert.  You're mentioned as Steve in some of the documents.

A.    I answer to both.

Q.    I'm going to be asking you questions today.  My name is Jamie Hailstone.  We met before on other cases and in this case.  I represent Susquehanna County which you've brought an action against.  You're under Oath.  You're being deposed.  Have you ever been deposed before?

A.    I believe so, yes.

Q.    So you understand that everything you say is going to end up in a transcript.  We're going to assume if you answer a question, you've heard it and understood it.  If I ask anything that's confusing, please ask me to repeat it or rephrase it.  We don't want you guessing.  If you can't hear me, ask me to speak up, or whatever we have to do.

Mr. Stoud, could you give me your educational background, please?

1

1    A.   I graduated from high school and I had taken college

2    courses and I have college credits, but I do not have a college

3    degree.

4    Q.   What high school and when?

5    A.   Neshaminy-Langhorne, 1982.  N-e-s-h-a-m-i-n-y

6    L-a-n-g-h-o-r-n-e.

7    Q.   And where is that?

8    A.   In Bucks County.

9    Q.   What has been your work experience after high school?

10   A.   I did retail loss prevention for JCPenney for a few

11   years.  I was a mortgage broker for Century 21 Mortgage.  I went

12   into the State Police in 1991, and I retired in 2012.  Then I

13   went to work for Susquehanna County.

14   Q.   While you were at the State Police, at what rank did

15   you retire?

16   A.   Corporal.

17   Q.   Where were you stationed over the course of your

18   career?

19   A.   I was stationed in Trevose, Troop N; I was stationed

20   at Troop R, Gibson; I was stationed at Troop R, Dunmore.  I

21   finished at State Police Headquarters in Harrisburg in the

22   Bureau of Criminal Investigation.

23   Q.   What were your duties in the Bureau of Criminal

24   Investigation?

25   A.   I was the supervisor of the criminal investigation

1    assessment unit.   That unit primarily dealt with unsolved

2    homicides, anything that was serial or behavioral in nature.   We

3    were also the missing persons, I guess, repository for the State

4    Police in the State, as well as the Amber Alert coordinator.

5         Q.    You mentioned you were the supervisor.

6         A.    Correct.

7         Q.    How many people did you supervise?

8         A.    There would have been an assistant, an analyst and the

9    individual that handled the tips--so there's three there.   Then,

10   in a more loose supervisor capacity, I suppose, that unit had

11   almost 40 people in it, full and part-time.   I wasn't

12   responsible for their direct supervision but there was, like,

13   adjunct reporting if we were working on certain cases together

14   or if there was a task force put together or something like that

15   at different times.

16        Q.    During your career as a State Trooper, did you ever

17   arrest anyone?

18        A.    Yes.

19        Q.    Do you have an estimate on how many?

20        A.    No.

21        Q.    Would you say in the hundreds?

22        A.    No, I wouldn't say it was that high.   I was a criminal

23   investigator for almost all of my career.   They were more

24   lengthier investigations.

25        Q.    In your career as a State Trooper, you had to testify

3

1   in Court.

2       A.   Yes.

3       Q.   Would you say that was many times?

4       A.   I would say many times.

5       Q.   After you retired from the State Police, you mentioned

6   that you went to Susquehanna County to work.  What was your

7   original position?

8       A.   Emergency Management Coordinator.

9       Q.   Why did you apply for that position?

10      A.   I believe...and I'm trying to recall.  I think it was

11  Commissioner Warren that reached out to inquire if I would be

12  interested in that job.

13      Q.   How did you know Commissioner Warren?

14      A.   Just in passing.  My wife worked at the Courthouse.

15  She got a message to me that they had an opening or they were

16  going to have an opening.  I think the individual had left

17  already.  They knew that I was considering retiring and they

18  wanted to know if I would be interested.  I came and

19  interviewed.

20      Q.   Who interviewed you?

21      A.   I think it was Commissioner Hall.  I can't remember if

22  both of them were there, or not.

23      Q.   When you say both, you mean Commissioner Warren and

24  Commissioner Hall.

25      A.   Correct.

4

1    Q.   Do you know who the other Commissioner was when you

2  first started working for Susquehanna County?

3    A.   Yes.  Mike Giangrieco.  G-i-a-n-g-r-i-e-c-o.

4    Q.   Do you have some kind of family relationship with

5  Mr. Giangrieco?

6    A.   Recently.  My son is married to his 2nd or 3rd cousin.

7    Q.   What about with Commissioner Hall?

8    A.   A family relationship?

9    Q.   Correct.

10    A.   My son's wife's brother is living with his

11  stepdaughter, I think.

12    Q.   Did you know Commissioner Hall before you took the job

13  at Susquehanna County?

14    A.   No, I did not.

15    Q.   Did you know Commissioner Giangrieco?

16    A.   Yes.

17    Q.   Was it because of that relationship or was it

18  something else...the reason you knew Commissioner Giangrieco?

19    A.   Because of what relationship?

20    Q.   You mentioned that your son...

21    A.   They just recently got married.

22    Q.   So you knew him as a friend, would you say?

23    A.   I knew him.  I met him.  He was the coroner solicitor

24  for a case I was involved with in 1995, and we have been friends

25  probably since that time.

5

1      Q.   You mentioned your wife worked in the Courthouse

2  before you took your position.  Did you know the solicitor at

3  the time?  Mr. Giangrieco is the solicitor now, once the

4  Commissioner.

5      A.   I'm trying to remember who the solicitor was.

6      Q.   I should have given you those instructions.  I don't

7  want you guessing at anything.

8      A.   I'm just thinking about it for a moment.  I don't.  I

9  cannot give you an answer.  It's a blank spot.

10      Q.   I know we're going back in time.

11      As Emergency Management Coordinator, how long did you

12  hold that position?

13      A.   I know this is one of those things where you don't

14  want me to guess.  It was probably a few months.

15      Q.   What were your duties?

16      A.   As Emergency Management Coordinator, you're

17  responsible for ensuring that the County's response was

18  appropriate for any spills that occurred within the County, as

19  well as ensuring appropriate response to emergency-related

20  issues--flooding and things like that, ensuring that the

21  emergency operations center was appropriately staffed and able

22  to respond to emergencies as they occurred.

23      Q.   Was this a full-time position?

24      A.   It was, yes.

25      Q.   Do you remember your salary?

1    A.    In the Forties.  I don't remember what it was.

2    Q.    You mentioned that you were only in this position for

3  a few months.  What happened?

4    A.    I was approached by Commissioner Hall and possibly

5  Commissioner Giangrieco--I can't remember if he was there for

6  the original conversation.  They wanted to create a Department

7  of Public Safety, an umbrella under which 911, EMA...and they

8  wished to create a GIS position for the County.

9    Q.    What is GIS?

10   A.    It's digital mapping.

11   Q.    When did you take that position, if you can recall?

12   A.    I think it would have been in 2013.

13   Q.    Did you keep your duties as Emergency Management

14  Coordinator when you became the Director of Public Safety?

15   A.    If I did, it would have been temporary.  At some

16  point, it became an oversight position wherein an Emergency

17  Management Coordinator was hired.

18   Q.    Do you recall who that was?

19   A.    The Emergency Management Coordinator?  Paul Johnson.

20   Q.    Mr. Johnson would answer to you as the Director.

21   A.    Correct.

22   Q.    How many people did you supervisor in your position as

23  Director of Public Safety?

24   A.    As Director of Public Safety, I would have had an

25  administrative assistant, emergency management coordinator

7

1   operations and training, the GIS person, the 911 coordinator.
2   It shifted a couple times through the years.  There were
3   supervisors under the 911 coordinator and then 911 staff.
4       Q.   How long were you in the Department of Public Safety?
5       A.   I think I pretty much stayed the Director of Public
6   Safety.  There was a brief time during which the chief county
7   detective issue was being played out but maybe it was
8   temporarily ended or was going to be ended but didn't.
9       Q.   Did there come a time that you became Chief Clerk of
10  Susquehanna County; correct?
11      A.   Yes.
12      Q.   But what you're telling me today is that you were
13  still Director of Public Safety.
14      A.   Correct.
15      Q.   When did you become Chief Clerk?
16      A.   I want to say it was around 2015.  I was asked to
17  assist with some of the responsibilities from the chief clerk's
18  office, and I did.  Basically personnel matters, investigation
19  matters and negotiating contracts.
20      Q.   Who asked you to do this?
21      A.   I believe it was all three Commissioners.
22      Q.   That would have been Hall, Giangrieco and Warren at
23  the time.
24      A.   Correct.
25      Q.   Do you remember your salary when you became Chief

1    Clerk?

2         A.   I don't, because I was Acting Chief Clerk for a long

3    period; then I became Chief Clerk.  It would have been Director

4    of Public Safety/Chief Clerk when they put it through the

5    meeting but I don't recall exactly when it was.

6         Q.   When you say you were Acting Chief Clerk, what do you

7    mean by that?

8         A.   I fulfilled the roles and responsibilities of the

9    Chief Clerk but I had not gone through a meeting to be named as

10   such.  I think I was named Acting, actually.

11        Q.   Was it your understanding that you were going to hold

12   this position until they found someone to fill it?  What was

13   your understanding?

14        A.   I don't know.  To be honest, it changed so many times.

15   The job position changed.

16        Q.   What were your duties as Chief Clerk?

17        A.   In a nutshell, the running of the County.  It was

18   project management for all of the projects that were currently

19   ongoing; it was the oversight of all departments that didn't

20   report to an elected official, as well as providing any type of

21   assistance for personnel in the elected officials' office at

22   their request; the negotiation of contracts; dealing with

23   grievances, investigations; the running of the keeper of the

24   records for the County Commissioners.

25        Q.   Did there come a time that you hired a deputy chief

1   clerk?

2       A.   There came a time when a deputy chief clerk was hired.

3   I'm not sure if I was part of that hiring process, or not.  I

4   think I was in on the interview.

5       Q.   I was going to get into that.  Ms. McNamara has

6   testified that you interviewed her.  Did you know her prior to

7   her applying for the job?

8       A.   No.  I had never seen her before.

9       Q.   And that was Maggie McNamara who was hired as the

10  deputy chief clerk; right?

11      A.   Yes.  Eventually.  There were several.  There were

12  others that occurred before she was hired but while I was there.

13      Q.   You had a different deputy chief clerk prior to Maggie

14  taking the job.

15      A.   No, I don't think I did.

16      Q.   What led to the decision to hire a deputy chief clerk?

17      A.   We had a position that was open.  You know, as I sit

18  here, I'm trying to remember if it was an administrative

19  assistant first that became a deputy chief clerk.  I can't

20  recall.

21      Q.   And you're also aware that Ms. McNamara has a claim

22  against Susquehanna County.

23      A.   I am.

24      Q.   There was an incident in December of 2015 between

25  Ms. McNamara and Rich Ely from the County.  Are you aware of

10

1    that incident?

2         A.    I am.

3         Q.    What do you know of what happened?

4         A.    I received a phone call at my house from Ms. McNamara

5    where she told me there was an incident that occurred at work.

6    I was not at work that day.  She reported that people were

7    getting ready to leave.  I think it was around the break before

8    Christmas.  Mr. Ely was talking to the people that were in the

9    Commissioners' office, and that he hugged them.  I don't

10   remember if he kissed them, as well, but she stepped back and

11   did not want any part of it.  That was the end of it at that

12   point.

13        Everybody subsequently left.  I believe it was just

14   the two of them that were left in the Commissioners' office

15   area.

16        She related that she went outside and got in her car.

17   He came out, as well.  He motioned for her to roll the window

18   down.  As she did so, he leaned in and tried to kiss her and

19   said something like, This is the last time you'll get this

20   chance, or, the last opportunity--something like that.  She

21   pulled back; he pulled back.  She rolled up her window, left,

22   and called me.

23        Q.    After you got this information, what did you do...

24   after you got the call from Ms. McNamara?

25        A.    I can't remember in what order but I called the

1    employment attorney for Susquehanna County and I called the
2    Commissioners.
3        Q.    And who was the employment attorney, if you can
4    remember?
5        A.    Scott Wilson.
6        Q.    What was the next step?  Did you investigate?
7        A.    I believe I also called the sheriff and had him hold
8    the tape because this happened on video, I think.  I believe I
9    told Mrs. McNamara to write a statement.  I can't remember if I
10   spoke to Mr. Ely or Mr. Ely provided a statement or a letter.  A
11   conversation was subsequently held with the Commissioners as to
12   what would occur as a result of this.
13       Q.    You mentioned that you got a statement from
14   Ms. McNamara.
15       A.    I believe there was a statement.
16       Q.    I was looking for the statement.  Would that be
17   something that would have been part of the file in Susquehanna
18   County?
19       A.    Absolutely.
20       Q.    But you never took it out of the Courthouse or
21   anything like that.
22       A.    No.
23       Q.    And you mentioned that Mr. Ely also provided a
24   statement; correct?
25       A.    Yeah.  A statement or letter.

1    Q.    What subsequently happened?

2    A.    There was a conversation about whether or not he

3  should face termination as a result.   There's a 0-tolerance

4  policy.   That was the recommendation from the employment

5  attorney and that's the recommendation that was forwarded to the

6  Commissioners.   Ultimately, it ended up being, I think, a

7  written final warning.

8    Q.    Who issued the written final warning?

9    A.    I did.

10    Q.    Who made the determination to issue the written final

11  warning?

12    A.    The Commissioners.

13    Q.    Your letter to Mr. Ely regarding his written final

14  warning doesn't make any mention of Mr. Ely approaching

15  Ms. McNamara inside the building.   He only approached her

16  outside.

17    A.    Okay.

18    Q.    Ms. McNamara believed that to be a mistake on your

19  part.  Do you agree?

20    A.    Do you have the letter?

21    Q.    I have the letter.

22    A.    Can I see it?

23    Q.    I'm not going to enter it into evidence.

24          I've already taken her deposition and she said that

25  she told you that he approached her.

1    A.    She did.   That's true.   The way a lot of times that

2  the letters...they would be authored by the employment attorney,

3  so that could be the reason for why it's not in there.

4    Q.    But he would have been given Ms. McNamara's statement

5  and Mr. Ely's statement.

6    A.    I would certainly think so.

7    Q.    You didn't give it to him.

8    A.    I probably did give it to him.   That would have been

9  one of the things I would have done.

10   Q.    There came a time when Mr. Giangrieco was no longer a

11 Commissioner; correct?

12   A.    It was that time right then.   This would have happened

13 in December.   After the break, the new Commissioners would have

14 taken over...or, the new Commissioner, I should say.

15   Q.    And who was that?

16   A.    Commissioner Arnold.

17   Q.    Did you ever talk to Commissioner Arnold about this

18 incident?

19   A.    Yes, at some point.

20   Q.    And what do you recall from that?

21   A.    I don't remember if she asked...I don't remember

22 exactly how it came up.   Maybe a few months after she took

23 office.

24   Q.    This is the Complaint.   I'm not going to enter it into

25 evidence.   I'd just like you to review it and verify that this

14

1    is the Complaint filed on your behalf.   Can you tell me if you

2    reviewed it before?

3         A.    (Witness reviews same).

4               Yes.

5         Q.    And you reviewed it before it was filed.

6         A.    I'm sure I did, yes.

7         Q.    I'm going to turn your attention to paragraph 22, page

8    6/21.   You make the claim, Plaintiff--being you--also found

9    himself subject to harassment and retaliation after reporting

10   the McNamara incident.

11        A.    Yes.

12        Q.    Could you tell me about that?

13        A.    Following the reporting of this incident,

14   Mrs. McNamara was placed under increasing, what I believe to be,

15   unfair scrutiny of her work, and it kept increasing.   It

16   actually started immediately after her reporting of this

17   incident in that she was assigned, I believe, prior to this

18   incident to work in veterans' affairs with Rich Ely where he had

19   been assigned.   He had been moved from the HR position.   It was

20   a very small office.   Following this incident, she came to me

21   and said, you know, that she was uncomfortable continuing that

22   assignment in that environment with him directly as a result of

23   this incident.   I took that concern forward to

24   Commissioner Hall, explaining that she was uncomfortable; she

25   didn't want to do it.   He came back and said he spoke to

1  Commissioner Warren, and she had to go.

2      I subsequently advised her that she had to do what she

3  was told to do, and she did.

4      Q.   We have testimony that Ms. McNamara never worked with

5  Mr. Ely after the incident.  Are you telling me today that she

6  did work with him after the incident?

7      A.   I can't tell you the date but I specifically recall

8  the conversation where she said she did not want to work with

9  him anymore in that environment.  The conversations would have

10  never happened with the Commissioners had she not reported the

11  incident because, before that, I don't think there was an issue.

12      Q.   That's all well and good but getting back to

13  paragraph 22, it states that you found yourself subject to

14  harassment and that's really what I'm asking about.  What

15  harassment and retaliation did you face after reporting the

16  McNamara incident?

17      A.   As a result of bringing up the unfair treatment of

18  her, I was being subjected to basically the same type of

19  behavior.

20      Q.   When are we talking?

21      A.   As I said, it went from the early part of that year up

22  to...May 31st is when it reached the point of...I made

23  complaints all along to the solicitor, to Commissioner Hall and

24  even to Commissioner Warren.  It continued unabated and got

25  progressively worse.

16

1    I think it was on May 31st, I made an official

2 complaint and told them, I don't care how you view this but

3 consider this to be an official complaint of harassing and

4 retaliatory behavior.

5    Q. And that's stated in the Complaint at paragraph 23.

6    A. I think it was the 31st, but I had told them all

7 along.  May 31st was not the first time that this occurred.

8    Q. You also testified earlier today that

9 Commissioner Arnold probably didn't know about this incident

10 because you talked to her about it months afterwards.

11    A. Months after January.

12    Q. Months after January, correct.

13    A. It was now May.

14    Q. I'm trying to get a timeframe of the actual incident.

15    A. There were ongoing issues with Commissioner Arnold, as

16 well.  I have no idea why they occurred.

17    I sought from Commissioner Hall why this was

18 occurring.

19    Q. And why was that?

20    A. Why did I seek it?

21    Q. I thought you said you got information from

22 Commissioner Hall.

23    A. I did.  I asked him, Why is this happening?

24    His response was always, What else could it be, or

25 something along those lines, regarding going back to the

17

1   original issue with her and my subsequent defense of the actions

2   that were being taken against her unfairly.

3       Q.   But if Commissioner Arnold didn't know about the

4   incident until some months after she became Commissioner, she

5   wasn't harassing anyone because of retaliation; correct?

6       A.   I don't know when she found out.  You asked when she

7   found out from me.  Whether or not she was told earlier by the

8   outgoing Commissioner, by Commissioner Warren or by

9   Commissioner Hall, I can't answer that.  I don't know that.

10      Q.   If they would testify that they didn't tell her about

11  it, would that make sense to you?

12      A.   They have said a lot of things that have not been true

13  so, no, that would not surprise me.

14      Q.   Paragraph 24.  I'll read it and then I have a couple

15  questions.

16          The retaliatory and harassing actions against

17  Plaintiff included but were not limited to personal derogatory

18  comments made against him by Defendant Commissioners Arnold and

19  Warren, undermining his authority as Chief Clerk.

20          It says that there were personal and derogatory

21  comments made by Commissioner Arnold.  What were those kind of

22  things that were being said to you or about you?

23      A.   The way that I looked; the way that I interacted;

24  where I was from; the fact that I didn't understand what it was

25  like because I wasn't from that County.  Off the top of my head,

18

1   that's...but it was constant.

2        Q.   When you say the way you looked, what do you mean by

3   that?  What would she say?

4        A.   She would just reference my appearance by the way I

5   looked.

6             What's our timeframe here that we're talking?

7        Q.   Whatever.  I'm just reading paragraph 24.

8        A.   Would you like to know the comments to date?

9        Q.   Sure.

10       A.   And then it continued.  At some point there were

11  conversations about me being involved in an inappropriate

12  relationship with Mrs. McNamara.  There are comments being made

13  to my subordinates.  There are comments being made by her about

14  an affair to others, including my subordinates apparently.

15  Comments about, I'm mad because you claimed a hostile work

16  environment.  I'm trying to think of all of them now.  Sarcastic

17  comments.  I have to be careful what I say because everybody

18  sues everybody here--things of that nature.

19       Q.   Is that a quote directly from Commissioner Arnold?

20       A.   It's close to a quote.  I have to be careful what I

21  say because everybody ends up getting sued here, or something

22  like that.  I have it written down.

23       Q.   You have notes.

24       A.   I do.

25       Q.   I'm going to ask for those notes eventually.

1          Breaking this paragraph up, it also goes on to say

2    that Defendant Commissioners Arnold and Warren undermined his

3    authority as Chief Clerk.

4          What do you mean by that?

5      A.    A lot of what I just told you...you know, going and

6    saying things that aren't true about me to other people, as well

7    as my subordinates, and going to my subordinates and not

8    following their own chain of command is certainly problematic.

9      Q.    The comments that were untrue...is that the alleged

10   affair?

11     A.    Certainly that was a big one.

12     Q.    Any other things that you can recall?

13     A.    There were a lot of comments that were being made.  A

14   lot of the comments came back to me.  They had even been made to

15   people who came directly to me and said she wanted me fired, she

16   wanted Mrs. McNamara fired.  She claimed she had to break us up.

17         There was an incident I had with another manager.  The

18   manager was wrong.  When she found out about it, her comment

19   was...somebody made the comment that they overheard it and that

20   I was correct in my handling of the incident or my interaction

21   with this person.  Her comment was something to the effect, I

22   don't care.  Us girls have to stick together, which she

23   confirmed apparently to Commissioner Hall, as well.

24     Q.    Paragraph 26, page 7/21.  I'm looking at the second

25   sentence.  After this meeting, Defendant Commissioner Arnold

1   went to another employee and indicated that she wanted Plaintiff

2   fired.

3           Do we know who that other employee was?

4       A.   It would have been the HR Director Jeanne Conklin.

5       Q.   You mentioned Jeanne Conklin.   I will submit to you

6   that your Attorney has filed on your behalf what is called a

7   Rule 26, Witness Disclosure.   It lists three people:

8   Jeanne Conklin, Lana Adams and Steve Janoski as being

9   individuals with information about this particular case.   Other

10  than those three named people, is there anyone else that you

11  know of, other than named Defendants, that would have

12  information pertinent to your action?

13      A.   Other than named Defendants?

14      Q.   Not the Commissioners.   Anyone else other than

15  Jeanne, Lana or Steve that would have information that would be

16  pertinent.

17      A.   The solicitor at that time--he was certainly aware of

18  it.   The Commissioners.   Unfortunately, DA Klein has died--he

19  was aware of it.

20           Not that I can think of right now.

21      Q.   What information would Lana Adams have?

22      A.   I'm not sure.   She was the chief clerk.   She replaced

23  me.

24      Q.   And what about Steven Janoski?

25      A.   Steven Janoski is now the person in charge of the IT

1   department.   He was the person that came forward as a result of

2   the emails that were requested in, maybe, December of '16.

3   There was a request supposedly made by Commissioners Warren and

4   Arnold to get any emails that existed between myself and

5   Ms. McNamara.

6       Q.   Let's talk about that.   I'm going to jump ahead to

7   paragraph 36 of the Complaint, page 9/21.   It says, On or about

8   January 9th, 2017, Defendant Commissioners Warren and Arnold in

9   violation of County policy demanded to view all emails between

10  Plaintiff and McNamara since McNamara went for a position in the

11  Susquehanna County District Attorney's office.

12          What county policy did they violate?

13      A.   There was a County policy that talked about their

14  review of employee emails.

15      Q.   What did it say?

16      A.   I can't, as I sit here, quote it.   I don't recall.

17      Q.   Do you believe that you had some protective interest

18  in those emails?

19      A.   I believe that those emails were a continuation of the

20  harassment.   I believe that those emails were not gotten for any

21  business purpose.

22      Q.   But you'll agree with me that the Commissioners have

23  every right to look at anyone's emails in the County.

24      A.   I do not agree with that.

25      Q.   And why is that?

1     A.    I agree that as long as they follow the policy, it is.
2  If you're doing it for a reason outside of that, then I don't
3  agree that that's true.   In this case, I was told that they
4  asked several attorneys who told them No.   I was also given a
5  reason for reviewing the emails that changed, I believe, three
6  times, depending on who was providing it.   Ultimately, I was
7  told by Commissioner Hall that Commissioner Warren was so upset
8  by her interaction with Attorney Reed(ph.) that she was looking
9  for any reason to justify her previous behavior, and that was
10  the real reason for getting the emails.
11     Q.    So you don't believe the Commissioners, as the
12  employers, have an absolute right to review any County employee
13  emails.
14     A.    As long as you're doing it for the right reasons.   As
15  long as you're following the policy and you're treating
16  everybody equally.   I don't believe you should be able to do it
17  in a harassing way or a retaliatory way, which is what I believe
18  this was based upon.
19     Q.    What came of this?
20     A.    What came of it?   Well, the individual that they asked
21  to retrieve the emails was the manager of IT who I had a problem
22  with earlier.   As a result of this and in getting the emails,
23  it's my understanding that she took it upon herself to conduct a
24  background investigation.   That background investigation turned
25  up what she considered to be questionable issues.   Those

23

1   questionable issues resulted in not one but two investigations

2   and a subsequent suspension from the DA's office for me.  At the

3   end of it, it was found that none of it had any merit whatsoever

4   but I still got dragged through all of it for no reason at all.

5        Q.   At the time of the email incident, you were no longer

6   Chief Clerk; right?

7        A.   I think I was a Deputy Chief Clerk then.

8        Q.   Why were you suspended from the DA's office?

9        A.   Because she alleged some sort of kickback on behalf of

10  people doing business with the County.  It ended up that it

11  wasn't even me that she was talking about.

12       Q.   This employee was fired; correct?

13       A.   This employee was fired after two investigations.

14       Q.   What were you doing in the DA's office at this time

15  that you were suspended from?

16       A.   I was a County Detective.

17       Q.   Back to paragraph 27 of the Complaint, page 7/21.

18  This is June of 2016.  It indicates that Plaintiff--you--were

19  instructed by Defendant Commissioners to conduct write-ups of

20  both yourself and McNamara and was informed if Plaintiff did not

21  comply, McNamara would be terminated immediately.  Plaintiff

22  completed these write-ups under duress.

23            I read that correctly.

24       A.   Yes.

25       Q.   Could you explain what this incident of write-ups is?

24

1    A.   How much detail do you want?

2    Q.   All.

3    A.   On May 31st is when I made the complaint, as I stated

4  earlier.  As a result of that, there was a meeting that took

5  place on June 7th.  I thought that the meeting was to address

6  the issues and to reach some sort of understanding.  When I

7  walked into the room...I'm not sure if it was prior on the way

8  to the room or in the room--it may have even been both.

9  Commissioner Hall told me that he was not in support of this

10  meeting; that he did not agree with this meeting, and that he

11  would act as a witness on my behalf as a result of the meeting.

12  I went in and the meeting started.  Commissioner Warren told me

13  that Maggie McNamara needed to be terminated; I asked why.  She

14  related there were problems referring to the issues with the

15  agenda.

16       I think I talked about increasing scrutiny earlier,

17  and that's what I'm talking about.  It was a missing comma or a

18  word out of place or something like that.

19       Through that time period where it was getting

20  progressively worse, we even got to the point of copying things

21  that had been previously approved, and those were still not able

22  to meet the bar.  I brought it up that I did not think it was

23  appropriate.  I thought she was a good worker and asked what

24  else there was.  Then she brought up the fact that she was

25  disrespectful, I believe, to a manager, and eventually named

1    that person as Mary Nolby.

2         I subsequently talked to Mary Nolby who related that

3    that was not true.  She did not feel that way, but did add that

4    Commissioner Warren had been hanging out in her office, making

5    her feel uneasy and talking about employees.

6         Regardless, the meeting continued.  Then it was

7    brought up about the amount of time that I was together with

8    McNamara in my office.  I pointed out the fact that we

9    frequently met; that we were responsible for the running of the

10   County.  It was stated at that point that it doesn't look good.

11   Either her or Commissioner Arnold said people were talking.

12        I asked for clarification because I said it sounds

13   like you are suggesting an inappropriate relationship.

14        Well, I think you know what I mean.

15        I'm asking you to state what you mean.

16        There was a heavy inference of an affair at that point

17   which I told them that I did not agree with.

18        The write-ups occurred after that meeting.

19   Commissioner Hall, in that meeting, said he didn't agree with

20   where any of this was going.  I stated in that meeting that I

21   would not terminate her.  I told them that I suppose they would

22   make whatever decision they would make.

23        The meeting came to an end, and I left.

24   Q.   You mentioned that you told the Commissioners that you

25   would not terminate her.  You didn't have that authority to

26

```
 1   terminate an employee; correct?
 2        A.   No.  They would be the decision-makers for the
 3   termination.  In terms of the person that would carry it out, it
 4   usually fell to me or the HR person.
 5        Q.   So, if they give you a direct order to fire her, you
 6   were going to tell them that you weren't going to do that.
 7        A.   I believed it to be an illegal act.  I told them that
 8   I believed this to be harassing and retaliatory behavior and a
 9   continuation of that.
10        Q.   Turning to paragraph 29.
11        A.   Are we done with 27?
12        Q.   I thought you were done.  I apologize if there's more.
13        A.   I don't know because we really didn't get to the
14   write-ups which I thought was your original question.
15             That gets us to where the meeting is over.  I was
16   subsequently approached by Commissioner Hall.  Commissioner Hall
17   said, They want you to conduct write-ups of Mrs. McNamara and
18   yourself.
19             I asked the question about writing myself up.
20             That's what they want.
21             What exactly am I supposed to write up?
22             Then I was provided a piece of paper which I believe
23   had four things on it.  I can't remember all of them.
24   Disrespectful to workers was one.  I think for me it was
25   something about defense of a subordinate, or something like
```

27

1    that.

2            Originally I refused to do the write-ups, again

3    stressing to him and subsequently to the solicitor that I

4    believe this to be an illegal action and I thought this was

5    continuing harassment and I didn't want to be part of it.  I was

6    told at that point that if I didn't write her up, she would be

7    fired--Commissioner Hall told me that.  So, I completed the

8    write-ups and I believe I documented all of that in the

9    completed write-ups, both for her and myself.

10           Any other questions on the write-ups?

11       Q.   No.

12           Paragraph 29, page 7/21.  It states that on

13   January 13th, 2016, Defendant Commissioner Arnold informed

14   Commissioner Hall that you wanted to eliminate the director of

15   public safety position that Plaintiff intended to return to

16   after serving as Chief Clerk.

17           At this point, you were no longer Chief Clerk;

18   correct?

19       A.   I think I probably was still Chief Clerk.

20       Q.   You resigned in June of 2016; correct?

21       A.   I don't recall the exact date.  If you tell me that's

22   true and that's what the resignation letter says, I wouldn't

23   disagree with it.  I don't know when it was effective, though.

24       Q.   That's my question.  When were you no longer Chief

25   Clerk?

1    A.    I don't recall, but it would have been around

2  June/July.

3    Q.    Commissioner Arnold wanted to eliminate the director

4  of public safety position.   That never happened; correct?

5    A.    She approached him, I guess, about getting rid of it.

6  It was also said to me in the meeting that I talked about on

7  June 7th...I had inquired about returning back to that position

8  and was told...I believe the quote was, I'm not certain that

9  position will be there, or, I'm not certain there will be that

10  position--something along those lines.   What I considered to be

11  a threat.

12    Q.    But it was never eliminated; correct?

13    A.    No.   It was ultimately eliminated.

14    Q.    When was that?

15    A.    That was I believe sometime in 2018 and then

16  subsequently brought back.

17    Q.    Were you Director of Public Safety in 2018?

18    A.    I was.

19    Q.    We'll get to that.

20         You also mention in your Complaint that Plaintiff

21  intended to return to Director of Public Safety after serving as

22  Chief Clerk.   Can you explain that to me?

23    A.    I'm not sure what you mean.

24    Q.    Did you have an agreement with the Commissioners when

25  you say you intended to return to that?

29

1      A.    They agreed when they asked me to take on more

2   increasing responsibilities within the Chief Clerk's office both

3   before I was acting and then after being named Chief Clerk that

4   at some point, if I wanted to, I could always revert back.

5      Q.    Who agreed to that?

6      A.    I'm going to say that it was probably Commissioners

7   Warren, Hall and Giangrieco at that point.

8      Q.    You'll agree that, as Sitting Commissioners, they

9   can't bind a new set of Commissioners with some kind of

10  agreement like this; right?

11     A.    I am, but the majority would still have held because

12  Hall and Warren were still there.  So, two out of three would

13  win that motion.

14     Q.    What if someone passed away...the majority?

15     A.    I guess we could do what-if-monster all day long.

16     Q.    That's my question, I guess.  You seem pretty clear

17  that you were going to get this job back but it seems like a

18  violation of a lot of, not only County policy but State law to

19  promise someone in that position...

20     A.    That is not the case of what we have.  The case of

21  what we have is that we still have the majority of three people

22  that have made the promise.

23     Q.    So, as long as they had the majority of those three

24  people, you felt that it was okay for them to promise this

25  position to you.

1    A.    Well, they made the promise; I just accepted it.

2    Q.    Ultimately, you went back to serving as Director of

3  Public Safety; correct?

4    A.    No.   I never left Director of Public Safety.   They

5  were always dual roles.

6    Q.    After you left Chief Clerk, what other position did

7  you take on in the County?

8    A.    I became the Deputy Chief Clerk; then I became, I

9  believe...and this is where you have to look at the Minutes.

10  First they created a chief county detective position and were

11  interviewing for the director of public safety.   Then

12  Commissioner Warren and maybe Commissioner Hall approached then

13  DA Klein and asked if he would be open to me continuing in my

14  role as Director of Public Safety.   He told me that he advised

15  them that as long as they were okay with the supervisory

16  responsibility falling to him, except for those specific issues

17  on emergency-related items, he was okay with it.   Then a new

18  position was created--Director of Public Safety/Chief County

19  Detective, which I was subsequently transferred into.

20    Q.    Do you recall when that was?

21    A.    Spring of '17, I'm guessing.

22    Q.    Turning to page 8/21, paragraphs 31, 32 and 33.   It

23  talks about an incident in October of 2016.   Could you explain

24  what that incident was?

25    A.    I was in my office with Commissioner Warren.   I can't

31

1   remember what we were talking about.   Commissioner Arnold

2   entered.   I can't remember what the issue was, as I sit here,

3   but she was extremely agitated.   She was yelling at me and then

4   she left and slammed the door.   Commissioner Warren even made a

5   comment that it was not right and something should be done about

6   it.

7          At this point, I believe it was in June or July...it

8   was after the meeting.   Sometime around that timeframe...well,

9   certainly by this point, I had already filed and made them aware

10  that I was filing an EOC Complaint.   As such, I'm sure I stated

11  at that time that I considered this to be continuing

12  retaliation, and I wrote a letter documenting it and forwarding

13  it to all the Commissioners, the solicitor and I believe the EOC

14  investigator.

15     Q.   When you left as Chief Clerk or even Deputy Chief

16  Clerk to become the County Detective and Director of Public

17  Safety, you had an increase in pay; correct?

18     A.   No.   I think it stayed where it was at.

19     Q.   So there was no loss of pay.

20     A.   No, there was no loss in pay, if that's the end of

21  your question.

22     Q.   Correct.

23     A.   There was a loss of responsibility.

24     Q.   After you left the Chief Commissioner or Deputy

25  Commissioner, whichever was defined at the time, and became

32

1   Chief County Detective and Director of Public Safety, did you

2   have any more contact with the Commissioners?

3       A.   Yes.

4       Q.   And what would that be?

5       A.   It would have been in my role for those issues that

6   were emergency-related.

7       Q.   I'm talking specifically about Commissioner Arnold.

8   After you left, did you have any more incidents with her?

9       A.   From October, forward?

10      Q.   Sure.

11      A.   Yes.

12      Q.   And what was that?

13      A.   There was a second incident following the first

14  incident which, again, was witnessed; which, again, was

15  documented.  I believe there was even a letter sent by the

16  solicitor to her, telling her to stop her, I believe,

17  retaliatory behavior.  Following that through the rest of the

18  time, it went to interactions where she would completely

19  ostracize and ignore me, even to the point of exchanging

20  pleasantries or meeting on work-related issues but would still

21  go around and make comments, is my understanding.

22      Q.   Who would tell you that she was making comments?

23      A.   I would hear from Commissioner Hall because that's who

24  I would be reporting to, saying, you know, I'm telling you

25  again...it's very difficult for me to interact and fulfill my

33

1    duties and responsibilities if I can't have a conversation with

2    the individual that I'm reporting to.  Do you see what I'm

3    saying?  It's my responsibility to brief all three so it becomes

4    difficult when one of them is renitent to having conversation at

5    all.

6         Q.    Paragraph 38, page 9/21.  There's a specific date

7    here.  On or about April 3, 2017, Defendant Commissioner Arnold

8    spoke to Plaintiff's subordinates and inquired if Plaintiff's

9    job was necessary.

10        A.    Yes.

11        Q.    I'm going to ask you first -- What job is she

12   referring to?  You've had several.

13        A.    I believe the Director of Public Safety is what she

14   was talking about.  She's talking to the subordinates across the

15   street.

16        Q.    What do you mean by that?

17        A.    Across the street would be the public office building

18   where public safety was.

19        Q.    And who was it that she spoke to?

20        A.    I'm not sure.  I was told that by, I believe,

21   Commissioners Warren and Hall.

22        Q.    You voluntarily left the job as Chief Clerk; correct?

23        A.    The environment was too toxic for me to remain.

24        Q.    But, you weren't fired or transferred.

25        A.    I was demoted.

34

1    Q.    Explain that to me.

2    A.    I was demoted from Chief Clerk to Deputy Chief Clerk,

3    and with it all of the responsibilities and supervision

4    oversight that I had went with it.   Now I was reporting to the

5    Chief Clerk.

6    Q.    Who was that?

7    A.    It would eventually be Lana Adams.

8    Q.    You were her Deputy Chief Clerk.

9    A.    Yes.

10    Q.    For how long?

11    A.    She was there from October, I believe, of '16.   I

12    don't know when she left.   It was sometime in early '17.

13         I don't remember when the next chief clerk came and

14    when I left in terms of the order.   Again, I'm sure it's in the

15    Minutes.

16    Q.    Were you having a problem with Lana Adams as your

17    chief clerk?

18    A.    Apparently Lana Adams was having a problem with me.   I

19    did what I could to help Lana Adams.   Apparently through the

20    deposition there were comments made where she had a problem with

21    me interacting with her.   I'm not aware of any of those

22    problems.   She never made me aware of any of them.   They never

23    made me aware of any.

24    Q.    Do you have any idea of who might have said she had a

25    problem?

35

1       A.    It was through the Commissioner's deposition.   I

2   believe it was Commissioner Warren talking about why they pulled

3   the emails.   They pulled the emails to see if they could glean a

4   better way to communicate with me by looking at myself and

5   Mrs. McNamara's emails.

6       Q.    Where are you currently working?

7       A.    I currently work for the State of Delaware, Department

8   of Labor, Office of Anti-Discrimination as an investigator.

9       Q.    Have you moved to Delaware?

10      A.    No.

11      Q.    Are you commuting?

12      A.    I stay down there for the week and come back on the

13  weekends.

14      Q.    Did there come a time that you left the District

15  Attorney's Office of Susquehanna County?

16      A.    Yes.

17      Q.    And why was that?

18      A.    I had left the District Attorney's Office.   District

19  Attorney Robert Klein had passed away.   His position was

20  subsequently filled by First Assistant District Attorney

21  William Urbanski.   Then there became somewhat of a question over

22  the legality of that, as I understand it.   Judge Legg then named

23  Marion O'Malley to take his place and be named as District

24  Attorney.

25          A lot of comments were getting back to me.   My support

1   for DA Klein may not have been in sync with the District

2   Attorney's thoughts, probably for the best.  Additionally, with

3   the death of DA Klein...I guess to put it in context and stop me

4   if I'm making this answer too long.  Commissioner Arnold and

5   Commissioner Warren had gone to DA Klein about Mrs. McNamara's

6   position, my position, where our offices were, I believe even in

7   the fact that she had been hired in the first place.  He put an

8   end to that, is what he told me.  With his death and

9   subsequently Mrs. O'Malley being put in that position,

10   Commissioner Arnold returned back to the DA's Office.  She

11   seemed to be very close with Commissioner O'Malley.  She was

12   close with Kathy Ragard and spent an increasing amount of time

13   up there which obviously increased my discomfort.  I thought it

14   probably would be best for me to leave that position.

15       Q.    Who is Kathy Ragard?

16       A.    Kathy Ragard is, I guess, the office manager for the

17   District Attorney's Office.

18           I believe it's Kathy with a K, and it's R-a-g-a-r-d.

19       Q.    As you're testifying here today, you're saying that if

20   District Attorney Urbanski won out with the legal challenge

21   over, you would have stayed on in the DA's Office.

22       A.    Yes.  Probably.  I would think so, yes.

23       Q.    Do you still have any contact with any of the current

24   Commissioners now that you're out of Susquehanna County?

25       A.    I have not spoken with Commissioner Arnold.  I have

1   not spoken with Commissioner Warren other than to say hello in

2   my Attorney's office during their depositions.  I speak

3   occasionally with Commissioner Hall.  That would be it.

4        Q.   Do you have any contact with Mr. Giangrieco at all?

5        A.   I told you that we've been friends for 23 years so,

6   yeah, we talk.

7        Q.   Are you still in contact with Ms. McNamara?

8        A.   I do talk to her, sure.

9        Q.   Any other County employees?

10       A.   Oh my God.  I talk to Jeanne Conklin; I talk to

11  Lance Benedict; I talk to John Oliver.  These are all people I

12  interacted with on a normal basis.  Sure, I would talk to

13  whoever I would see.  I just spoke with somebody from probation

14  because I had to get qualified.

15       Q.   Does your wife still work for the County?

16       A.   She does not.

17       Q.   When did she leave?

18       A.   In 2012, I believe.

19  **ATTY. HAILSTONE:**   That's all I have.

20                        * * * * * * * *

21  **ATTY. SZEWCZYK:**   No questions.

22                        * * * * * * * *

23

24            (RECORD CLOSED---11:35 A.M.)

# C E R T I F I C A T E

     **I HEREBY CERTIFY** that the proceedings and evidence are fully contained in the notes of testimony taken by me at the Deposition of **ROBERT STOUD** on October 1, 2018, and that the same is a true and correct transcript thereof.


_____
PATRICIA FUMANTI
Court Stenographer