# Exhibit C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT STOUD                )   CIVIL ACTION - LAW
324 Maple Street            )
Montrose, PA 18801          )
                            )   JURY TRIAL DEMANDED
        Plaintiff           )
                            )
-vs-                        )
                            )
SUSQUEHANNA COUNTY          )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
COMMISSIONER ELIZABETH      )
ARNOLD                      )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
COMMISSIONER MARYANN        )
WARREN                      )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
        Defendants          x

_____

DEPOSITION TESTIMONY OF

**ELIZABETH MCCAHILL ARNOLD**

THURSDAY, AUGUST 16, 2018

321 SPRUCE STREET
SCRANTON, PENNSYLVANIA

CHRISTINE A. MESSNER
COURT STENOGRAPHER

KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PA  18507
(570) 558-3011      (800) 570-3773
FAX  (570) 558-3014



2

C O U N S E L   P R E S E N T:

On behalf of the Plaintiff:
       MAZZONI, KARAM, PETORAK, VALVANO
       BY:  GERALD KARAM, ESQ.
       321 Spruce Street, Suite 201
       Bank Towers Building
       Scranton, Pennsylvania 18503

On behalf of the Defendant:
       KREDER, BROOKS HAILSTONE, LLP
       BY:  A. JAMES HAILSTONE, ESQ.
       220 Penn Avenue, Suite 200
       Scranton, Pennsylvania 18503

## STIPULATIONS

It was agreed by and between counsel that all objections, except as to the form of the question, will be reserved until the time of trial.

It was further agreed that the reading, signing, sealing and filing of the deposition transcript will be waived.

3

# INDEX OF WITNESSES

EXAMINATION                                              PAGE NUMBER

Elizabeth McCahill Arnold

By Mr. Karam                                                4-73

# INDEX OF EXHIBITS

FOR PLAINTIFF
EXHIBIT          DESCRIPTION                          MARKED

Exhibit 1       Letter                                   56

-oO0o-

4

```
1      ELIZABETH MCCAHILL ARNOLD was called, and having

2      been duly sworn, was examined and testified as

3      follows:

4                        EXAMINATION

5

6      BY MR. KARAM:

7           Q.      Would you please state your name for

8      the record.

9           A.      Elizabeth McCahill Arnold.

10          Q.      And do you mind if I call you

11     Commissioner for today?

12          A.      That's fine.

13          Q.      Commissioner, my name is Gerry Karam

14     and I represent Robert S. Stoud better known as Steve

15     Stoud, who I will refer to today as Steve in this

16     deposition and Maggie McNamara who I will refer to as

17     Maggie in a claim that they have against Susquehanna

18     County.  Can you please tell me how you're currently

19     employed?

20          A.      I'm a Susquehanna County commissioner.

21          Q.      I'm going to be asking you a whole

22     bunch of questions.  We have a stenographer here.

23     This is going to be more of a conversation than an

24     interrogation.  And the stenographer is going to be

25     taking down everything that we say.
```

5

1       If you don't hear what I'm saying,
2   please let me know.  If you don't understand a
3   question, please let me know.  Otherwise I'm going to
4   assume that you have heard the question and
5   understood the question.  The stenographer can only
6   take down verbal responses, can't take down a nod of
7   the head or hand gestures.  So I would ask that all
8   your responses be verbal in nature.
9       And as I said this is more of a
10  conversation, and when we have conversations a lot of
11  times we talk over each other.  But in this case I
12  would just ask you let me finish my question and then
13  you'll have all the ability to answer it as fully as
14  you need to.  Okay?
15      A.    Okay.
16      Q.    You said you're currently employed as a
17  county commissioner.  How long has that been?
18      A.    A little over two-and-a-half years.
19      Q.    Okay.  And how old are you, I
20  apologize?
21      A.    Fifty-five.
22      Q.    Fifty-five.  Okay.  Are you married,
23  single?
24      A.    I am single.
25      Q.    Single.  Children?

6

1    A.    Yes.

2    Q.    How many kids?

3    A.    Two.

4    Q.    Adult --

5    A.    Yes.

6    Q.    -- children?  What's your educational

7  background?

8    A.    I went to trade school.  I'm a barber

9  and I'm a licensed real estate agent, not licensed at

10  the time because I let my licenses go.  I was

11  licensed in Pennsylvania and New York.  And I have

12  some education, some college education and high

13  school.

14    Q.    And how about your work history?

15    A.    I've been a barber since I was 19 years

16  old, currently not working that, and real estate.

17  And I worked in the oil and gas industry for

18  approximately six years as a landsman.

19    Q.    As a landsman.  For what company?

20    A.    We represented Cabot Oil and Gas, but I

21  worked for -- I was a self-employed contractor

22  basically working for TS Calkins and Associates out

23  of Bradford, Pennsylvania.  I worked for them for

24  about three years.  Prior to that I did seismic

25  exploration and I was a permit agent.

7

1          Q.     Okay.  And where were your -- the

2     various locations where you worked as a barber?

3          A.     Lemon, Pennsylvania.

4          Q.     Lemon Township?

5          A.     Yeah.

6          Q.     Wyoming County?

7          A.     Yes.

8          Q.     Lake Carey?

9          A.     Yes.  I was there when the tornado

10    happened.

11         Q.     Wow.

12         A.     Yeah.  It didn't affect me at all.  It

13    affected a lot of my customers.

14         Q.     You were there for a while I guess?

15         A.     Yes.

16         Q.     Okay.

17         A.     I had bought a building there.  I was

18    there for about seven years.

19         Q.     So you're a commissioner approximately

20    two-and-a-half years you said?

21         A.     Yes, I came in in 2016.

22         Q.     And I'm going to just repeat what

23    Commissioner Hall and Commissioner Warren have

24    indicated just to confirm with you.  You're of the

25    republican party, but you ran individually, not as a

8

1    team for commissioner; is that accurate?

2          A.    I'm of the republican party.  I was not

3    part of the party at the time I ran if that's what

4    you mean.

5          Q.    Okay.  But what I'm getting at is you

6    didn't run as part of a team --

7          A.    No.

8          Q.    -- running for commissioner?

9          A.    No.

10         Q.    You ran individually?

11         A.    Yes.  Yes, sir.

12         Q.    And is it accurate to say that the

13   three of you, Commissioner Hall, Commissioner Warren

14   and yourself, govern on an individual basis, not a

15   party basis?  In other words, you don't vote as a

16   team?  Don't answer until he comes back.

17               Do you need that repeated or do you

18   remember that question?

19         A.    Please repeat it.

20         Q.    You don't vote as a team, you vote as

21   how you individually feel is best for the community?

22         A.    That's correct.

23         Q.    Do you know Steve Stoud?

24         A.    Yes.

25         Q.    How do you know Steve?

9

1      A.      Because he worked at the courthouse

2  when I started there.

3      Q.      Did you know him before you started?

4      A.      I met him several times in 2015 during

5  the campaigning.   When I would come into the

6  courthouse to do stuff at the voter registration

7  office I met him.

8      Q.      And how was your relationship with him

9  at that stage?

10      A.      Cordial, basically that of strangers.

11  We didn't really know each other.   I was like who is

12  he, he's the acting chief clerk, okay.

13      Q.      And did you know Maggie McNamara?

14      A.      I did not until 2015.   Again I met her

15  like when I came in to get paperwork while I was

16  campaigning.

17      Q.      Did you know Rich Ely?

18      A.      No.

19      Q.      Did there come a point in time after

20  you became commissioner when you became aware of a

21  complaint Maggie McNamara made against Rich Ely?

22      A.      I was not aware of that until several

23  months after I was there.

24      Q.      Okay.  About when?

25      A.      I can't give you a date.  I'm going to

10

1    say three months maybe, I don't know for sure.

2           Q.     And do you know Rich Ely?

3           A.     Well, I do now, but I didn't at the

4    time.  I didn't know any of these folks really until

5    I started there.

6           Q.     So tell me what you knew about the

7    complaint that McNamara made against Ely.

8           A.     It was Christmastime and there was

9    people giving hugs to each other and merry Christmas

10   to each other.  And I guess he attempted to hug her

11   or they said there was something to do with the car

12   and the window and he knocked on the window.

13          Q.     And was he disciplined to your

14   knowledge?

15          A.     I believe Mr. Stoud wrote him a letter.

16          Q.     Were you told that Maggie McNamara

17   complained that was it was an unwanted advance by

18   Rich Ely?

19          A.     I believe Mr. Stoud told me that when I

20   heard the story.

21          Q.     Okay.  Are you aware if there's a chain

22   of command policy in Susquehanna County?

23          A.     I was told that there was, yes.

24          Q.     Who told you that there was?

25          A.     Probably Steve Stoud or Alan Hall or

11

1   both.

2          Q.     Okay.  And what was your understanding

3   of what the chain of command policy in Susquehanna

4   County was?

5          A.     That the commissioners are at the top,

6   the chief clerk is under the commissioners and the

7   rest of the employees basically fall under the chief

8   clerk unless they are under another elected official.

9          Q.     And were you told that the chain of

10  command policy goes both up and down?

11         A.     I guess so.

12         Q.     You were told that?

13         A.     Okay.

14         Q.     No, I'm not --

15         A.     I guess I was.

16         Q.     No --

17         A.     Up and down.

18         Q.     When I say down, meaning if you have an

19  issue with an employee in IT, that you the

20  commissioners would work it first through the chief

21  clerk and then it would work its way down through the

22  supervisory chain.

23         A.     I don't recall that exact conversation,

24  no, but it could have happened.  I do know that it's

25  the commissioners and the chief clerk was under the

12

1    commissioners, that chain of command.

2        Q.    Do you recall ever voting on a chain of

3    command policy as a commissioner?

4        A.    I don't.  I'm thinking that may have

5    been in place before I got there.

6        Q.    Okay.  Was there ever a point in time

7    where a commissioner, a fellow commissioner or an

8    attorney told you that you weren't following the

9    chain of command properly?

10       A.    Yes.

11       Q.    Tell me about that.

12       A.    I can't recall the exact conversation,

13   but I was told that I was not following the chain of

14   command.

15       Q.    And who told you and when?

16       A.    I'm going to say probably Alan Hall,

17   Commissioner Hall.

18       Q.    Did anybody else say it to you?

19       A.    I don't recall.

20       Q.    Were there any points of time when you

21   would go and speak with subordinates of supervisors

22   without the supervisors' knowledge?

23       A.    Probably I did, yes.

24       Q.    Can you tell me --

25       A.    Because I talk to people.  I ran my

1    campaign that way that I was a person that was

2    approachable, so people approached me.

3          Q.    Well, I'm not talking about people

4    approaching you.  I'm talking about you approaching

5    people.

6          A.    Yes.

7          Q.    Did you approach subordinates?

8          A.    Yes.

9          Q.    And following your approaching those

10   subordinates, were you ever told that that's not

11   proper?

12         A.    Yes.

13         Q.    In terms of the chain of command?

14         A.    Yes.

15         Q.    Okay.  Tell me what subordinates it was

16   and who told you it wasn't appropriate?

17         A.    I talked to Tara Kennedy.

18         Q.    And who is Tara Kennedy?

19         A.    She is the assistant to the director of

20   Veterans Affairs.

21         Q.    Okay.  And what were you talking to her

22   about?

23         A.    There was a seminar that she and

24   Mr. Ely wanted to go to, attend to.  And she needed

25   that training so that she could get certified to do

14

1   her job, that was my understanding.  And I asked her

2   if she was comfortable going down to that and she

3   told me she was.  There was conversation about them

4   not being allowed to go.

5        Q.    Was this after the complaint made by

6   Maggie McNamara?

7        A.    I don't know that it was after the

8   complaint, but it was after the incident.

9        Q.    After the incident.  Okay.

10        A.    Yes.  So I think people were uneasy

11   about that.

12        Q.    Anybody else?

13        A.    That I just had like everyday

14   conversation with?

15        Q.    That you approached to talk about

16   county business.

17        A.    No.  There's an incident that what you

18   may be thinking of when Steve Stoud, I thought he was

19   actually gone to be the chief detective at that point

20   and I was in the county building.  And I'm bringing

21   this up because I know it's in the complaint

22   somewhere, that I was questioning employees whether

23   they thought they needed a Public Safety director or

24   if they could just handle their own departments.  And

25   I was accused -- okay.  Alan Hall wrote me a letter,

15

1   that's what happened.

2            He wrote me a letter like reprimanding

3   me that I went over there and questioned the

4   employees as to whether or not we needed a Public

5   Safety director.  And that is not true completely.  I

6   did ask that question, but I did not go to the county

7   office building looking to ask anyone anything other

8   than the planning, the head of planning which is

9   Robert Templeton, and I had gone in his office to

10  talk to him.

11           And as I stepped out into the hallway,

12  several employees came up with like a smile on their

13  face and said hey, are we going to get a new boss.

14  This was after we had hired another gentleman who

15  applied for the job of Public Safety director, and we

16  hired him but Commissioner Hall asked him if he would

17  also like to take on the responsibility of being

18  chief clerk.  So this man was hired.

19      Q.      Who is that man?

20      A.      Steven and it starts with K,

21  K-A-R-N-I-E-K maybe.

22      Q.      And who were the employees that came up

23  to you and said hey, are we going to have a new boss?

24      A.      Well, can I finish that conversation?

25      Q.      Absolutely.

1      A.    So that man was hired and he started on

2   a Monday, and on Tuesday he walked off the job.  So

3   people were kind of joking like wow, that guy lasted,

4   you know.

5      Q.    A day?

6      A.    A day.  You know so that's why.  I was

7   away at conference when that happened in Harrisburg.

8   And so when I came back, I went to see Mr. Templeton

9   about something and that's when several came up to me

10  and, you know, they were joking like, gee, when are

11  we going to get a boss.

12          When I said to them do you think we

13  need that person, it was nothing directed at Mr.

14  Stoud, who I believe was not in that position at that

15  point anyway.  He was already up with the District

16  Attorney working in that job.  And I didn't say it as

17  a negative towards anyone.

18          What my question was was, you know,

19  that was like a $60,000 a year job, do we need to

20  have that job, do we need to be spending that

21  taxpayer money on that; or could the head of EMA, the

22  head of 911 could they, you know, take care of

23  themselves, take care of the department.

24          Who were they, Carolyn Ainey was one

25  that asked and I think Michelle Graziano came walking

17

1    up the hall that day.  And there was one other

2    person, but I can't remember who it was.  It seemed

3    like there was three.  It was like a lighthearted,

4    joking type of conversation.

5         Q.    Did there come a point in time where

6    you started to question the work product of Maggie

7    McNamara?

8         A.    Mostly the problem that I saw with

9    Maggie was the agenda, having mistakes on the meeting

10   agenda, just errors.

11        Q.    Can you describe the mistakes and

12   errors?

13        A.    Nothing huge, you know, a comma or a

14   word missing or, you know, maybe a couple words

15   missing.  It was nothing huge.

16        Q.    Nothing that you would fire a person

17   for?

18        A.    No.

19        Q.    What else troubled you about Maggie's

20   work product?

21        A.    I don't have a lot of things with

22   Maggie.  A couple times I tried to get ahold of her

23   by phone because in the Commissioners' Office, your

24   chief clerk and deputy chief clerk and your HR

25   director and your assistant to HR, they are all down

18

1    in front of the courthouse, and the three

2    commissioners' offices are in the back of the

3    building.  And we had construction as soon as I

4    started the job, fairly soon afterwards we started a

5    very large construction project where the hallway

6    closed down and you actually had to go outside.  All

7    winter we had to deal with that, going outside and

8    around the building to get to the Commissioners'

9    Office to get to our staff.

10           And I know there was a couple of times

11   when I would call down to Maggie to ask her a

12   question and she was not at her desk or she didn't

13   answer her phone anyway.  So the second time I went

14   down, or it might have been twice, because I know I

15   was annoyed, I went down and she was in Mr. Stoud's

16   office and they were sitting talking.

17       Q.    Did you ask what they were talking

18   about?

19       A.    No, I did not interrupt them.  That

20   particular day Michelle Graziano was in there as

21   well.  It was the afternoon, like probably 2:00.

22       Q.    Nothing inappropriate about the deputy

23   chief of staff being in the chief -- or the deputy

24   chief clerk being in the chief clerk's office having

25   a discussion, is there?

1        A.     No.

2        Q.     So she made some minor errors with the

3   agenda, a couple times you couldn't get ahold of her.

4   Anything else about Maggie McNamara that her work

5   product had bothered you?

6        A.     Not that I can think of.

7        Q.     Did there come a point in time when you

8   became aware that both Steve Stoud and Maggie

9   McNamara felt that they were working in a hostile

10  work environment and that they were being retaliated

11  against?

12       A.     When they filed their claims.

13       Q.     Did you know beforehand though?  I mean

14  isn't it true that they mentioned it maybe not to

15  you, but certainly mentioned it to Commissioner Hall

16  and Commissioner Warren that they felt that they were

17  being retaliated against and it was a hostile work

18  environment?  Did that get communicated to you at

19  all?

20       A.     I know Mr. Stoud, yeah, Mr. Stoud I

21  know was upset because I know a couple times he said

22  I can go back across the street.

23       Q.     What does that mean?

24       A.     Back to his job as the Public Safety

25  director.  Apparently they had talked about that, the

20

1  previous commissioners, the previous board.  So yes,

2  I knew that they were -- I don't know about the

3  retaliation part.  I didn't know that was tied to

4  that, but I did know that they were upset.

5      Q.    Okay.  Did you ever indicate to anybody

6  that you weren't happy that Stoud and McNamara were

7  saying that they worked in a hostile work

8  environment?

9      A.    Not that I recall.

10     Q.    Do you recall a meeting in the

11 beginning of June of 2016, okay, so June 2016 where

12 all three commissioners were present and Steve Stoud

13 was present as well and that you brought up the fact

14 at that meeting that Steve Stoud complained that he

15 was working in a hostile work environment?

16     A.    I remember that meeting very well.  I

17 don't remember him saying that.  What I remember in

18 that meeting --

19     Q.    No, no.  Not him saying that, you

20 saying it.

21     A.    That I said that he said he was working

22 in a hostile work environment?

23     Q.    And that then you accused him of

24 causing a hostile work environment?

25     A.    I probably did.  I don't remember that

21

1   part of that meeting.  I remember another part that's

2   more vivid in my mind.

3           Q.    Okay.  But do you recall accusing Steve

4   of causing a hostile work environment?

5           A.    I don't.

6           Q.    You don't?

7           A.    I don't, but I may have.  I'm not going

8   to say I didn't say it, but I don't recall it.

9           Q.    And when you say you may have, is that

10  because that's what you believe?

11          A.    Yes.

12          Q.    Why do you believe Steve would cause,

13  causes a hostile work environment?

14          A.    Because I feel that he intimidated

15  people.

16          Q.    And how would he intimidate people?

17          A.    Some of it just his demeanor.

18          Q.    Did you ever receive any complaints

19  that he, from employees, that he intimidated them?

20          A.    Yes.

21          Q.    Who?

22          A.    Different women that had had incidents.

23          Q.    Can you tell me who?

24          A.    One would be Sharon Depew.

25          Q.    What did Sharon Depew complain about?

22

1      A.    Sharon takes care of payroll and

2   checks, writes the checks out.  She handles the

3   money.  And her office was in the back of the

4   building at that point in time at end of the

5   treasurer's office.  And she was in a smallish office

6   with one door going in and out.

7        And she told me of an incident where

8   something in Maggie's work that Maggie had sent up

9   was not correct and Sharon sent it back down to the

10   front office to be corrected.  And Mr. Stoud came up

11   to her office and put both his hands in the doorway

12   like this.  This is the only doorway to get in or

13   out.

14        This woman is sitting at her desk.  And

15   he had his hands in the doorway like this and said

16   why did you send that work back down, we're supposed

17   to be a team, why did you just not correct it.  And

18   Sharon who's been there I think 20 years said that's

19   not my job to fix other people's work and they need

20   to learn to do their job.

21      Q.    Okay.

22      A.    That's one incident.

23      Q.    I want to hear them all.

24      A.    There was another incident that

25   happened I believe before I was there.  Shari Whitney

1   told me that apparently Maggie McNamara had called

2   her on the telephone, their office was towards the

3   back of the building almost in the front and called

4   her for something, I don't recall what it was.

5          And before they -- when they hung up

6   the phone, Shari Whitney did not say goodbye.

7   Apparently that ended up being a problem and Mr.

8   Stoud ended up calling her into his office to speak

9   to her about that.

10       Q.    Okay.  Anything else?

11       A.    I have some of them written down, but

12   they're not coming to me at the moment.  There was

13   another employee that no longer works for the county.

14       Q.    Name?

15       A.    Laura Watts.

16       Q.    Laura who?

17       A.    Watts.  She was the director of voter

18   reg for about eight years I believe.  The building

19   was under construction down front at that time in

20   2015.  There was a lot of dust flying in the air.  It

21   was a big mess.

22          They had to move the election office to

23   the back of the building into the room where Alan

24   Hall's office is now, a much, much smaller space.

25   And it was a very big election.  There were eight

24

1      people running for commissioner.  There were people

2      running for treasurer, people running for auditor.

3      So it was a fairly big election, so they were busy.

4             And she called down and asked if Maggie

5      could bring her up staples for the copy machine

6      because they had to get the street lists out, simple

7      request.  Maggie and another gal did take the staples

8      up to her.  Shortly thereafter Mr. Stoud showed up in

9      the doorway and said really, you couldn't come down

10     and get your own staples, really, or something to

11     that effect.

12        Q.    Okay.

13        A.    And Mrs. Watts said we're supposed to

14     be a team and she was very swamped and very

15     overwhelmed preparing for the election and all the

16     construction is going on.  You know people are

17     tracing in and out of her office, so it was a

18     stressful time.  She left that day and never came

19     back.

20        Q.    She didn't come back because Steve

21     Stoud said she should have went and got her own

22     staples?

23             MR. HAILSTONE:  Object to the

24        form.  She doesn't know why.

25             MR. KARAM:  Well, I'm asking her.

**KEYSTONE COURT REPORTING AGENCY, INC.**

25

1          MR. HAILSTONE:  Right.  If she

2     knows.

3          THE WITNESS:  I think that was

4     probably the last straw that broke the

5     camel's back.  I think there were

6     probably numerous other things.

7  BY MR. KARAM:

8     Q.    Are you aware of any formal complaints

9  being made against Steve Stoud?

10    A.    I'm not aware of any.

11    Q.    Are you aware of him ever being

12 disciplined?

13    A.    No.

14    Q.    Are you aware of a complaint ever

15 formally being made against him?

16    A.    Maybe one.

17    Q.    Tell me about it.

18    A.    Maybe Kathy Ragard did.

19    Q.    What did she say?

20    A.    I'm not sure.  I did not see that.

21    Q.    Okay.  Let's get back to this June

22 meeting.  Are there any others, by the way, any other

23 matters?

24    A.    Not that I can recall.

25    Q.    Getting back to this June 7, 2016

26

1      meeting, it's my understanding at that meeting that

2      you indicated that you wanted Maggie McNamara

3      terminated?

4              A.      I may have.

5              Q.      Well, do you recall telling your fellow

6      commissioners you wanted Maggie McNamara terminated?

7              A.      I do not recall that.

8              Q.      If I tell you that right before you

9      were here Commissioner Warren was here and she

10     vividly recalls you saying you wanted Maggie McNamara

11     terminated, would you dispute what Commissioner

12     Warren is saying?

13             A.      Possibly.

14             Q.      Well, tell me how it's possible you

15     would dispute that.

16             A.      I don't trust everything there.

17             Q.      You don't trust Commissioner Warren?

18             A.      Yes.

19             Q.      Do you trust Commissioner Hall?

20             A.      No.

21             Q.      Do you trust Steve Stoud?

22             A.      No.

23             Q.      So if all three of those people are

24     saying at this meeting you indicated you wanted

25     Maggie McNamara terminated, are you saying they're

1   lying?

2          A.     I'm saying I don't remember saying

3   that.

4          Q.     Well, let me ask you this:  On June 7,

5   2016 did you want Maggie McNamara terminated?

6          A.     I don't recall.

7          Q.     You're saying it's possible?

8          A.     It is possible.

9          Q.     Why would it be possible that you said

10  you wanted Maggie McNamara terminated?

11         A.     Because of the tension, because of the

12  drama, because there always seems to be something

13  going on.

14         Q.     What was going on?

15         A.     There was always something going on.

16         Q.     Tell me what.  If there was always

17  something going on, give me an example of what was

18  going on.  You just indicated the only problems you

19  had with Maggie McNamara is work product, was she --

20  she wasn't there when you called her a couple times

21  and that she made a couple of errors on the agenda

22  that weren't too big a deal and that's all you

23  indicated that was wrong with her work product.

24         Then at the June 7, 2016 meeting two

25  commissioners and the chief clerk are indicating that

28

1    you said you wanted her terminated.  Why?

2          A.     I don't remember.

3          Q.     Well --

4          A.     I honestly don't remember.

5          Q.     -- then you said there was always

6    something going on.  Can you give me an example of

7    what was going on?

8          A.     There was always drama about the agenda

9    and about things not being correct.

10         Q.     About these minor errors that you're

11   talking about?

12         A.     Mm-mm.

13         Q.     Okay.  Anything else?

14         A.     Not that I can recall, no.

15         Q.     So when you say there was always drama,

16   that drama that you're talking about is limited to

17   the minor typographical and grammar errors in an

18   agenda; is that accurate?

19         A.     Yes.

20         Q.     Do you recall Commissioner Warren

21   agreeing with you that Maggie McNamara should be

22   terminated?

23         A.     I'm sure Commissioner Warren did want

24   her terminated at one point.  I'm sure we did discuss

25   that.  I don't know the date of it.

29

1       Q.    Okay.  So you do recall discussing the

2  termination of Maggie McNamara with Commissioner

3  Warren?

4       A.    I believe it was said, but I don't

5  believe it was said in that meeting.  I believe we

6  may have said it with Jean Conklin.

7       Q.    Okay.  And I was going to get to that.

8       A.    Okay.

9       Q.    I was going to get to that because Jean

10  Conklin also indicates that you went to her and told

11  her that you wanted Maggie McNamara terminated.  Do

12  you recall that?

13       A.    I vaguely do.  I think I was upset that

14  day and I don't remember what had happened.  But I

15  would have to be upset to say that because I'm not a

16  person to go around thinking we should terminate

17  someone, you know.  It has to be -- these are

18  people's livelihoods.  This is their income to

19  support their family.  So I don't take this stuff

20  lightly.

21       Q.    And somebody shouldn't be terminated

22  for a typo or a --

23       A.    No.

24       Q.    -- grammatical error in an agenda,

25  right?

30

1     A.     No.  And I do believe --

2     Q.     And they shouldn't be threatened with

3  termination for that stuff, correct?

4             MR. HAILSTONE:  You didn't let her

5          finish her answer.

6             THE WITNESS:  I believe that they

7          shouldn't be threatened with that, but I

8          believe that that conversation was

9          behind closed doors with the chief clerk

10          and the three commissioners, then she

11          shouldn't have known about that.  That

12          should have been a private, confidential

13          conversation.

14  BY MR. KARAM:

15     Q.     Okay.

16     A.     I do believe that I had said to Mr.

17  Stoud on more than one occasion Steve, I'm not

18  worried about a couple minor things on the agenda.

19  That really would upset Commissioner Warren a lot.

20  She's very into grammar I guess.  And it's not just

21  Maggie, she corrects everybody.

22             You put a letter in front of her for

23  her to proofread and she's going to mark it up,

24  that's her thing.  You know and I'm sure I said to

25  Mr. Stoud more than once I'm not that concerned about

1    that, there's bigger things to worry about.

2         Q.    So let's get back to you wanting to

3    terminate Maggie McNamara.  You agree that you wanted

4    to terminate her, you're just unsure at what point in

5    time you communicated it to the other commissioners

6    and to Jean Conklin.  Is that an accurate statement?

7         A.    I think it is.  But I say I think

8    because I can remember a time when the opening became

9    open up with the District Attorney, and I thought to

10   myself in my head Maggie should apply for that, like

11   why doesn't she just move to another department where

12   she's not scrutinized so much, you know.

13        Q.    Do you agree that there was a high

14   level of scrutiny on Maggie's work product?

15        A.    I do.  But I don't know in my opinion

16   that it had anything to do with the Richard Ely

17   thing.  I don't see where those two.

18        Q.    Well, do you agree that this high level

19   of scrutiny occurred after her complaint about

20   Richard Ely?

21        A.    I never would have put that together

22   until I read about that.  Like I never would have

23   thought that.

24        Q.    Who else did you indicate to that you

25   wanted Maggie McNamara terminated, other than the two

32

1    commissioners and Jean Conklin?

2          A.    I don't recall anyone.

3          Q.    Anyone else?

4          A.    I don't recall anyone, unless I said

5    something to my solicitor Michael Giangrieco.

6          Q.    What were your reasons for wanting to

7    terminate Maggie?

8          A.    I don't know.

9          Q.    You don't know?

10         A.    Well, what I'm telling you, I'm trying

11   to tell you just that there was drama, there was

12   tension in the Commissioners' Office all the time.

13         Q.    But you can't tell me what the drama

14   was other than the agenda, the typos in the agenda.

15   Before you came here today, did you talk about your

16   testimony here with anybody?

17         A.    I tried to read through my notes last

18   night.

19         Q.    So you've taken notes of everything?

20         A.    No, not everything.  But I do have, I

21   have jotted a few things down.  I tried to read

22   through stuff, the letters that were sent to me and

23   stuff like that.  I thought Robin Reed wrote a very

24   good letter.  I thought it was quite accurate in her

25   details.

33

1    Q.    What else did you read through?  What

2    other documents did you look at in preparation for

3    today?

4    A.    I read Robin Reed's letters.  I read a

5    letter that Alan Hall sent to me.  I read the letters

6    that Steve Stoud had written and Maggie's deposition.

7    Q.    And none of those -- who gave you

8    Maggie's deposition?

9    A.    My attorney Jamie Hailstone.

10   Q.    Did you see anything in Maggie's

11   deposition?  Did you read through it?

12   A.    Yes.

13   Q.    Was there anything in Maggie's

14   deposition that you felt was inaccurate?

15   A.    I'm trying to go through it in my head.

16   I know I made some notes.  I don't know if I would

17   say inaccurate.  I did not know that Commissioner

18   Hall was telling her things that I thought were

19   spoken in confidentiality.

20   Q.    Okay.  So you may have a problem with

21   Commissioner Hall speaking to Maggie McNamara.  But

22   in terms of the accuracy of what Maggie stated, did

23   you see anything that was inaccurate or false in her

24   deposition?

25   A.    Not that I can recall.

34

1       Q.      Okay.  At this early June 2016 meeting,

2    and I'll submit to you that it was June 7, 2016, do

3    you recall Steve Stoud responding to the request to

4    terminate Maggie McNamara with outrage; basically

5    saying look, she's a good employee, she does good

6    work, she shouldn't be terminated?  Do you recall

7    Steve doing, and I'm paraphrasing, do you recall a

8    response like that?

9       A.      I believe he did.  I know he did not

10   want to.  I know he defended her.  So yes, he

11   probably did say she was a good employee.  I've heard

12   him say that before.

13      Q.      And by the way, Maggie was never

14   written up, right?

15      A.      I never wrote her up.  I don't know if

16   anyone else did.

17      Q.      She was never disciplined for anything,

18   was she?

19      A.      Not that I'm aware of.

20      Q.      And her immediate supervisor gave her

21   very good reviews?

22      A.      He did.

23      Q.      Do you recall it coming up at that

24   meeting that you believed Maggie McNamara and Steve

25   Stoud were having an affair?

1       A.    I'm not sure how it was brought up, but

2    I know that that was discussed.  What I remember of

3    the meeting that day, what stands out the most in my

4    mind was that Steve Stoud stated that everything was

5    going along smoothly for the last two years with no

6    bumps in the road up until the last six months.  What

7    has changed he said in the last six months, and he

8    was facing Commissioner Warren, and he swung his head

9    around and looked at me across the table like that.

10    That's the highlight of that meeting for me.

11       Q.    So he was blaming you for whatever

12    problems were existing?

13       A.    I was the change.  I was what was

14    different.

15       Q.    Okay.  Let's get back to Steve Stoud

16    and Maggie McNamara having an affair.  I will submit

17    to you that -- well strike that.  If Commissioner

18    Warren and Commissioner Hall and Steve Stoud have

19    indicated that you brought up them having an affair

20    in this meeting, would you dispute that?

21       A.    Well, I can't recall it, so I can't

22    agree to it.

23       Q.    Well, let me ask this:  Let's speak in

24    a very general sense.  Do you ever recall having a

25    conversation with anybody about Steve Stoud and

36

1    Maggie McNamara having an affair?

2          A.    I know I talked to Michael Giangrieco.

3          Q.    So you told him you felt they were

4    having an --

5          A.    I didn't use the word affair.  I don't

6    know when the word affair came into play.  I said

7    something is not right here because I heard of these

8    incidents where he had gone and yelled at people.  He

9    also yelled at Commissioner Warren after a

10   commissioners' meeting one day.  He went up to her

11   office and yelled at her and she came and immediately

12   told me right after it happened.

13                And so I said to Mr. Giangrieco my

14   solicitor in his office, I said what is going on.  I

15   said a man doesn't go around yelling at people

16   defending one of his employees.  He said it's normal

17   for a supervisor to defend an employee.  I'm like to

18   that extent, I said something is not right here.  And

19   I did say that to Jean Conklin.  I did say at the

20   time when I went in that day and she was in his

21   office, I said is she in there every day, I said,

22   what is going on here.

23         Q.    If Jean Conklin indicates that you said

24   they were having an affair, would that be, you know,

25   would you dispute that?

37

1      A.      I dispute the word affair, the word

2  itself.

3      Q.      Was there --

4      A.      Did I say what is going on here --

5      Q.      How about that they're in an

6  inappropriate relationship?

7      A.      And I didn't say that.  I said Jean,

8  what's going on here, why is she in there every day

9  and Jean said that's what we are all wondering.  I

10  said is it necessary for her to be in there that

11  amount of time every day because it seemed like it

12  was in the afternoons a lot.  And Jean said I guess

13  they are working on stuff.

14      Q.      Did you insinuate that they were having

15  an affair?

16      A.      I may have said, yeah, I may have been

17  wondering.  Everyone in the building was.

18      Q.      And who else did you talk to about it?

19      A.      People talk about it all the time.

20      Q.      That's what I'm asking.  Who else did

21  you talk to about Steve and Maggie having an affair?

22            MR. HAILSTONE:  I object to the

23         phrasing.  She never said and she was

24         very clear she never used the word

25         affair.

1  BY MR. KARAM:

2        Q.    Affair, inappropriate relationship,

3  however you want to phrase it, who else did you talk

4  to about that?

5        A.    I would say both commissioners, I would

6  say Michael Giangrieco, I would say Jean Conklin,

7  maybe I may have said something to Jane Krupinski,

8  I'm not sure.  People talked about it.

9        Q.    Let me ask you this:  Did you ever ask

10 Steve Stoud about it?

11       A.    No.

12       Q.    You were his supervisor, right?

13       A.    I was, yes.

14       Q.    He was a direct report to you as a

15 commissioner, he directly reported to each one of the

16 three commissioners; correct?

17       A.    Mm-mm.

18       Q.    Yes?

19       A.    Yes, yes.

20       Q.    And you never asked him about it?

21       A.    I don't recall that I did.

22       Q.    But you went talking to a subordinate

23 of his Jean Conklin, you went and talked to her about

24 it; correct?

25       A.    I made that remark to her, yes.

1    Q.    And don't you think that that
2    undermines his authority as the chief clerk when
3    you're going to one of his subordinates and saying
4    hey, something is going on between he and Maggie
5    that's not right?   Doesn't that undermine his
6    authority?
7         A.    Yes, it probably does.
8         Q.    Do you agree that the better approach
9    should have been to go directly to Steve Stoud and
10   say I'm concerned about rumors I'm hearing or I'm
11   concerned about the amount of time you're spending
12   with Maggie, why is it necessary that you spend so
13   much time with the deputy clerk?
14        A.    That would have been a better approach,
15   you're right.
16        Q.    And do you agree that there's nothing
17   unusual with hour-long meetings between the deputy
18   clerk and the chief clerk?
19        A.    I don't see that happening.   I don't
20   know what the normal protocol was.
21        Q.    Okay.
22        A.    This is my first time I had an
23   experience with a chief clerk and deputy chief clerk.
24        Q.    Do you know the duties of the chief
25   clerk and the --

40

1       A.      Yes.

2       Q.      What are the duties of the chief clerk?

3       A.      To get agendas ready, to read mail that

4  comes in, to look over contracts, to discuss things

5  with the commissioners.

6       Q.      He's basically --

7       A.      Daily operations.

8       Q.      He's basically in charge of the daily

9  operations of the county?

10      A.      Mm-mm.

11      Q.      And what are the duties of the deputy

12 chief clerk?

13      A.      To assist him.

14      Q.      To assist him.  So she will assist him

15 in his duties, correct?

16      A.      Yes.

17      Q.      And he will delegate some of his duties

18 to her?

19      A.      Yes.

20      Q.      So do you agree that it's natural for

21 them to have to meet to discuss these duties?

22      A.      Yes.

23      Q.      And the office that they're meeting in,

24 it's a glass office, right?  Not a glass, you can see

25 into the office is what I'm saying.

41

1         A.      There is a glass window in the door,

2    yes.

3         Q.      So they're not meeting behind a closed

4    door that nobody can see in?

5         A.      Correct.

6         Q.      Do you recall telling Jean Conklin that

7    you were going to put a disciplinary letter in Steve

8    Stoud's file following the meeting that we just

9    talked about?

10        A.      I probably said it to her, I did want

11   to do that.  I did not do that.

12        Q.      Why did you want to do that?

13        A.      For the way that he looked at me and

14   spoke to me in that meeting, I thought it was

15   disrespectful.

16        Q.      And you went and told one of his

17   subordinates this?

18        A.      Well, she was the HR director, so I

19   thought that's where we're supposed to go with those

20   things.

21        Q.      Okay.  So now do you recall -- you said

22   you recall that meeting in question?

23        A.      Mm-mm.

24        Q.      Do you recall the next day there being

25   another meeting with just the commissioners where you

1      went over a list of complaints that you wanted Steve

2      Stoud to address with Maggie McNamara?

3           A.    I thought we did that in the first

4      meeting.

5           Q.    Okay.

6           A.    I thought we did.

7           Q.    Do you ever recall going to one of the

8      commissioners and indicating that we have to break up

9      Steve Stoud and Maggie McNamara?

10          A.    If I did, it may have been Alan Hall.

11          Q.    Do you recall saying that to Alan Hall?

12          A.    Not those words, no.  No, I really

13     don't.  I don't really.  I remember in that meeting

14     on the 7th I said that people, meaning the

15     constituents wanted the circle broke up.

16          Q.    What circle?

17          A.    The commissioners, the chief clerk,

18     Michael Giangrieco and the deputy chief clerk.

19          Q.    Meaning they wanted them broke up as to

20     don't communicate with each other or fire them or

21     what do you remember?

22          A.    I guess they were just insinuating that

23     they were a clique.

24          Q.    And were you part of that clique?

25          A.    No, I've never been part of the clique.

43

1          Q.     Was MaryAnn Warren part of the clique?

2          A.     She was a commissioner, yes.

3          Q.     Alan Hall was part of the clique?

4          A.     Yes.

5          Q.     Michael Giangrieco was part of the

6    clique?

7          A.     Yes.

8          Q.     Steve Stoud?

9          A.     Yes.

10         Q.     Maggie McNamara?

11         A.     Yes.

12         Q.     Jean Conklin?

13         A.     I don't remember.  Jean started just

14   there a little bit before I did.  Do you want me to

15   turn that off?

16              MR. HAILSTONE:  Yes.

17   BY MR. KARAM:

18         Q.     So do you recall -- well, you're saying

19   you don't recall going to Commissioner Hall saying

20   that you have to break up McNamara and Stoud?  You

21   don't recall that?  Verbal answer.

22         A.     I'm thinking.  I'm thinking.  I don't

23   recall the exact conversation, but I may have said

24   that to him.  A lot went on.  I don't -- I didn't

25   document everything.  I guess I should have.

44

1     Q.    Okay.  So what does may have said it

2   mean?  Does that mean you might have said it because

3   that's the way you thought?

4     A.    Yes.

5     Q.    Okay.  So you -- so whether you said it

6   to Alan Hall or not, you felt you had to break up

7   Steve Stoud and Maggie McNamara?

8     A.    I probably thought that perhaps if they

9   weren't working in the same office for us that maybe

10   it would be calmer.

11    Q.    Okay.  So then can I say -- can I take

12  breaking up to mean you wanted to move one of them

13  out of that office?

14    A.    I think that would be fair to say that.

15    Q.    Okay.  And by moving one, that would

16  have to be a change of duties and responsibilities in

17  another position; correct?

18    A.    Correct.

19    Q.    Do you ever recall when you -- do you

20  ever recall saying that you wanted to break them up

21  because you wanted to save their marriage?

22    A.    I don't recall saying that.

23    Q.    Do you recalling saying that you've

24  seen this happen before, we need to save their

25  marriage?

**KEYSTONE COURT REPORTING AGENCY, INC.**

45

1          A.      I do not recall saying that.

2          Q.      Did you believe that?

3          A.      Probably I believed that because I have

4   seen things like that before.

5          Q.      And did you believe that about Maggie

6   McNamara and Steve Stoud?

7          A.      I didn't know anything about their

8   marriages, so I don't.  I just know I don't recall.

9          Q.      Do you recall at one point speaking

10  with Steve Stoud about a constituent concern and him

11  saying that he would handle it and you saying no,

12  that you would handle it and that then you turn to

13  Steve and indicated everyone lies and I have to

14  apparently be careful about what I say to everyone or

15  I'll get sued?

16         A.      I don't recall the conversation about a

17  constituent.  I don't recall that conversation at

18  all.  But I probably at some time did say that to Mr.

19  Stoud because it seems like everyone was always

20  worried about us being sued.  I was hearing that all

21  the time, watch what you say, watch what you say,

22  we'll get sued, we'll get sued, we'll get sued.

23         Q.      Okay.  I'm going to bring your

24  attention to October 26, 2016 and what I'll submit to

25  you is that was the day that at about quarter to nine

46

1   in the morning you entered Steve Stoud's office and

2   Commissioner Warren was present when you entered.   Do

3   you recall that?

4          A.      I do.

5          Q.      Tell me what happened that day.

6          A.      That was the morning of a

7   commissioners' meeting as I remember.   Commissioners'

8   meeting mornings are always kind of hectic, a little

9   stressful because you're maybe making last-minute

10  changes to the agenda and tweaking it maybe.   And

11  there was a lot going on that day.

12              I had been put in as chairman of the

13  board in September.   I was vice chair before that.

14  And in a public meeting the other two -- well,

15  Commissioner Hall stepped down as chairman of the

16  board during the public meeting and Commissioner

17  Warren had put me in as chairman and he second it,

18  Commissioner Hall second that decision.

19              I had no knowledge that they were going

20  to do that.   There had been no discussion prior to

21  that, that he had any thoughts of stepping down, so

22  it was quite surprising to me.   So that was around

23  the end of September.   So now we are -- this is

24  probably our second or third meeting after that

25  happened.

47

1          Mr. Stoud had maybe scheduled me to go

2     sign for two Tree Hub vans at say 11:00 and he also

3     told me there was a construction meeting at 10:00.

4     And I was thinking there wasn't a construction

5     meeting because they were usually on Wednesdays

6     usually following the meeting, the commissioners'

7     meeting, but I thought we had just had one the week

8     before that I had been part of.

9          So I looked at Mr. Stoud and I'm

10    looking at the calendar, the white board on the wall

11    where he has the calendar and he would put down

12    appointments and meetings that we had.  And I said

13    how am I going to be at the construction meeting if I

14    have to go sign for those vans, and he said well I

15    don't know, I thought you would not go to the

16    construction meeting.  And I said well, I want to go

17    to all the meetings I'm supposed to be at.

18          So apparently I said it too sharp

19    because then he wrote me a letter about it and then

20    Commissioner Warren put in the letter that she heard

21    it and that I spoke too sharp or something.  It was

22    just, you know, we were hurrying, it's right before

23    the meeting, stressful and it was going to be a busy

24    day.  I didn't know how I was going to be in two

25    places at one time.

48

1      Q.      Do you remember yelling?

2      A.      No.

3      Q.      Do you remember slamming the door?

4      A.      No.  I did not slam the door because

5  the door was between his office and the meeting room

6  and that door would be open.  We would never close

7  that door until the meeting started and then that

8  door would be closed.

9      Q.      Did Commissioner Warren indicate to you

10  that she felt your behavior was inappropriate?

11      A.      She did not indicate that to me.  She

12  did not talk to me about the incident.  She wrote

13  that and apparently discussed that with Mr. Stoud

14  because he wrote that in his complaint against me

15  that she stated that.

16      Q.      After you received the letter from

17  Steve Stoud about him feeling he was treated

18  inappropriately by you that day, do you recall

19  telling the other commissioners that you wanted

20  responsibilities removed from Steve Stoud?

21      A.      I don't recall it.  I may have.  I was

22  very upset.  I was very upset.

23      Q.      Why?  And so why may you have wanted to

24  remove responsibilities from him?

25      A.      Because I thought he was disrespectful

49

1  to me.  That letter was written that day.  When I

2  left the building that day, I saw one of the

3  construction guys on the sidewalk and I said do we

4  have a construction meeting today and he said no, we

5  had it last Wednesday, remember.  And I said okay

6  that's what I thought.  So there was no construction

7  meeting.

8              I went on and signed for Tree Hub

9  buses.  Later that afternoon I was in my office, and

10 that's when I came down to the front office to check

11 my mailbox to get my mail.  And Mr. Stoud was sitting

12 at his desk and he was on the phone with someone, I

13 assume it was another commissioner, and Jean Conklin

14 was sitting in front of his desk.  Apparently they

15 were discussing possibly a personnel issue.

16             I retrieved my mail from my mailbox and

17 Mr. Stoud said well Betsy is here right now, I'll ask

18 her.  And I turned around and looked at him and he

19 addressed me with the personnel issue that was on the

20 table at the moment, I don't recall what it is, and

21 he said, you know, what do you think and I gave him

22 my answer.

23             And then I asked him on my way out

24 about the incident that had taken place in the

25 morning and I asked him if there's any construction

50

1   meeting and he said, no.  So when I left the office

2   then, I guess I asked him for an apology.  He said I

3   don't know what you want me to say.

4           Q.    When you say I guess --

5           A.    Because I left and I came back.

6           Q.    But I don't want you to guess.

7           A.    Okay.

8           Q.    I want you to tell me what you know.

9           A.    Okay.  We had a bit of a conversation

10  there in front of Jean Conklin and I said there was

11  no construction meeting and I had left the office and

12  came back though and then addressed that.

13              And then he said I don't know what you

14  want from me, and I said I guess I'm looking for an

15  apology and he threw his pen down on the table and

16  slid his chair back and thew his hands in the air and

17  he said that'll never happen.  He threw the pen down

18  and said that'll never happen and then I went out the

19  door.

20              And I went out the door, it wasn't like

21  I slammed the door.  I went like that I guess, you

22  know, fine, and I went like that and so the door

23  closed loudly and then I got written up for that.

24          Q.    If Jean Conklin described it as a slam,

25  would she be inaccurate?

51

1      A.      I don't feel it was a slam.   It
2  probably sounded like a slam.   I didn't slam the door
3  forcefully.   I whipped it with my hand like that.
4      Q.      And if Jean Conklin described your
5  behavior as badgering and argumentive, would that be
6  an accurate description?
7      A.      I do not feel it was badgering, no, and
8  disrespectful.
9      Q.      Did there come a point in time then
10 when you limited your interaction with Steve Stoud?
11     A.      I tried to, yes.
12     Q.      Why did you try to?
13     A.      Because it was like walking on
14 eggshells quite frankly.   And also Attorney Robin
15 Reed, I don't have the dates on when she came into
16 the picture, but she kept advising us to only talk to
17 him about work, to limit our conversation with him,
18 you know, and to be very careful.
19     Q.      So did you -- did there come points in
20 time where you stopped talking to him even about
21 work?
22     A.      No, I don't believe I did.   I would say
23 good morning, I was cordial, did what I had to do.
24     Q.      Do you know Lisa Kowalewski?
25     A.      I do.

1    Q.    How do you know her?

2    A.    She worked for the county.

3    Q.    What did she do for the county?

4    A.    She was the head of IT.

5    Q.    Okay.  And did you become aware of an

6  incident that was witnessed by Jean Conklin involving

7  Steve Stoud and Lisa Kowalewski?

8    A.    Yes, I was made aware of the incident.

9    Q.    Okay.  And who made you aware of the

10 incident?

11   A.    I missed it.  It happened in the

12 morning before I got there, unfortunately I missed

13 it.  I walked into the voter registration office and

14 the director of registration at the time was Diane

15 Quatrocchi and she said did you just hear what

16 happened and I said no, what, and she said there was

17 yelling in the hallway.  And I said no, I missed it,

18 I just got here, who is yelling and then she told me.

19   Q.    What did she tell you?

20   A.    She said it was between Mr. Stoud and

21 Lisa.

22   Q.    And did it come to your attention that

23 the incident was, you know, there were witnesses to

24 it?

25   A.    Yeah.

53

1      Q.     And it was concluded that Lisa

2    Kowalewski acted inappropriately?

3      A.     That's what I was told.

4      Q.     And that Jean Conklin witnessed, was

5    one of the witnesses; correct?

6      A.     That's what I was told.

7      Q.     And at that point in time did you

8    indicate to anybody in the registrar's or the

9    recorder's office or the IT department that look, we

10   can't blame Lisa, we girls have to stick together?

11     A.     I made the remark one time that girls

12   have to stick together.  I don't know about the we

13   can't blame Lisa part.  But I know I did make that

14   remark before, us girls have to stick together, yeah.

15     Q.     In other words, we need to blame this

16   on Steve Stoud?

17     A.     No.  Just that women need to stick

18   together and be supportive of women.

19     Q.     But do you recall making this statement

20   in relationship -- in relation to this incident?

21     A.     Yes.

22     Q.     So in other words, the girls have to

23   stick together against the guys in this situation, is

24   that -- I don't want to put words in your mouth.

25     A.     No.

54

1       Q.      I can only take that to mean, you know,

2  one thing.

3       A.      I guess my -- what I would mean by that

4  remark is that I would want to hear Lisa's side of

5  the story before I would make a decision as to what

6  happened, what the truth was.

7       Q.      Okay.  Did you trust your HR director?

8       A.      No.

9       Q.      You don't trust Jean Conklin?

10      A.      No.

11      Q.      So let me get this straight, in the

12  hierarchy of Susquehanna County government, there's

13  the three commissioners?

14      A.      Yes.

15      Q.      You're one of them?

16      A.      Yes.

17      Q.      You don't trust the other two?

18      A.      No.

19      Q.      There is the chief clerk at the time

20  Steve Stoud, you don't trust her -- or him?

21      A.      Correct.

22      Q.      There's the deputy chief clerk was

23  Maggie McNamara, you don't trust her?

24      A.      Correct.

25      Q.      Jean Conklin is the head of HR, you

1    don't trust her?

2            A.      Correct.

3            Q.      Why don't you trust Jean Conklin?

4            A.      Because I think that, first of all, the

5    HR director's office is in our pod, so to say.  So

6    anyone that comes in and out of there, everyone in

7    our area can see.  I have suggested on two different

8    occasions at least that I feel her office should be

9    at the end of the hall somewhere where people

10   don't -- aren't exposed to, you know, so they have

11   some privacy.  So that everyone in the Commissioners'

12   Office doesn't know who is going to see HR.

13           So I didn't agree and I still don't to

14   this day agree to where the location of her office

15   is.  I feel that the other two commissioners have

16   spent a lot of time talking to Jean Conklin behind

17   closed doors and I feel that Mr. Stoud did as well.

18           I also know that during the spring, and

19   I'm going to say the spring of 2017 but I may have to

20   check that, that everyone in the front office got

21   raises, nice raises, and that was at the

22   recommendation of Mr. Stoud.  And I thought that was

23   strange that we have I believe the beginnings of a

24   lawsuit on the table and now people are getting

25   raises in that office.

56

1      Q.     Well, don't you typically -- did you

2   get cost of living raises every year?

3      A.     They do, yes.

4      Q.     But it's strange that they got raises?

5      A.     One of them was I think like $5,000.  I

6   think it was a little over and above that.

7      Q.     Do you recall Attorney Reed telling you

8   that you can't continue to ignore Steve Stoud because

9   he was a direct report to you?

10            MR. HAILSTONE:  Objection to

11         attorney/client privilege.  She can't

12         answer what Robin Reed told her.

13            MR. KARAM:  She -- huh?

14            MR. HAILSTONE:  She can't answer.

15   BY MR. KARAM:

16      Q.     Did anybody ever tell you that -- did

17   anybody ever say to you that you need to deal with

18   Steve Stoud because he's a direct report to you?

19      A.     Alan Hall.

20      Q.     And that was when you weren't dealing

21   with him, correct?

22      A.     I limited my exposure to him.  I don't

23   believe I ever ignored him by any means.

24            (Whereupon a recess took place.)

25            (Whereupon Exhibit 1 was marked

57

1          for identification.)

2                    MR. HAILSTONE:   I'm going to

3          object to this document that is

4          protected by attorney/client privilege.

5          I have given it to Attorney Karam in

6          good faith with the understanding that

7          he would understand that.  Also I will

8          allow questions today, but I do have an

9          objection that it is protected.  Thank

10         you.

11   BY MR. KARAM:

12         Q.    Okay.  Commissioner, have you had the

13   chance to review Plaintiff's Exhibit Number 1?

14         A.    Yes.

15         Q.    Do you need more time?

16         A.    I'm still going down, yes.

17         Q.    Okay.

18         A.    Okay.

19         Q.    Okay.  So my questions regarding

20   Plaintiff's Exhibit Number 1 are going to be not what

21   Mike Giangrieco is stating to you in this letter, but

22   it's also my understanding that Alan Hall has said

23   directly to you similar or exact things to you.

24              Having reviewed this letter, let's

25   start with paragraph number one.  It's in the last

58

1    part of it, it's saying the conversation has been

2    described by others to have been unprofessional,

3    upsetting to not only Mr. Stoud but to other

4    employees who witnessed your interaction with Mr.

5    Stoud.

6              I'm assuming this is the October 26th

7    interaction.  Is that what -- what's your assumption?

8        A.    That was about the construction

9    meeting, correct, and signing for the vans, yes.  I

10   would assume that that is it because this is dated

11   November 1, 2016, so it would have been, you know, a

12   week later I guess that he wrote this, yes.

13       Q.    So did Alan Hall indicate to you that

14   there were other witnesses who witnessed your

15   interaction with Mr. Stoud that day?

16       A.    I don't remember a conversation with

17   Alan Hall on that particular moment, on that

18   particular incident.

19       Q.    Do you recall Alan Hall stating to you,

20   and I'll go to the second paragraph, that your

21   contact with Steve Stoud was unprofessional and

22   retaliatory?

23       A.    Did you just ask me if Commissioner

24   Hall said that to me?

25       Q.    Yeah.

1        A.      I don't remember that conversation with
2    Mr. Hall.
3        Q.      Well --
4        A.      And I didn't feel that I was angry or
5    unprofessional.
6        Q.      Well, did Mr. Hall have conversations
7    with you about his concerns about the way you were
8    treating Steve Stoud?
9        A.      He had concerns about me talking to
10   people.  He did tell me what this letter says, to not
11   talk to people so we wouldn't get sued.
12       Q.      Well, are you reading this letter as
13   saying you shouldn't talk to Steve Stoud?  Is that
14   what your take is on this letter?
15       A.      Yeah.  I mean it says one, two, three,
16   four paragraphs down it is being strongly suggested
17   that you cease and desist from any further
18   communication with Mr. Stoud that could be in any way
19   be deemed unprofessional, hostile or retaliatory.
20       Q.      Right.
21       A.      So yeah.
22       Q.      So he's --
23       A.      I mean those words jumped out at me,
24   cease and desist communicating with my chief clerk,
25   that's what's stuck in my head.

60

1      Q.     But communication and then it's only

2    communication that's unprofessional, hostile and

3    retaliatory?

4      A.     Yes.

5      Q.     Do you take that, do you take that to

6    say cease all communication with Steve Stoud?

7      A.     No.  It said that it can be deemed, in

8    any way be deemed.

9      Q.     Deemed unprofessional --

10     A.     Right.

11     Q.     -- hostile or retaliatory?

12     A.     Right.

13     Q.     So he's not telling you you can't ask

14   Steve Stoud what's on tonight's meeting agenda?

15     A.     Correct.

16     Q.     You can communicate with Steve Stoud,

17   just not in a hostile or retaliatory way?

18     A.     But I didn't feel that I had

19   communicated that morning on the 26th with him in

20   that way.  I did not feel that I was angry or

21   unprofessional.

22     Q.     Okay.

23     A.     So --

24     Q.     But would you agree --

25     A.     -- it makes a person on edge of what

61

1   they can say and what they can't say or they're going

2   to get a letter put in your mailbox, you're going to

3   get written up.   I'm probably the only commissioner

4   in history that's had letters written.   I probably

5   have a file.

6           Q.    Okay.  But you would agree though that

7   at least looking at this letter, hearing from

8   Commissioner Warren and, you know, talking to Jean

9   Conklin that witnesses disagree with how you're

10  assessing your own conduct.   Okay?

11          A.    The only one that was in the room was

12  Commissioner Warren.   The door was open, so whether

13  Jean Conklin could hear through the wall and through

14  the door being open.

15          Q.    Jean Conklin was there the second time

16  you came in?

17          A.    Yes, the second time she was, yes.

18          Q.    Okay.  And both felt that your actions

19  were hostile and retaliatory.

20          A.    Okay.

21          Q.    Okay?

22          A.    They're entitled to their --

23          Q.    They are.  I'm not -- and again, I'm

24  just bringing to your attention that a part of this

25  letter that was sent to you was based on witnesses to

1    what occurred.  Okay.  And I'm not even bringing in

2    how Steve Stoud felt.  Okay?

3         A.    Mm-mm.

4         Q.    Do you have any personal animus against

5    Steve Stoud?

6         A.    Can you rephrase that?

7         Q.    Do you have any personal animus towards

8    Steve Stoud?

9         A.    Not at this time I did not.

10        Q.    Okay.  Not on November 1, 2016?

11        A.    Correct.

12        Q.    Okay.  Do you recall telling

13   Commissioner Warren that this whole situation was

14   blown out of proportion and that it wasn't really

15   that big of a deal?

16        A.    When you say incident, you mean on

17   October 26th?

18        Q.    October 26th.

19        A.    I don't recall saying that to her, but

20   I may have.

21        Q.    And that her responding no, that's not

22   true, I witnessed it, what's in Giangrieco's letter

23   is accurate?

24        A.    I don't recall having that conversation

25   with her.

63

1      Q.     Okay.  Do you recall indicating to

2  Commissioner Hall that you were going to oppose a new

3  county detective position in the District Attorney's

4  Office because you felt that it was a position Steve

5  Stoud was going to get?

6      A.     That I was going to oppose a position,

7  I don't recall that conversation.  There was

8  conversation because that position of chief county

9  detective was occupied by Debra Strong for many, many

10 years.  And then suddenly it was determined that she

11 was not in fact the chief county detective because it

12 never went through a meeting, like years ago it never

13 went through a salary board meeting or it never went

14 through a meeting.

15     Q.     Steve Stoud had nothing to do with that

16 though, did he?

17     A.     I have no idea.

18     Q.     Do you recall saying to Commissioner

19 Hall that you thought that this position was just a

20 big conspiracy between everyone to put one of their

21 cronies in the position?

22     A.     I don't recall that conversation.  I

23 did not --

24     Q.     Do you believe that?

25     A.     I don't know about cronies.

64

1    Q.    Well, maybe --

2    A.    I don't know why it was -- I don't know

3  why after say 20 years and I don't know the exact

4  years.  But Debbie Strong -- well, it was a good 20

5  probably because I think Debra Strong worked for the

6  county for almost 40 years, just shy of 40 years.

7          In December I believe, you'd have to

8  check, but I think it was going to be 40 years in

9  December and then she left us just months before that

10  December marker because, I don't know why because.

11  But I'm just saying I know that conversation was

12  going on and that all of a sudden she was not the

13  chief county detective, that it never went through

14  the meeting.

15          So she was going to have the title of

16  just county detective, and District Attorney Klein

17  was going to fill, you know, run an ad and interview

18  people to fill the chief county detective slot.  So I

19  didn't know why that --

20    Q.    Did you trust chief -- or did you trust

21  District Attorney Klein?

22    A.    I did.

23    Q.    Okay.  And he was the one that was

24  going to select whoever gets this position?

25    A.    Yes.

65

1      Q.      But nonetheless you objected to the
2  position at least to Commissioner Hall?
3      A.      I don't believe I objected to it.
4      Q.      Okay.  Did you indicate that you
5  thought that Steve Stoud was going to get the
6  position to him?
7      A.      I may have in a confidential
8  conversation.
9      Q.      And you didn't want that to happen?
10     A.      I don't think I really cared whether
11 that happened.  If he worked there, I think that's
12 his background, he would make a good detective.
13     Q.      Okay.  Let's go to January 2017.  The
14 Kowalewski incident has already occurred between
15 Kowalewski and Stoud.  McNamara I believe is already
16 over at the District Attorney's Office?
17     A.      I believe you are right.
18     Q.      Yeah.  She's already over at the
19 District Attorney's Office.  Did there come a point
20 in time where you requested e-mails between Stoud and
21 McNamara?
22     A.      I did not request them.  Commissioner
23 Warren wondered if we should look at e-mails and it
24 takes two commissioners to make decisions, so I said
25 well if we need to look at e-mails.

66

1    Q.      Why would you need to look at e-mails?

2    A.      As I recall there was a question as to

3    whether -- well, when a person leaves a department,

4    it was my understanding when they leave a department

5    like such as the commissioners because there's a lot

6    of confidential material that they should not have

7    access to that e-mail anymore or those files, that it

8    would be severed.  And I think there was a question

9    as to whether or not Ms. McNamara may still have been

10   doing some things in the Commissioners' Office.

11   Q.      And was that question ever asked of

12   Steve Stoud --

13   A.      I don't know.

14   Q.      -- whether McNamara was still doing

15   things?

16   A.      I don't know if the question was asked

17   of him.  I did not ask it.

18   Q.      Did you ever ask?

19   A.      No, I never did.

20   Q.      And that was the only reason why you

21   were going to retrieve the e-mails between Stoud and

22   McNamara?

23   A.      As I recall.

24   Q.      Have you ever retrieved e-mails before

25   of people who have left county employees, employment?

67

1          A.      I have not, no.

2          Q.      Are you aware of them retrieving

3     e-mails of anybody who left the commissioners'

4     employment?

5          A.      Not that I'm aware of.

6          Q.      Yet all of sudden you're retrieving

7     e-mails between Steve Stoud and Maggie McNamara?

8     Yes?

9          A.      Yes.

10         Q.      And you voted to approve that?

11         A.      Yes.

12         Q.      Did you consult with your solicitor

13    about this?

14         A.      I don't believe I did.  I also did not

15    read them.

16         Q.      Did you discuss with Alan Hall his

17    opinion on this?

18         A.      I believe there was a discussion, yes.

19         Q.      And what was Alan --

20         A.      He was not in favor.

21         Q.      Okay.  And if I tell you that

22    Commissioner Warren and Commissioner Hall both said

23    that Solicitor Giangrieco wasn't in favor of it

24    either, would that refresh your recollection?

25         A.      It doesn't refresh it, but I can see

68

1   him saying that.

2          Q.     Okay.  And this task to retrieve

3   e-mails was given to who?

4          A.     I would believe that was Stephen

5   Janoski.

6          Q.     Okay.  Who was the IT director?

7          A.     Yes.

8          Q.     Okay.  How did Lisa Kowalewski end up

9   seeing the e-mails?

10         A.     She had been there, she had been the

11  director before Stephen.

12                MR. HAILSTONE:  I'm going to

13         object.  There's no evidence that she

14         ever saw them and you're putting

15         evidence in the record.  If you have

16         proof that she saw them, I would like to

17         see it.

18  BY MR. KARAM:

19         Q.     And did you become aware that Lisa

20  Kowalewski started a non-county authorized

21  investigation of Steve Stoud?

22         A.     Yes.

23         Q.     How did you become aware of that?

24         A.     I believe from the other two

25  commissioners and that I know the District Attorney

69

1    Bob Klein was involved in the investigation.

2            Q.    Okay.  Did you ever talk to Lisa

3    Kowalewski about it?

4            A.    I don't recall that.  I know Lisa

5    Kowalewski came to me after the incident in the

6    hallway and she told me her side of that.

7            Q.    Her side of the e-mail situation or her

8    side of --

9            A.    Her side of what happened in the

10   hallway that day with Mr. Stoud.  She was very

11   shaken, very shaken up.

12           Q.    Okay.  But we're beyond that.

13           A.    Okay.  Okay.

14           Q.    What I'm asking you about is did you

15   ever talk to Lisa Kowalewski about her non-authorized

16   background investigation on Steve Stoud?

17           A.    I may have.  She may have told me that

18   she did it from her home.

19           Q.    Okay.  When did she tell you this?

20           A.    I'm not sure.

21           Q.    Okay.  Did she tell you about the

22   content of the e-mails between Steve Stoud and Maggie

23   McNamara?

24           A.    No.

25           Q.    What did she tell you about her

70

1    investigation?

2           A.      That she was concerned about Mr. Stoud

3    after the scene that they had had and his behavior.

4           Q.      And did you validate that concern with

5    her?

6           A.      I may have.

7           Q.      How?

8           A.      I may have said, you know, I don't

9    blame you or something like that.  I don't recall

10   what I said.

11          Q.      Did you say you have the same concerns?

12          A.      I don't recall saying those words.

13          Q.      Was that something that you thought

14   though?  Did you have those same concerns?

15          A.      Not that he would be doing anything

16   against the county directly.

17          Q.      Did she indicate to you she believes

18   Steve Stoud was taking kickbacks from vendors?

19          A.      I'm not sure if she said that to me,

20   but I heard that in that report when the DA and

21   Justin Sprout did an investigation, I believe that

22   came up in that meeting.

23          Q.      And you know that Steve was suspended

24   from his position with the District Attorney's Office

25   as a result of these allegations?  You do know that,

71

1  right?

2          A.      Yes.

3          Q.      Did you ever speak to Janoski about

4  this at all?

5          A.      No.

6          Q.      Why did Warren come to you and ask that

7  she wanted to see the e-mails between McNamara and

8  Stoud?

9          A.      As I recall I thought it was just

10 simply because she wondered if Maggie was still doing

11 work in the Commissioners' Office that she shouldn't

12 be doing because she now was employed by the District

13 Attorney.

14         Q.      After Steve Stoud went to the DA's

15 Office, do you recall talking to DA Klein that you

16 disagreed with the salary he was putting on for Steve

17 Stoud?

18         A.      I do believe I had a conversation with

19 him about the salary because it seems to me as he

20 said -- because he ended up doing two jobs.  He was

21 doing the detective job as well as the Public Safety

22 director job at one time.

23                 And I remember Attorney Klein saying

24 well, we're getting -- you know, we're not paying

25 $60,000 for a Public Safety director, you know.  We

72

1    just gave him another $10,000 or $13,000, whichever

2    it was, one of those.  So you know we're saving the

3    taxpayers' money by doing it this way.  We had that

4    conversation.

5         Q.    And do you recall talking to Robert

6    Thatcher, Jr.?

7         A.    I talked to Robert Thatcher, Jr.

8    because he was put on my task force, the county's

9    task force, not my task force.

10        Q.    Do you recall talking to him about the

11   need to have a Public Safety director?

12        A.    I probably did because I was trying to

13   determine whether we really needed that position.  It

14   had nothing to do with Mr. Stoud or anybody else.  It

15   was do we need to be paying that money out.

16             Because before Mr. Stoud came from the

17   county, it was my understanding that they didn't have

18   a Public Safety director and you just had your heads

19   of departments 911 and EMA and they handled it

20   themselves.  That's the only reason I was asking that

21   question.  He came highly recommended Mr. Thatcher

22   for that position.

23        Q.    Did you ever talk specifically with

24   Jean Conklin about who you would like to replace

25   Maggie McNamara with?

73

1         A.    I don't recall having that

2  conversation.  Did she say I did?  Did she have a

3  name?

4               MR. HAILSTONE:  Just answer his

5       questions, that's it.

6              THE WITNESS:  I don't recall that.

7              MR. HAILSTONE:  You answered it.

8  BY MR. KARAM:

9         Q.    Okay.  One second.  Okay.  There came a

10  point in time where you ended up hiring Lana --

11         A.    Lana Adams.

12         Q.    -- Adams as the chief clerk, correct?

13         A.    Yes.

14         Q.    So she -- there was a period of time

15  then where she was Steve Stoud's immediate

16  supervisor, correct?

17         A.    When he was a Public Safety director?

18         Q.    No.  When he was deputy chief clerk.

19         A.    Okay.  Yes.

20         Q.    Or deputy clerk?

21         A.    Yes, yes.

22         Q.    The supervisory role was assumed by

23  Lana over Steve?

24         A.    Yes.

25         Q.    Okay.  I have nothing further.

74

1              MR. HAILSTONE:   No questions.

2              (Whereupon the deposition of

3        Elizabeth McCahill Arnold concluded at

4        1:15 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

        I, Christine Messner, a Notary Public in and for Wyoming County, Pennsylvania, do hereby certify that the deposition was reported in machine shorthand by me, that the said witness was duly sworn/affirmed by me, that the transcript was prepared by me or under my supervision and constitutes a complete and accurate record of same.

        I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.


Christine Messner
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507