**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**ROBERT STOUD**                          :

     **Plaintiff**                          :      **CIVIL ACTION NO. 3:17-2183**

     **v.**                          :                **(JUDGE MANNION)**

**SUSQUEHANNA COUNTY,**                          :

     **Defendant**                          :

**<u>MEMORANDUM</u>**

Presently before the court is the motion for summary judgment of the remaining defendant Susquehanna County (the "County"), (Doc. 30), pursuant to Fed.R.Civ.P. 56. Plaintiff Robert Stoud, a former employee of the County, essentially alleges that his rights under Title VII of the Civil Rights Act of 1964 were violated when he was subjected to a hostile work environment in retaliation for investigating and reporting an incident of sexual harassment alleged by a female subordinate against a County official. For the reasons set forth below, the motion will be **DENIED** since there are substantial questions of fact as to whether plaintiff was subjected to a hostile work environment, whether plaintiff received an adverse employment action, and whether the alleged abusive actions by the County were in retaliation for his investigation and report of the sexual harassment incident and for filing an EEOC complaint against the County.

## I.    BACKGROUND[1]

The plaintiff initiated this action on November 29, 2017, and brought claims for retaliation and creating a hostile work environment, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e. He also asserted state law claims under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951, *et seq.*, for retaliation and a hostile work environment. The plaintiff alleges that when he was Chief Clerk of Susquehanna County one of his female subordinates reported an incident of inappropriate conduct by Richard Ely, the Susquehanna County Director of Veterans Affairs.[2] The plaintiff alleges that after he reported the inappropriate conduct to the County Commissioners, they subjected him to increasing and pervasive harassment

---

[1] Since the court stated the background in its August 6, 2018 Memorandum granting in part, and denying in part defendants' motion to dismiss, (Doc. 20), it will not be fully repeated herein. *See also* 2018 WL 3727388.

The court also notes that it stayed this case on January 10, 2019, and it appointed a mediator. The stay was lifted on April 12, 2019, after a settlement was not reached.

[2] The court notes that the instant case was related to the case filed by the plaintiff's female subordinate, Maggie McNamara, against the Susquehanna County defendants originally named in the instant case as well as Ely. McNamara's case settled and was dismissed on January 17, 2020. *See* McNamara v. Susquehanna County, Civil No. 17-1782, M.D.Pa.

and retaliation. Consequently, the plaintiff alleges that he was constructively discharged from the Chief Clerk position and demoted.

Specifically, plaintiff's complaint contains four counts, to wit: (I) Title VII Retaliation; (II) Title VII discrimination/Hostile Work Environment; (III) Retaliation under the PHRA; and (IV) Hostile Work Environment under the PHRA. As relief, plaintiff seeks an injunction to prevent defendants from harassing their employees, monetary damages, including back pay and front pay, punitive damages, equitable relief, attorney's fees, and costs.

In its August 6, 2018 Memorandum, the court allowed plaintiff's claims under Title VII and the PHRA against the County to proceed. However, plaintiff's claims under Title VII and the PHRA against the two defendant County Commissioners, Arnold and Warren, were dismissed.

On November 29, 2018, defendant County filed its motion for summary judgment and its statement of facts. (Doc. 30; Doc. 31). After the stay was lifted, the County filed its brief in support of its motion on May 2, 2019. (Doc. 44). Plaintiff filed his response to the County's statement of facts and his brief in opposition with exhibits on May 21, 2019. (Doc. 45; Doc. 46).

This court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343. The court can exercise supplemental jurisdiction over plaintiff's claims under the PHRA pursuant to 28 U.S.C. §1337. Venue is

appropriate in this court since the alleged constitutional violations occurred in this district and all parties are located here. *See* 28 U.S.C. §1391.[3]

## II.   MATERIAL FACTS[4]

Plaintiff, a retired Corporal with the Pennsylvania State Police who spent a large portion of his career as a criminal investigator, was hired by the County in September of 2012 as the Emergency Management Coordinator. At the time plaintiff was hired, the three County Commissioners were Mary Ann Warren,

---

[3] The court notes that since the parties state the correct legal standard with respect to a motion for summary judgment under Fed.R.Civ.P. 56(c) in their briefs, the court will not repeat it herein. Suffice to say that if the moving party meets its burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party", In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003), then the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

[4] The court only states the relevant material facts that are supported by citation to the record. The court notes that many of the County's statement of facts, (Doc. 31), are not supported by citation to evidence in the record in violation of Local Rule 56.1, M.D.Pa. The County also alleges facts with improper citations to the record. Further, the County did not even submit any exhibits in support of its statement of facts. Thus, the County's unsupported facts are not considered. Plaintiff's facts that are supported by the exhibits he submitted are considered. Also, legal conclusions and argument are not included. A material fact is one that "might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

Allan Hall and Michael Giangrieco. In December of 2012, plaintiff was moved to the Director of Public Safety position. Plaintiff held the Director position in addition to the other positions he held throughout his tenure with the County.

In June of 2014, plaintiff became acting Chief Clerk for the County, and in January of 2016, he was appointed Chief Clerk. Also, in 2014, McNamara applied for the position of Administrative Assistant to the County Chief Clerk. She was interviewed by plaintiff and Ely, who was the Director of Human Resources, and also Deputy Chief Clerk. McNamara was hired for the position and began working for plaintiff as his Administrative Assistant.

Subsequently, McNamara was promoted to Deputy Chief Clerk for the County and her salary increased. She reported to plaintiff who was the Chief Clerk. Ely relinquished his position Deputy Chief Clerk since he was busy with his duties as HR Director. As Deputy Chief Clerk, McNamara's had a new set of job duties and responsibilities, including signing for the Chief Clerk in his absence when necessary.

On December 23, 2015, plaintiff was contacted by McNamara, and she reported an alleged incident of unwanted advances by Ely at the County's holiday party. At this time, Ely was the Director of Veterans Affairs for the County. In particular, McNamara stated that when she was leaving for the night after the party, Ely knocked on her window and she opened it halfway.

Ely then stuck his face into McNamara's open car window and made "kissy lips at [her] and tried to kiss [her]", and he said "you won't get this offer again." As McNamara sat back in her car seat, Ely pulled his face back and she rolled up her car window.

McNamara then drove out of the parking lot and called plaintiff on her cell phone to report Ely's improper advances towards her. Plaintiff told her to go home and enjoy the holiday, and that he would take care of the incident.

Plaintiff reported the incident the same night to the Commissioners, the County's employment attorney, and the County Sheriff. Plaintiff asked the Sheriff to hold the video tape of the incident which occurred in the County parking lot. At this time, Elizabeth Arnold was not yet a Commissioner. Plaintiff then called McNamara and told her that he called the Commissioners about the incident and told her that it was going to be addressed.

Sometime thereafter, the Commissioners directed plaintiff to investigate the Ely incident. McNamara prepared a written statement about the incident upon the advice of plaintiff. She also gave plaintiff a copy of her statement. Plaintiff also had Ely prepare a written statement about the incident. Plaintiff recommended to the Commissioners that Ely be terminated. However, after plaintiff reported back to the Commissioners, they decided to give Ely a Final Written Warning, as opposed to terminating him, for his inappropriate conduct.

Ely was issued a Final Written Warning on December 30, 2015 by plaintiff regarding the incident with McNamara. Plaintiff advised Ely that if he repeated any harassing conduct in the future, he would be immediately terminated. Plaintiff then notified McNamara about the formal warning Ely received, and she told plaintiff that she felt Ely deserved something more than the reprimand.

Arnold became a Commissioner in early January of 2016, and she filled Giangreco's position when he became County solicitor. After Arnold took office, plaintiff told her about the Ely incident with McNamara.

After he reported the incident, plaintiff stated that Commissioners Arnold and Warren began to constantly harass McNamara and placed her under unfair scrutiny. Plaintiff was also harassed by the two Commissioners and he stated that they retaliated against him for reporting the Ely incident. McNamara also testified that in early 2016 Arnold and Warren began to unfairly criticize and scrutinize her work due to her reporting the Ely incident. She also stated that Warren humiliated her in a public meeting.

Remarkably, soon after McNamara's complaint about Ely, she was assigned by the Commissioners to assist Ely "in a very small office" as he transitioned into his new position as Director of Veteran's Affairs. McNamara told plaintiff, as her supervisor, that she was not comfortable working with Ely

and plaintiff reported this concern to the Commissioners. Nonetheless, Commissioners Warren and Arnold still required McNamara to assist Ely for a few weeks. During this time, Ely occasionally yelled at McNamara and got angry at her, and she advised plaintiff of this. However, she had to continue assisting Ely.

Warren also admitted that after McNamara's complaint about Ely, she witnessed a constant animus and harassment towards plaintiff as well as McNamara by Arnold. Warren stated that she saw Arnold treat plaintiff and McNamara in an inappropriate manner. Warren further stated that Arnold alleged plaintiff was having an affair with McNamara and she admitted that the rumors of the affair perpetuated by Arnold undermined plaintiff's authority and credibility.

Arnold also admitted that she spread the rumors of plaintiff's alleged inappropriate relationship with McNamara to others County employees, including the two other Commissioners, *i.e.*, Warren and Hall. Arnold also admitted that her conduct by spreading the rumor and discussing it with plaintiff's subordinates undermined plaintiff's authority as Chief Clerk. Arnold further admitted that she may have wanted to remove responsibilities from plaintiff.

Plaintiff testified that after he investigated the sexual harassment report against Ely, the retaliatory and harassing actions by Arnold and Warren began. The actions they took against him, included, making personal and derogatory comments against him, increased scrutiny, and undermining his authority as Chief Clerk. Specifically, plaintiff stated that from the early part of 2016 through May 31, 2016, Arnold and Warren subjected him to harassment and retaliation, and that their conduct continued and progressively got worse over time. Plaintiff also stated that Arnold made comments to his subordinates about him having an affair with McNamara. During this time, plaintiff complained about the unfair treatment he was receiving to Hall, Warren, and Giangreco. Nonetheless, the harassment continued unabated and got progressively worse.

Finally, on May 31, 2016, plaintiff made "an official complaint of harassing and retaliatory behavior" to the Commissioners and stated that "he believed he was facing retaliation for defending McNamara from the harassment she was receiving." Plaintiff stated that Hall later indicated to him Warren's and Arnold's conduct was due to the Ely complaint and his subsequent defense of McNamara regarding the unfair treatment she received after her complaint. Hall testified that Arnold insinuated that plaintiff and McNamara were having an affair and he told Arnold to stop her behavior since

it was wrong. Hall stated that Arnold told him that she believed she had to break up plaintiff and McNamara to save plaintiff's marriage. Hall later told plaintiff about Arnold's statement. Arnold also made personal and derogatory comments about plaintiff to his subordinates and both she and Warren undermined his authority.

Additionally, in late May or early June of 2016, Jeanne Conklin, the County's new HR Director, advised plaintiff and Hall that Arnold and Warren indicated to her that plaintiff and McNamara had to be separated since they were having an affair, and that they wanted the two employees fired. Plaintiff also stated that Arnold wanted to break up his alleged relationship with McNamara to save their marriages.

On June 7, 2016, plaintiff was called to a meeting with the Commissioners. Plaintiff thought the meeting was to address his May 31 complaint about harassment. At the meeting, plaintiff again complained to Arnold and Warren about creating a hostile work environment due to their personal and derogatory comments about him and since they intimated that he was conducting an improper relationship with his deputy, McNamara.

However, plaintiff discovered that the purpose of the meeting was to tell him that McNamara needed to be terminated for alleged problems with her work. Hall indicated to plaintiff that he did not agree with the meeting. Plaintiff

defended McNamara and stated that she was a good worker. There was also "a heavy inference" in the meeting that plaintiff was having an affair with McNamara. At the end of the meeting, plaintiff indicated that he would not terminate McNamara since he believed she was being subjected to continuing harassing and retaliatory actions based on her complaint against Ely. Plaintiff was later told by Hall that Arnold and Warren wanted him to issue "write-ups" against McNamara for poor performance issues, and Hall told plaintiff that if he refused, McNamara would be fired.

Thus, based on his May 31 complaint about harassment, plaintiff stated that Arnold and Warren directed him to prepare "write-ups" for McNamara. Plaintiff stated that he took issue with the reasons for the write-ups Warren and Arnold cited but he completed the write-ups as they directed. Plaintiff was also directed by the Commissioners to conduct a counseling session with McNamara about her alleged deficient work performances.

McNamara testified that she was counseled by plaintiff on June 10, 2016, due to the alleged work issues the two Commissioners had but she stated that these issues were not legitimate and she refuted them in her deposition. Plaintiff sent a letter to the Commissioners regarding his counseling session with McNamara and detailed the issues discussed with her as well as her responses. In one of her responses regarding the issue of

unnecessary personal chatting in the office, McNamara stated that she resented the fact that she had to clarify she was not having an unprofessional relationship with plaintiff and plaintiff agreed with her response.

On June 13, 2016, plaintiff sent the Commissioners a memo detailing his meeting with McNamara and her belief that Warren and Arnold were treating her unfairly and singling her out for criticism. Plaintiff also noted how McNamara believed she was being subjected to the excessive criticisms as retaliation for her complaint about Ely and that it began after her complaint. Plaintiff recounted that Arnold had commented to him and Hall after the Ely incident that she did not see what the big deal was, "it was only a hug at Christmas."

On June 14, 2016, plaintiff resigned as the Chief Clerk and he became Deputy Chief Clerk while still maintaining his Director of Public Safety position. In his letter resigning as Chief Clerk, plaintiff stated that he was resigning due to "some recent management directional and operational changes that have resulted in a working environment where I feel that I cannot effectively continue within the position of Chief Clerk." Plaintiff testified that although he voluntarily resigned as Chief Clerk, it was because the work "environment was too toxic for me to remain." He also stated that the Deputy Chief Clerk position was a demotion and he lost responsibilities and supervisory authority. Further,

he now reported to the new Chief Clerk, Lana Adams. Warren also admitted that when plaintiff became Deputy Chief Clerk it was a demotion and that he no longer reported directly to the Commissioners.

On June 21, 2016, McNamara resigned as Deputy Chief Clerk and transferred to the County's District Attorney's Office as the Victim Witness Coordinator. McNamara stated that she left her position as Deputy Chief Clerk due to the harassing conduct by the Commissioners and since she thought she would be terminated by the Commissioners. She also stated that Hall encouraged her to apply for the DA's position since Warren and Arnold were going to fire her.

After McNamara transferred to the District Attorney's Office, plaintiff discovered that on January 9, 2017, Warren and Arnold directed the County IT department to get all of the emails between himself and McNamara in the County's email address. Plaintiff stated that this was done as further harassment against him for reporting the Ely incident and, that Arnold and Warren were looking for reasons to investigate him.

Hall testified that when Warren and Arnold decided to retrieve plaintiff's County emails, the solicitor advised them not to do it. Hall also stated that the emails lead to unsubstantiated allegations against plaintiff which resulted in plaintiff's suspension from the DA's Office pending a County internal

administrative investigation as well as a criminal investigation. Plaintiff was later cleared of any wrongdoing in both investigations.

Plaintiff also complained to the County solicitor Michael Giangrieco about the continuing harassment he and McNamara were being subjected to by Warren and Arnold, and Giangieco advised him he would meet with the Commissioners and tell them to stop.

Sometime in June or July of 2016, after the June 7 meeting, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging harassment and retaliation by the County due to his reporting Ely's sexual misconduct incident. Plaintiff made the Commissioners and the solicitor aware of his complaint. Thereafter, Arnold entered plaintiff's office and was agitated and started yelling at him, and plaintiff attributed this behavior to his EEOC complaint.

Due to the continuing harassment plaintiff was experiencing, on November 1, 2016, Giangrieco sent a letter to Arnold stating that her unprofessional conduct towards plaintiff were deemed by County employees who witnessed it to be "retaliatory and created a hostile work environment." He also stated that it was most troubling that her conduct towards plaintiff came after she was put on official notice of his EEOC complaint. As such, Giangrieco "strongly suggested" that Arnold cease and desist from further

communicating with plaintiff in any way that could be deemed "unprofessional, hostile or retaliatory."[5]

On April 16, 2017, plaintiff left his position as Deputy Chief Clerk and became Chief County Detective with the County's District Attorney's Office, but he also retained his Director of Public Safety position. Plaintiff did not suffer any loss of pay when he transferred to the DA's Office. However, he stated there was a loss of responsibility with his new position.

Plaintiff also testified that Arnold's and Warren's harassment and retaliatory behavior towards him continued after he was in the District Attorney's Office, including the email investigation, and that they continued to make comments about him. In fact, the District Attorney Robert Klein advised plaintiff that the Commissioners wanted him to fire plaintiff and McNamara, but he refused to do so.

Moreover, in April of 2017, Arnold went to subordinates in the Department of Public Safety and questioned whether plaintiff's position as Director was really needed. This inquiry by Arnold undermined plaintiff's

---

[5] Relatedly, on June 11, 2020, plaintiff filed a "supplemental responsive statement," (Doc. 55), noting that on May 19, 2020, Giangrieco also filed a lawsuit in this court, wherein he makes "allegations pertinent to this matter" regarding the County's insurance company and County employees and the handing of the Stoud's EEOC complaint. (Doc. 55, at 2).

authority as Director. Eventually, both plaintiff and McNamara left the DA's Office when Klein died and were no longer employed by the County.

In her deposition, Warren admitted that the harassment of plaintiff was constant, and that Arnold had alleged an affair existed between plaintiff and McNamara. She also admitted that the rumors of the affair spread by Arnold undermined plaintiff's authority and credibility in his position as Chief Clerk with the County. Warren also acknowledged that Arnold was warned to stop spreading rumors about the alleged affair. Warren further admitted that when plaintiff became Deputy Clerk he lost his supervisory duties, and that Arnold wanted to remove as many duties and responsibilities from plaintiff as she could. Additionally, Warren stated that there were times when Arnold refused to interact with plaintiff making the situation uncomfortable, and that Arnold's treatment of plaintiff affected his ability to perform his job.

Hall's deposition testimony corroborated the fact that Arnold had insinuated plaintiff and McNamara were having an affair. Hall stated that he told Arnold to stop this behavior because it was wrong. Hall also stated that Arnold told him she believed she had to break up plaintiff and McNamara to save plaintiff's marriage. Hall later informed plaintiff of Arnold's comments. Hall also testified that Arnold had a personal animus against plaintiff, and that early in her tenure, Arnold told the County HR Director that she wanted to fire

plaintiff and McNamara. Eventually, Warren and Arnold called a meeting with Hall and told him that they wanted plaintiff and McNamara fired. Hall replied that "I'm not part of this. If you guys want to do this, you're going to do it on your own."

## III.   DISCUSSION

In Count I, plaintiff raises a Title VII retaliation claim and, in Count II, a Title VII hostile work environment claim. Counts III and IV mirror Counts I and II, except that they are state law claims under the PHRA.[6] Plaintiff essentially alleges that the County, through Arnold and Warren, harassed him and retaliated against him due to his reporting McNamara's complaint about sexual harassment by Ely, and due to his filing an EEOC complaint against the County based on the harassment he received. Plaintiff does not allege that he personally was the subject of any sexual harassment or discrimination.

---

[6] The court does not distinguish between the plaintiff's Title VII and PHRA claims because "the same standards govern each." *McNeill v. Greyhound Lines, Inc.*, 628 F. App'x 101, 103 n. 1 (3d Cir. 2015) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999)); *see also Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015); *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002)("The language of the PHRA is . . . substantially similar to [Title VII and other federal] anti-retaliation provisions, and we have held that the PHRA is to be [] interpreted as identical to federal anti-discrimination laws except where there is something specifically different . . . .").

At issue regarding plaintiff's claims of retaliation and hostile work environment under Title VII and the PHRA are the following: whether plaintiff suffered a tangible employment action; whether the evidence shows a causal connection between the alleged hostile work environment and plaintiff's reporting of the sexual harassment incident by Ely and filing of his EEOC complaint; and whether plaintiff was constructively discharged by the County. In viewing the evidence in the light most favorable to plaintiff, the court finds disputed material facts exist with respect to the stated issues.

Only the County remains as a defendant in this case with respect to plaintiff's claims under Title VII and the PHRA. The court will first address plaintiff's Title VII retaliation claim.

### A. Title VII Retaliation Claim

The County argues that plaintiff's Title VII retaliation claim cannot proceed since he has failed to establish that he suffered any tangible employment action or tangible job consequence as a result of the alleged harassment and retaliation by Arnold and Warren. It points out that when plaintiff voluntarily resigned his position as Chief Clerk for the County and became Deputy Chief Clerk, along with his position of Public Safety Director, and later when he became Chief County Detective/Public Safety Director, he

did not have any loss in salary or benefits. The County also states that plaintiff's voluntary transfer to the District Attorney's Office was not a demotion.

In order to establish a retaliation claim in violation of Title VII, a plaintiff must prove a *prima facie* case by providing facts showing that: (1) he was engaged in a protected activity; (2) he has suffered an adverse employment action based on exercise of the protected activity; and (3) there is a causal link between the protected activity and the adverse employment action. *Hussein v. UPMC Mercy Hospital*, 466 Fed. Appx. 108, 111-12 (3d Cir. 2012) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)); *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir. 2000). Further, plaintiff must show a causal connection between his participation in a protected activity and the adverse employment action. *Thomas v. Pocono Mtn. Sch. Dist.*, 2011 WL 2471532, *8 (M.D.Pa. June 21, 2011). "Causation 'may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Id.* (citation omitted).

In *Mufti*, 667 F.Supp.2d at 552, the court stated:

> A plaintiff must participate in a protected activity to establish a retaliation claim. *See* Barber v. CSX Distribution Services, 68 F.3d 694, 700–701 (3d Cir. 1995) (finding a general letter of complaint that did not mention discrimination was not a protected

activity). Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *See e.g.*, Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990). However, to constitute "protected activity," the employee must also have a "good faith, reasonable belief that a violation existed." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

The court in Larochelle v. Wilmac Corp., 210 F.Supp.3d 658, 698 (E.D.Pa. 2016), discussed the second element of a retaliation claim. The court stated that "retaliation claims—unlike other Title VII claims—do not limit adverse employment actions to those that 'affect the terms and conditions of employment.'" *Id.* (citing Moore, 461 F.3d at 341). The court explained that "[w]hat is required is a showing that a reasonable employee would have found the retaliatory actions 'materially adverse,' which means that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citations omitted).

To satisfy the third, "material adversity," element of a retaliation claim, plaintiff must prove that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hare v. Potter, 220 Fed.Appx. 120, 128 (3d Cir. 2007)* (citing *Burlington N. & Santa Fe Ry.*

- 20 -

*Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)). Thus, "[w]ith respect to the causation component, the court must consider whether 'a reasonable jury could link the employer's conduct to the retaliatory animus.'" *Id.* (citing Jensen v. Potter, 435 F.3d 444, 449 n. 2 (3d Cir. 2006). "To assess this, the court may consider the 'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and the 'existence of a pattern of antagonism in the intervening period.'" *Id.* (citation omitted).

Further, "Title VII's anti-retaliation provisions [42 U.S.C. §2000e-3] protect employees who oppose employment practices made illegal by Title VII." *Brangman v. Astrazeneca,* LP, 952 F.Supp.2d 710, 721 (E.D.Pa. 2013) (citation omitted). "The Plaintiff must therefore be opposing employment practices made illegal by Title VII." *Id.* (citation omitted). Also, "case law has established that opposition to an illegal employment practice must identify the employer and the practice–if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). Moreover, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII." *Id.* (citations omitted). "[T]o succeed on a Title VII retaliation claim, an employee must have an 'objectively reasonable' belief that the activity he opposes

constitutes unlawful discrimination under Title VII." *Ferra v. Potter*, 324 Fed.Appx. 189, 192 (3d Cir. 2009) (citation omitted).

The evidence, as detailed above, shows that plaintiff has sufficiently established all of the elements of his Title VII retaliation claim against the County, including an adverse employment action.

Here, the evidence shows that plaintiff's reporting of the Ely incident and his EEOC complaint about the subsequent harassment he suffered and his treatment by the County, through Warren and Arnold, constitute protected activity under Title VII, since a reasonable person would believe that the conduct complained of violated Title VII. *Id.* (citation omitted).

Also, plaintiff demonstrated that he felt compelled to resign his position of Chief Clerk with the County due to the continuing harassment he and McNamara were subjected to by Arnold and Warren which started soon after reporting the Ely incident. Thus, there is "temporal proximity" between plaintiff's protected activities and the retaliatory response plaintiff showed that he received from the County. In fact, plaintiff showed that he suffered continued harassment even after he transferred to the DA's Office. Further, he showed that his new position as Deputy Chief Clerk had sufficiently different and lesser responsibilities. As such, plaintiff's new position as Deputy Chief Clerk was clearly a demotion even though there were not any

effects on plaintiff's salary and benefits, since plaintiff lost his supervisory duties and now reported to the person who replaced him. No doubt that an adverse employment action in a constructive discharge case, such as the instant one, includes demotions and job transfers, even if plaintiff does not suffer from a loss of pay or benefits. Jones v. School Dist. of Phila, 198 F.3d 403, 411-12 (3d Cir. 1999).

Additionally, while it is well-settled that "an employee's voluntary resignation does not constitute an adverse employment action", plaintiff has presented evidence to show that he was constructively discharged from the Chief Clerk position. *See* Larochelle, 210 F.Supp.3d at 705. "To make out a constructive discharge claim, a plaintiff must establish that he or she was discriminated against by her employer 'to the point where a reasonable person in his position would have felt compelled to resign'", and, "prove that he or she actually resigned." *Id.* at n.36 (internal citation omitted). Here, although plaintiff wrote a resignation letter with respect to his Chief Clerk position, he has established that a reasonable person in his position would have felt compelled to resign due to the pervasive harassment he faced from Warren and Arnold. Thus, genuine issues of fact exist as to whether plaintiff's resignation was "clearly a voluntary act" and whether he suffered an adverse employment action.

Indeed, it be cannot be ignored that Arnold was trying to undermine plaintiff's authority shortly after he reported the December 2015 Ely incident, i.e., since early January 2016 when she took office, and that she did in fact undermine his authority and credibility by spreading the rumor that plaintiff and McNamara were having an affair and by continually making negative comments about plaintiff. The conduct by Arnold continued even after plaintiff filed his EEOC complaint. This is not a case where plaintiff was simply subjected to criticisms about his work performance by the Commissioners as the County suggests. In fact, Giangreco strongly urged Arnold to stop her unprofessional communication with plaintiff. Plaintiff also testified that Hall advised him Arnold's conduct resulted from the Ely incident. Further, as plaintiff points out, "[t]he record makes absolutely no reference to any harassing or retaliatory conduct *prior* to Plaintiff investigating McNamara's complaint [about Ely]." Also, there was an undisputed deliberate attempt to remove as many responsibilities from plaintiff as possible, and this attempt succeeded. All of these facts constitute direct evidence of retaliatory animus toward plaintiff for reporting the Ely incident and for filing his EEOC complaint.

In short, plaintiff has met his burden of establishing a causal link between the protected activity and the adverse employment action by

showing a pattern of antagonism as well as temporal proximity "unusually suggestive of retaliatory motive." *See* Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000). Thus, a reasonable jury could clearly link the County's conduct after plaintiff reported the Ely incident and after he filed his EEOC complaint, through its decision makers, to the retaliatory animus.

Moreover, since plaintiff has established his prima facie case of retaliation through direct evidence, he does not need to apply the McDonell Douglas burden-shifting framework. *See* Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198-99 (3d Cir. 2015) (Court held that a plaintiff who seeks to prove his Title VII retaliation claim through indirect evidence, can do it by utilizing the McDonnell Douglas burden-shifting framework.). Even if the burden-shifting framework applied, plaintiff has clearly met his burden by showing "by a preponderance of the evidence that there is a 'but-for' causal connection between the adverse employment action and retaliatory animus." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 258 (3d Cir. 2017) (holding that "the Supreme Court has made clear that 'Title VII retaliation claims must be proved according to traditional principles of but-for causation.'") (citation omitted). Also, insofar as plaintiff is deemed to be proceeding under a pretext theory, he has submitted more than ample evidence to "convince the factfinder that the [County's] proffered non-

retaliatory explanation [i.e., Warren and Arnold were not satisfied with plaintiff's work performance as Chief Clerk] was false, and that retaliatory animus was the '*real reason* for the adverse employment action.'") *Id.* (emphasis original) (citation omitted).

As such, since plaintiff has met his ultimate burden by showing that retaliatory animus was the "but-for" cause of the adverse employment action (i.e., his demotion to Deputy Chief Clerk), the County's motion for summary judgment with respect to plaintiff's claims of retaliation under Title VII and the PHRA, Counts I & III, will be denied.

### B. Hostile Work Environment Claim

In Counts II and IV, plaintiff raises his hostile work environment claims under Title VII and the PHRA. The County contends that plaintiff's hostile work environment claims fail to show a tangible employment action as a result of the alleged harassment.

"To succeed on a hostile work environment claim [against the employer], the plaintiff must establish that 1) the employee suffered intentional discrimination because of [his protected characteristic], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat*

*superior* liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted).

In Taylor v. JFC Staffing Assoc., 690 F.Supp.2d 357, 367-68 n. 4 (M.D.Pa. 2009), the court noted that:

> The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." *See e.g.*, Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). As the Third Circuit recognized in Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), "the difference is meaningful, and the Supreme Court's word controls." *Id.* at n. 3. By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. In other words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile work environment claim.

"When a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment, Title VII is violated." Oncale v. Sundowner Offshore Srvs., Inc.,

523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

"To establish that a supervisor's harassment culminated in a tangible employment action, 'a plaintiff must show that the tangible employment action was related to, or caused by, the alleged unlawful harassment or retaliation.'" Bumbarger v. New Enterprise Stone and Lime Co., Inc., 170 F.Supp.3d 801, 841 (W.D.Pa. 2016) (citation omitted). "The Supreme Court has clarified that an individual qualifies as a supervisor in harassment actions 'only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 837-38.

Here, since the evidence shows that Warren and Arnold were harassing plaintiff and since, as Commissioners, they were unquestionably his supervisors, the County, may be held strictly liable. Id. at 837. Also since "the harassment resulted in a 'tangible employment action' against [plaintiff], then the employer is strictly liable." Minarsky v. Susquehanna County, 895 F.3d 303, 310 (3d Cir. July 3, 2018) (citations omitted).

"[A] court's hostile work environment analysis 'must concentrate not on individual incidents, but on the overall scenario' because it is often difficult to

determine the motivation behind allegedly discriminatory actions." Syed, 906 F.Supp.2d at 355 (citation omitted). "In assessing the evidence presented, [the court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is ... relevant.... But while psychological harm ... may be taken into account, no single factor is required.'" Miller v. Thomas Jefferson Hosp., 565 Fed.App'x 88, 93 (3d Cir. 2014) (citation omitted).

Plaintiff has provided more than enough evidence to show that he suffered from tangible employment actions based on the totality of the circumstances and, based on the continual and pervasive harassment by Arnold and Warren after he reported the Ely incident and after he filed his EEOC complaint. He also established that he was forced to resign as Chief Clerk and move into a subordinate position as Deputy Chief which had significantly less responsibilities and authority. The evidence also shows that the harassment unreasonably interfered with plaintiff's work performance as a supervisor when he was Chief Clerk as it undisputedly undermined his authority and that plaintiff's new position was a demotion based on his

testimony explaining the different positions. Further, plaintiff complained about the constant and persistent harassment from Arnold and Warren and about the rumors which Arnold spread to both Hall and Giangreco, as well as other County employees. In fact, both men advised the two Commissioners to stop their actions against plaintiff since it was clearly wrong. Even after plaintiff transferred to the DA's Office, the harassment continued.

As such, the County's motion for summary judgment will be denied as to plaintiff's hostile work environment claims in Counts II and IV.

### IV. CONCLUSION

Based on the foregoing, the motion for summary judgment filed by the County, (Doc. 30), will be **DENIED** with respect to all of plaintiff's claims against it. An appropriate order will issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: July 7, 2020**
17-2183-02

- 30 -