# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MAGGIE McNAMARA,                )   CIVIL ACTION - LAW
            Plaintiff           )
                                )
-vs-                            )   NO. 3:17-CV-2182-MEM
                                )
SUSQUEHANNA COUNTY,             )
et al,                          )
            Defendants          )
_____         )   _____
                                )
ROBERT STOUD,                   )   CIVIL ACTION - LAW
            Plaintiff           )
                                )   NO. 3:17-CV-2183-MEM
-vs-                            )
                                )
SUSQUEHANNA COUNTY,             )
et al.,                         )
            Defendants.         x


DEPOSITION TESTIMONY OF

ALAN M. HALL

WEDNESDAY, AUGUST 15, 2018

MAZZONI KARAM PETORAK & VALVANO
321 SPRUCE STREET
SCRANTON, PENNSYLVANIA

KATHLEEN HUGHES
COURT REPORTER


KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PA  18507
(570) 558-3011     (800) 570-3773
FAX  (570) 558-3014



C O U N S E L   P R E S E N T:

**On behalf of the Plaintiff:**
   MAZZONI KARAM PETORAK & VALVANO
   BY:  GERARD M. KARAM,ESQ.
   321 Spruce Street
   Scranton, PA 18503

**On behalf of the Defendant:**
   KREDER BROOKS & HAILSTONE
   BY: JAMES HAILSTONE, ESQ.
   220 Penn Avenue, Suite 200
   Scranton, PA 18503

### STIPULATIONS

   It was agreed by and between counsel that all objections, except as to the form of the question, will be reserved until the time of trial.
   It was further agreed that the reading, signing, sealing and filing of the deposition transcript will be waived.

### INDEX OF WITNESSES

EXAMINATION           PAGE NUMBER
ALAN M. HALL, COMMISSIONER
 By Mr. Karam   . . . . . . . . . . . . .   3

3

1    **A L A N   M.   H A L L,** COMMISSIONER,

2    WAS CALLED, AND HAVING BEEN DULY SWORN,

3    WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4              COURT REPORTER:  Usual stipulations,

5        counsel?

6              MR. HAILSTONE:  Yes.

7              MR. KARAM:  Yes.

8

9    **EXAMINATION BY MR. KARAM:**

10       Q.    Would you please state your name for

11   the record?

12       A.    Alan M. Hall.

13       Q.    And how are you currently employed?

14       A.    I'm the Chairman of the County

15   Commissioners of Susquehanna County, plus I'm

16   self-employed.

17       Q.    Do you mind if I call you Commissioner

18   for today?

19       A.    Whatever you want to do.

20       Q.    How are you self-employed?

21       A.    I'm a Real Estate Agent.

22       Q.    And if you had to put a split on the

23   time you spend as Commissioner and Real Estate Agent,

24   what would that be?

25       A.    Probably about 75/25.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

4

Q.      Seventy-five Commissioner?

A.      Yep.

Q.      Could you give us your educational background?

A.      I have a four year Business Degree from Wilkes University.

Q.      And how about your work history?

A.      I worked many jobs through my career. I was self-employed at thirteen to Universal Instruments Corporation where I was Manager of Manufacturing Facilities, and also Manager of Production and Inventory Control.

Q.      And then from where did you go?

A.      Universal, I went to a company called Red's Garage, I was Manager of his Towing and Recovery Operation, heavy equipment.  And from there I went into the transportation field with Holmes Transportation, I was a driver and dispatcher for them, they went out business.  I went to work for Yellow Freight, I was a driver, dispatcher, morning manager, and then they merged with Roadway and I retired from there.

Q.      And then ran for office?

A.      Then ran for office.

Q.      Did you run individually or as a team

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

5

1    with somebody?

2         A.    Individually.

3         Q.    And have you run individually every

4    time?

5         A.    Every time.

6         Q.    When were you first elected?

7         A.    2012 I think.

8         Q.    And when you were elected in 2012, who

9    were the other Commissioners in Susquehanna County?

10        A.    The ones that were elected at that time

11   were Maryann Warren, she was the Democrat; Mike

12   Giangrecco, he was the Republican.

13        Q.    And how would you characterize your

14   governing style, did you work as a team or was it

15   party rule governing?

16        A.    I would say most generally it was as a

17   team.

18        Q.    Have you ever given a deposition

19   before?

20        A.    Yes.

21        Q.    When?

22        A.    I can't recall, it was few years ago on

23   a case involving Clean and Green.

24        Q.    Was it as a Commissioner --

25        A.    Yes.

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

6

1     Q.     -- that you gave the deposition?

2     A.     Yes.

3     Q.     Did you prepare for your deposition

4  here today at all?

5     A.     No.

6     Q.     Did you speak with anybody prior to

7  coming for the deposition?

8     A.     Just my attorney.

9     Q.     And who is your attorney?

10    A.     Jamie.

11    Q.     And did you review any documents?

12    A.     No.

13    Q.     Do you know Steve Stoud?

14    A.     Yes.

15    Q.     And how do you know Steve?

16    A.     He was an employee at the County.  I

17  was one of the individuals that hired him.

18    Q.     Tell me about how Steve was hired?

19    A.     He was hired, we had an issue in our

20  911 EOC not being efficient and not being managed

21  properly.  We were looking for a Public Safety

22  Director and his name came up, we interviewed him and

23  hired him for that position.

24    Q.     And what year would that have been?

25    A.     I can't recall.  I mean, it's got to be

**KEYSTONE COURT REPORTING AGENCY, INC.**

7

1    '14, '15; '13 maybe.

2         Q.    It was during your first term?

3         A.    It was during my first term, yes.

4         Q.    And what has your working relationship

5    been like with Steve since you hired him?

6         A.    Redefine that please?

7         Q.    Well, do you have any -- during your

8    term as Commissioner and Steve's employment with the

9    County, did you have any problems with Steve?

10        A.    Did I personally, no.

11        Q.    Did you have any problems with his work

12   product?

13        A.    With his product, no, I did not.

14        Q.    Do you know Maggie McNamara?

15        A.    Yes, I do.

16        Q.    How do you know Maggie McNamara?

17        A.    She was an employee of the County.

18        Q.    And were you involved in her hiring?

19        A.    Well, County Commissioners always are

20   involved in the hiring except for another elected

21   official, so everything has to get finally approved

22   by the County Commissioners.

23        Q.    Did you interview her?

24        A.    My recollection is that I did not

25   interview her, that was done by Steve and probably

**KEYSTONE COURT REPORTING AGENCY, INC.**

8

1  the HR Director at the time.

2        Q.    During your term as Commissioner, did

3  you have or witness any problems with Maggie

4  McNamara's work product?

5        A.    The only thing that I can recall is the

6  issues that the Commissioners had with the Agenda and

7  the punctuation or substance of the Agenda.

8        Q.    Why don't you describe who had the

9  problems and what the problems were?

10        A.    Well, it was the other Commissioners,

11  the other two Commissioners --

12        Q.    Who were?

13        A.    Commissioner Warren and Commissioner

14  Arnold were the ones that basically reviewed the

15  Agendas and looked for things that they felt weren't

16  correct as far as typos or substances that weren't

17  correct, that's something I didn't really pay that

18  much attention to.

19        Q.    You didn't believe it to be

20  significant?

21        A.    Well, my management style was

22  different.  I didn't worry about crossing the t's and

23  dotting the i's.  I was worried about keeping the

24  wheels on the bus.

25        Q.    So other than that, you had no problem

**KEYSTONE COURT REPORTING AGENCY, INC.**

9

1   with Maggie McNamara's work product?

2          A.    No, I did not.

3          Q.    How about Richard Ely, do you know him?

4          A.    Yes.

5          Q.    Tell me, how do you know him?

6          A.    He was hired as the HR Director at

7   Susquehanna County.

8          Q.    And who was involved in the interview

9   process in hiring him?

10         A.    That was the Commissioners.

11         Q.    You being one?

12         A.    Yes.

13         Q.    Was Steve Stoud involved in the

14  interviewing process?

15         A.    I can't remember if he was or not.

16  I can't remember the time he was hired versus Steve,

17  but if he had been there, he probably would have

18  been.

19         Q.    And what was he hired as?

20         A.    HR Director.

21         Q.    So can you tell me as Commissioner,

22  what are the duties of the HR Director?

23         A.    Well, at Susquehanna County it was a

24  little bit different than most places.  But basically

25  it was taking care of people's medical, making sure

**KEYSTONE COURT REPORTING AGENCY, INC.**

10

1    they were signed up, making sure that the Pension

2    things were filled out correctly, working with the

3    Actuary, making sure the Actuary had the information

4    they needed, trying to take care of the, you know,

5    personnel issues.  If somebody had a personnel issue,

6    one of the other elected officials or one of the

7    Department Heads try to intervene and make sure

8    people were doing things correctly.

9         Q.    Did there come a point in time when

10   there was a HR issue involving Rich Ely himself?

11        A.    Can you be more specific?

12        Q.    Well, did there come a time when Maggie

13   McNamara made a complaint about Rich Ely?

14        A.    Yes.

15        Q.    Tell me what you knew about that?

16        A.    I had received a phone call from the

17   Chief Clerk, which was Mr. Stoud, that apparently

18   there was an issue at work, where apparently Mr. Ely

19   was hugging or kissing people for a Christmas

20   farewell right before Christmas.

21        Q.    And how was that complaint handled?

22        A.    It was given to Mr. Stoud to

23   investigate and to inform us as to what the findings

24   were.

25        Q.    And what was your understanding of what

**KEYSTONE COURT REPORTING AGENCY, INC.**

11

1   Mr. Stoud's findings were?

2        A.     That there was an incident in the

3   office where he had been hugging.  And apparently

4   there was one lady that came in the office from vote

5   register I think she was, came in and hugged and gave

6   Rich a kiss, and then apparently others in the office

7   did partake in the same thing.

8              My understanding is that at that point

9   nothing occurred in the office except maybe the look

10  at each other between McNamara and Ely.  But then he

11  apparently went to the parking lot, and my

12  understanding was, he tapped on the window, she

13  rolled the window down, and at that point he offered

14  to -- my understanding, I think it was to give her a

15  Christmas wish or kiss or whatever on the cheek or

16  whatever, and my understanding was that she said no,

17  and backed away and he backed away and that was the

18  end of it.

19       Q.     And was there a finding by the

20  Commissioners as to whether this amounted to

21  harassment?

22       A.     There was a finding by the

23  Commissioners that it was --well, I guess a type of

24  harassment you would call it, that it was an act of

25  unwanted gesture that the Commissioners deemed was

12

1    not appropriate.

2         Q.    And did Mr. Ely, did he acknowledge

3    that it was not appropriate?

4         A.    Yes, I do recall that he did write a

5    letter of response acknowledging that what he did was

6    not right, he shouldn't have done it, yes.

7         Q.    And did Mr. Stoud make any

8    recommendations regarding discipline of Mr. Ely?

9         A.    Yes.

10        Q.    What was his recommendation?

11        A.    His recommendation at the time, he felt

12   that Mr. Ely needed to be let go for the incident.

13        Q.    And what did the Commissioners

14   conclude?

15        A.    The Commissioners concluded that the

16   infraction at that time, that as a group of

17   Commissioners that he was going to be given a Final

18   Written Warning, that the incident was not

19   appropriate and any further types of incidents of any

20   kind would lead to his termination.

21        Q.    And was that a unanimous decision of

22   the Commissioner?

23        A.    I would say -- I would say no.

24        Q.    What was the vote, how did the vote

25   break down?

**KEYSTONE COURT REPORTING AGENCY, INC.**

13

1        A.      Well, let me rephrase that.  It was not

2    a vote because we didn't take a vote because

3    Commissioner Giangrecco was outgoing at the time so

4    he abstained from it all, which left Commissioner

5    Warren and myself.

6        Q.      Just Commissioner Warren and yourself?

7        A.      Right, at that time.  Commissioner

8    Arnold hadn't taken office at that point.  So at that

9    point it was a split between her and I as to what

10   should happen.

11       Q.      What did you believe should happen?

12       A.      I was leaning toward termination but I

13   agreed to keeping him and doing the Written Warning.

14       Q.      And can I assume that one of the

15   reasons you were leaning towards termination because

16   was the fact that he was the HR Director of the

17   County acting in an inappropriate way with another

18   employee?

19       A.      That's correct.

20       Q.      Any other reasons?

21       A.      No.

22       Q.      So who notified Mr. Ely of the decision

23   that he would just -- what was the discipline?

24       A.      It was a Formal Written Warning that

25   was created by our Labor Attorney and came back to

**KEYSTONE COURT REPORTING AGENCY, INC.**

14

1    our Chief Clerk which was Mr. Stoud to administer.

2         Q.    And was that placed in his personnel

3    file then?

4         A.    Yes.

5         Q.    And it still would be there?

6         A.    I would hope.

7         Q.    And during your time as Commissioner,

8    was there a Chain of Command Policy that was

9    instituted ever?

10        A.    Well, yeah, there's always been a Chain

11   of Command with the County.

12        Q.    And why don't you tell me what that is?

13        A.    Well, The Chain of Command is that

14   everybody if supposed to -- if there's an issue,

15   they're supposed to work with their Immediate

16   Supervisor and work up the ladder.  If they have an

17   issue, they go to their Supervisor, if that's a

18   problem, then they to go their Manager, if that

19   doesn't get resolved, on up to Chief Clerk, and then

20   to the County Commissioners.  And vice versa, if the

21   Commissioners need something, they go to whoever

22   reports directly to the Commissioners and they're

23   supposed to handle it down through.

24        Q.    So when it comes to the Commissioners,

25   if there is an issues, who are the Commissioners

15

1    supposed to go to?

2          A.    I'm sorry?

3          Q.    So if there is an issue within the

4    County that the Commissioners want to investigate or

5    have a question on, how are the Commissioners

6    supposed to handle that situation?

7          A.    They go to whoever the direct report is

8    to the Commissioners, if it's the --

9          Q.    Would that be the Chief of Staff?

10         A.    The Chief Clerk, depending on how it

11   was split up at the time.  We did have the Chief

12   Clerk reported to the County Commissioner at one

13   point and the Public Safety Director reported, so it

14   depends on whose department it was.

15         Q.    And is it appropriate for a

16   Commissioner to go to an employee that may have two

17   or three Supervisors above him, would it be

18   appropriate for a Commissioner to go directly to that

19   employee?

20         A.    Well, they can.  I mean, they don't

21   have to follow the Chain of Command.  I mean, they

22   are a Commissioner, they can pretty much do what they

23   want.

24         Q.    Would it be appropriate?

25         A.    Well, I guess it depends on who you're

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

16

1    asking.

2         Q.    I'm asking you?

3         A.    Well, me, I wouldn't do that.  I would

4    go to the person that I should be going to which

5    would be the Chief Clerk.

6         Q.    Commissioner Arnold came in what year?

7         A.    '16, '17.  She started the beginning of

8    '16 maybe.

9         Q.    Did there become issues with regard to

10   the Commissioner Chain of Command with Commissioner

11   Arnold?

12        A.    Yes.

13        Q.    Can you tell me about that?

14        A.    Well, she was notorious of going to

15   employees directly and not going to Supervisors or

16   Department Heads or the Chief clerk.

17        Q.    And was she ever warned against doing

18   this?

19        A.    Yes.

20        Q.    Who would warn her against doing this?

21        A.    There was actually --- I did as the

22   Chairman of the Commissioners after talking to the

23   other Commissioner Warren that we agreed that we

24   needed to do something, and also our County Solicitor

25   Giangrecco also gave her a letter.

**KEYSTONE COURT REPORTING AGENCY, INC.**

17

1       Q.    What were the instances that led you to

2  warn her against behaving this way?

3       A.    The issue I remember is that she went

4  into the Public Safety Department and talking to

5  people in the Public Safety Department that were two

6  or three levels down and talking to them, you know,

7  personnel issues and other issues with the County.

8       Q.    And at the time who was the Director of

9  Public Safety?

10      A.    That was Mr. Stoud.

11      Q.    Did you witness any personal issues

12  that Commissioner Arnold may have had with Steve

13  Stoud?

14      A.    Personal in what way?

15      Q.    Personal animus against him?

16      A.    Yes, there was said from the beginning

17  that part of what she ran on was the management of

18  the County had to go.

19      Q.    But isn't that more style than personal

20  management style?

21      A.    Her style is how she wants to do

22  things, yeah.

23      Q.    But what I'm saying is, did you see a

24  personal animus that she had against Steve Stoud, she

25  didn't like him?

**KEYSTONE COURT REPORTING AGENCY, INC.**

18

1          A.      I would say that's a true statement.

2          Q.      Why would you say that's a true

3   statement?

4          A.      I am not positive as to the reasons

5   why.

6          Q.      And what did you see her do that would

7   lead you to believe that she had a personal animus

8   against Steve Stoud?

9          A.      Well, she had made comments to the HR

10  Director that was Sara (sic) at the time that she

11  wanted him fire.

12         Q.      And indeed she stated she wanted Maggie

13  McNamara fired as well, isn't that correct?

14         A.      That's true.

15         Q.      And would this be very early on in her

16  tenure as a Commissioner when this started?

17         A.      Yes.

18         Q.      Was it Commissioner Arnold and

19  Commissioner Warren the ones who were complaining

20  about typos and grammar errors and Maggie McNamara's

21  agenda?

22         A.      I would say that's true.

23         Q.      Both of them?

24         A.      Yes.

25         Q.      Did you ever have discussions with him,

**KEYSTONE COURT REPORTING AGENCY, INC.**

19

1   that hey, look, this isn't that big a deal?

2        A.    Well, I had discussions with them and I

3   didn't say it wasn't that big a deal.  I did have

4   discussions with them to say that they needed to try

5   and meet with Maggie and Steve and work it out and

6   come to a resolution as to the issues and problems,

7   that it wasn't productive in the way things were

8   going.

9        Q.    Did there come a point in time when

10  Commissioner Warren indicated to you that she wanted

11  to intentionally embarrass Maggie McNamara by

12  exposing these typos and grammar errors?

13       A.    I would say that the comment was more

14  of, well, if it's not going to get fixed before the

15  meeting, then I'll just bring it up in the meeting

16  then.

17       Q.    Did she say her intention was to

18  embarrass Maggie at the meeting?

19       A.    I think the wording was that -- she

20  didn't say that she was intentionally trying to

21  embarrass her.  Her comment was, that she would

22  probably be embarrassed if I bring this up at the

23  meeting.

24       Q.    At that point in time, Maggie

25  McNamara's position was of Deputy Chief Clerk, is

**KEYSTONE COURT REPORTING AGENCY, INC.**

20

1  that accurate?

2       A.    Yep.

3       Q.    And her office was in Commissioners'

4  office?

5       A.    Right.

6       Q.    After Rich Ely was disciplined when he

7  was HR Director, did there come a point in time when

8  you moved him?

9       A.    Yes.

10      Q.    Where did you move him?

11      A.    He was moved out -- a Veterans Affairs

12  person was discharged and we needed somebody in our

13  Veterans Affairs, he was a Veteran, so he was

14  qualified, we thought it would be our best fit to

15  move him to our Veterans Affairs office.

16      Q.    Why was the Veterans Affairs guy

17  discharged?

18      A.    I can't remember.  He was goofing off,

19  not doing his job.  I can't recall.

20      Q.    Could it be a sexual harassment against

21  him?

22      A.    Not that one.

23      Q.    So Rich went into Veterans Affairs

24  which is in another building?

25      A.    Was in another building.

21

1       Q.      Was in another building.  And then did

2   come a point in time when the Commissioners or one

3   Commissioner or two Commissioners indicated to Maggie

4   McNamara, you have to go over there now and help Rich

5   Ely with Veterans affairs?

6       A.      I don't know what the other

7   Commissioner said.  But I remember my conversation

8   was, asked if she would help out and go over and see

9   what is going on over there to make sure our Veterans

10  get taken care of, but I don't know what the other

11  one said.

12      Q.      So she went over there?

13      A.      Yes.

14      Q.      Can you describe the Veterans Affairs

15  office?

16      A.      It's in the County Office Building,

17  it's basically two offices in one, there's a back

18  office and a front office.  You go through the front

19  office to get to the back office.  And basically the

20  clerical person sat in the front and the Veterans

21  Director sat in the back.

22      Q.      And would you describe Maggie's

23  position as the clerical position at that time?

24      A.      No. I would classify her position as

25  the Deputy Chief Clerk that was over trying to help

22

1    out.

2         Q.    But she would be working in a clerical

3    position?

4         A.    She would be working in that area, yes.

5         Q.    And you said it was two offices in one?

6         A.    Yeah.

7         Q.    So how big of an area was this?

8         A.    Each office was probably, you know,

9    eight by twelve.

10         Q.    So she'd be working right next to Mr.

11    Ely?

12         A.    The first office, there was a wall

13    behind her before you went into the office where he

14    was.

15         Q.    I'm going to call your attention now to

16    May of 2016, you were the Chairman of the

17    Commissioners at point in time, correct?

18         A.    I believe so, yes.

19         Q.    And your Solicitor was Mike Giangrecco?

20         A.    Yes.

21         Q.    Do you recall Steve Stoud coming to see

22    you and explaining that the situation with

23    Commissioner Arnold and Commissioner Warren as it

24    relates to Maggie McNamara and Steve Stoud was

25    rapidly deteriorating, in that they felt there was

**KEYSTONE COURT REPORTING AGENCY, INC.**

23

1    hostile work environment between those Commissioners,

2    not you, those Commissioners and themselves?

3         A.    Well, we had a conversation about the

4    conditions, the work conditions.    And yes, he did

5    say that he felt that it had deteriorated quite a

6    bit, and that, you know, he didn't mention the word

7    hostile.

8         Q.    Did he mention the word harassing?

9         A.    He may have, I don't recall.

10        Q.    Did he mention the word retaliatory,

11   that they were being retaliatory against?

12        A.    I don't that.

13        Q.    Nonetheless, he came to you and told

14   you that we have a bad situation?

15        A.    Yes.

16        Q.    And what else was said at that meeting?

17        A.    Well, I think it was --and I can't

18   remember the timing -- that this all lead up to that

19   meeting to another meeting of the other two

20   Commissioners which I pulled him into --

21        Q.    Him being Steve?

22        A.    Steve, I'm sorry, which I pulled Steve

23   into, which was about a performance issue with Maggie

24   McNamara, that that meeting went through -- which was

25   not another -- which wasn't a great meeting either.

**KEYSTONE COURT REPORTING AGENCY, INC.**

24

1       Q.    And I don't want to put words in your

2  mouth but I'm going to paraphrase something.

3           In May of 2016 Steve Stoud goes to you

4  and Mike Giangrecco and says, this situation with the

5  other two Commissioners and Maggie McNamara and Steve

6  Stoud is deteriorating, they claim -- they said it

7  was, you're harassing, hostile; you and Mike in turn

8  decide, well, the other two Commissioners need to be

9  brought in on this, is that accurate?

10      A.    Well, what we said was, they all need

11  to get together to have a conversation to work this

12  out.

13      Q.    And then they all get together and the

14  meeting turns to, well, how are we going to

15  discipline Maggie McNamara?

16      A.    No, that is not true.  What happened

17  was, there was tried several opportunities to have

18  conversations between all of them but it got to the

19  point where the other two Commissioners that they

20  weren't happy with what was going on, so they decided

21  to have a meeting to talk about the issue with Mr.

22  Stoud and Maggie McNamara.

23      Q.    What weren't they happy with?

24      A.    Well, again, it was all about the

25  agendas, and they had something about Maggie talking

**KEYSTONE COURT REPORTING AGENCY, INC.**

25

1    to Department Heads gruffly or inappropriately.

2          Q.    And have any Department Heads come

3    forward and confirmed that?

4          A.    Not to me.

5          Q.    Did they give you names of Department

6    Heads who came to them and said they're complaining

7    to me about Maggie.

8          A.    Actually, I think Commissioner Arnold's

9    response was, that she didn't have to tell anybody

10   the names that she was talking to.

11         Q.    So she wouldn't share the names with

12   the Chairman of the Commissioners?

13         A.    No.

14         Q.    Okay.   Sorry.   Go ahead?

15         A.    So that the two Commissioners called me

16   in, they were in Commissioner Warren's office,

17   Commissioner Warren and Arnold were in Commissioner

18   Warren's office, they called me and said, you know,

19   we have a problem, we don't like this, we want to

20   take a look and see what we can do about getting rid

21   of Steve and Maggie.

22              And I said, I'm not a part of this,

23   this is on you, I will go get Steve.  You guys deal

24   with it however you want.

25         Q.    So let me back up.  At this stage, to

**KEYSTONE COURT REPORTING AGENCY, INC.**

26

1    your knowledge, and let's first talk about Maggie

2    McNamara, the only complaints you heard the

3    Commissioners say at this stage against Maggie

4    McNamara was, she made some typos and grammatical

5    errors in agendas -- -

6                      MR. HAILSTONE:  I object to the

7            form.

8    BY MR. KARAM:

9            Q.      -- and she spoke gruffly with

10   Supervisors that they would not name?

11           A.      Well, there was more than just that, it

12   was the -- you can talk about the grammatical errors,

13   but there was also the, you know, the wording of the

14   motions that was -- that they believe was an issue.

15   Also, it was the talking to the other Department

16   Heads, but also then there was the issue of Steve and

17   Maggie spending too much time together.

18           Q.      And we'll get to that.

19           A.      I'm sure.

20           Q.      We'll get to that in a second.

21           A.      And there were some issues there, I

22   can't remember what they were.

23           Q.      But for what you just said, they wanted

24   to fire Maggie?

25           A.      Yes.

**KEYSTONE COURT REPORTING AGENCY, INC.**

27

1      Q.     And they made it clear?

2      A.     Yes.

3      Q.     Now, let's go to this spending too much

4  time together.  Was it clear to you that at some

5  point in time either Commissioner Arnold,

6  Commissioner Warren or both who were claiming or

7  insinuating that Maggie McNamara and Steve Stoud were

8  having an affair?

9      A.     That was just Commissioner Arnold.

10     Q.     And she made it clear to you that she

11 felt they were having an affair?

12     A.     Yes.

13     Q.     Were you the only one that she said

14 that to?

15     A.     To my knowledge, no.

16     Q.     Who else do you believe she said that

17 to?

18     A.     The Solicitor.

19     Q.     Mike Giangrecco?

20     A.     Mike Giangrecco, Jeanne Conklin, who

21 was the HR Director at the time, and I don't know who

22 else but other people in the building knew.

23     Q.     And do you believe that Commissioner

24 Arnold was using that belief to attempt to fire

25 Maggie McNamara and Steve Stoud?

**KEYSTONE COURT REPORTING AGENCY, INC.**

28

1      A.    I don't think so, I think her

2  motivation --

3      Q.    Was that part of her motivation?

4      A.    No, I think her motivation was that she

5  just wanted different people in those offices.

6      Q.    What was her reasoning in saying that

7  Steve and Maggie were having an affair?

8      A.    I don't know -- well, she was just

9  saying that they spend too much time in the office

10  and they're always giggling and stuff like that.

11      Q.    And did she think that was

12  inappropriate?

13      A.    Apparently.

14      Q.    Did she ask what were they meeting

15  about?

16      A.    You know, she may have.  And my

17  response would be:  I have no clue, why don't you go

18  ask them.

19      Q.    So at this meeting where Arnold and

20  Warren said we want Stoud and McNamara fired, what

21  was your response?

22      A.    My response was:  I'm not part of this.

23  If you guys want to do this, you're going to do it on

24  your own.

25            I said, at this point I'll go get Mr.

**KEYSTONE COURT REPORTING AGENCY, INC.**

29

1  Stoud.  If you want to do something with McNamara you

2  -- I said, but at the same time you've got an

3  employee who's never been written up, never had any

4  discipline issues, you know, you can't do it this

5  way.

6            And I said, you might want to think

7  about this.  And that's when they decided that

8  they're going to do a Written Warning instead of

9  terminating her.  And that's when I said:  Listen,

10  I'm going to get Steve, she works for Steve, she

11  doesn't work for me, I'm not doing this, I'm not

12  getting in the middle of it.

13          Q.    Was Mike Giangrecco there at the time?

14          A.    He was not in the meeting.

15          Q.    Was he consulted?

16          A.    I don't know if any of them consulted

17  him or not, I don't believe so, but then again, they

18  may have.

19          Q.    At this meeting did Arnold or Warren

20  make complaints that Stoud and McNamara are

21  complaining that they were working in a hostile work

22  environment and that they're being harassed?

23          A.    Did Commissioner Warren and

24  Commissioner Arnold say that?

25          Q.    Yeah.

**KEYSTONE COURT REPORTING AGENCY, INC.**

30

1    A.    No.

2    Q.    No?

3    A.    No.

4    Q.    Did you ever hear Warren or Arnold

5    complain that Stoud was claiming that he was working

6    in a hostile work environment or McNamara?

7    A.    No, I don't think so -- I can't recall.

8    Q.    So did there come a point where Stoud

9    was brought into the meeting?

10    A.    Yes.

11    Q.    And were you still there?

12    A.    Yes.

13    Q.    And what happened at the meeting?

14    A.    Mr. Stoud came in and sat down and I

15    told them:  Here he is, tell him what you want to do.

16    Q.    And what did they tell him?

17    A.    They both shared that they were not

18    pleased with McNamara's performance and that they

19    wanted her written up.  And that there was issues and

20    they went down through some of the issues of the

21    spending too much time together, the problems with

22    the agendas, the attitude toward the Department Heads

23    and Elected Officials.

24    Q.    And did Commissioner Arnold indicate

25    that people were talking about them?

**KEYSTONE COURT REPORTING AGENCY, INC.**

31

1        A.    I don't know if she said it there but

2  she has said that.

3        Q.    Do you know who these people were?

4        A.    Again, she doesn't tell you who she

5  talks to but she talks to everybody.

6        Q.    Do you recall Steve Stoud asking who

7  these people were and Arnold saying, I don't have to

8  tell you?

9        A.    I don't recall that.  I had heard that

10  but I don't recall it.

11        Q.    Do you recall Commissioner Warren or

12  Commissioner Arnold stating to Stoud that it doesn't

13  look good for them to be spending so much time

14  together?

15        A.    Ask the question again?

16        Q.    Do you recall either Commissioner

17  Arnold or Warren stating to Steve Stoud that it

18  doesn't look good for Stoud and McNamara to be

19  spending so much time together?

20        A.    In that meeting?

21        Q.    Well, in that meeting or at another

22  time?

23        A.    I don't recall hearing the conversation

24  but I do remember either Mr. Stoud or somebody

25  telling me that that conversation existed.

**KEYSTONE COURT REPORTING AGENCY, INC.**

32

1      Q.      And was it after this meeting that she

2   went to Conklin, to your knowledge, that she went to

3   the HR Director Conklin and said:  I want McNamara

4   and Stoud terminated?

5      A.      No, I think that was before that

6   meeting.

7      Q.      Before that meeting?

8      A.      Yeah.

9      Q.      And then on June 8th, 16, did you

10  attend another meeting regarding Stoud and McNamara,

11  around June of 2016?

12     A.      You'd have to tell me what the

13  conversation was for me to remember.

14     Q.      Where they came up with a list of

15  complaints that they wanted Stoud to address to

16  McNamara?

17     A.      I think that was the same meeting.

18     Q.      Okay.  Could it have been a different

19  meeting where the actual list was given?

20     A.      No.  I think it was the day after the

21  initial meeting is when they came up with a list of

22  the issues to address.

23     Q.      And did Steve Stoud indicate that he

24  didn't agree with this, that he felt that Maggie

25  McNamara -- that their complaints against Maggie

**KEYSTONE COURT REPORTING AGENCY, INC.**

33

1    McNamara were not warranted?

2         A.    Yes.

3         Q.    And did they tell him that if he didn't

4    address these issues with them that he'd be fired?

5         A.    I don't know if it was exactly worded

6    that way.

7         Q.    How was it worded?

8         A.    I can't remember.

9         Q.    Well, can you paraphrase it?

10        A.    Well, I think it would be the same with

11   any other employee, if we ask the employee to do

12   something and they refuse a direct order, then yeah,

13   they'd probably lose their job.

14        Q.    Did Stoud indicate to them that some of

15   their allegations were inaccurate?

16        A.    Yes, in his opinion he did say that.

17        Q.    And what was their response to that?

18        A.    I think --  I'm trying to recall the

19   conversation.  I believe their response was that they

20   felt the allegations were correct.

21        Q.    And did he indeed address those issues?

22        A.    Yes.

23        Q.    And he provided you and the other

24   Commissioners with documentation to address those

25   issues?

**KEYSTONE COURT REPORTING AGENCY, INC.**

34

1    A.    I believe he did.

2    Q.    Did there come a point in time then

3 when you met with Steve Stoud and Maggie McNamara

4 about the environment that they were working in and

5 an opening in the District Attorney's office?

6    A.    I did talk to -- I know I talked to

7 Maggie about that, I don't know if Steve was there or

8 not.

9    Q.    And would it be accurate to say that

10 you basically said, hey, Maggie, these two, Warren

11 and Arnold, want to get rid of you, there's an

12 opening in the DA's office, you should apply for it?

13    A.    No.  I think my comment was, is that,

14 you know, the situation at hand, there's only a few

15 options; one, you can sit down with the two of them

16 and try to work it out, figure out how to get

17 something worked out so that it's, you know, works

18 for everybody or there's a position in the District

19 Attorneys' office, you can apply for that position.

20 I can't guarantee you because I'm only one

21 Commissioner, that things are going to change, get

22 better or get worse.

23    Q.    When you say work out, work out what?

24    A.    Work out the relationship that the

25 other two Commissioners had with her as far as the

**KEYSTONE COURT REPORTING AGENCY, INC.**

35

1    issues they had at hand.

2        Q.    And those issues were addressed with

3    Maggie through Steve Stoud, correct?

4        A.    Right.

5        Q.    How do you work out the Commissioners

6    saying, you're having affair with your Supervisor?

7             MR. HAILSTONE:  I object to the

8             form.  You can answer, if you can.

9             THE WITNESS:  Well, I think you

10            need to have a conversation between two

11            people.

12   BY MR. KARAM:

13       Q.    Wasn't it already said that that's just

14   simply not true?  Weren't they informed that it

15   wasn't true?

16            MR. HAILSTONE:  I object to the

17            form.  I object to putting facts in the

18            record that aren't in the record.  I

19            don't think that it was ever asked

20            whether.

21   BY MR. KARAM:

22       Q.    Did you have knowledge that Arnold and

23   Warren were informed that this isn't true?

24       A.    Well, I do know that both McNamara and

25   Stoud said that, you know, that is incorrect.

36

1    Q.    Yet Arnold continued with the

2  insinuations?

3    A.    Well, I don't know at the timing of it

4  as to how much continuation there was, if any.

5    Q.    Do you recall in mid June, you

6  approaching Steve Stoud and saying that Commissioner

7  Arnold approached you and told you that she felt she

8  had to break them up in order to save Steve Stoud's

9  marriage?

10    A.    That is true.

11    Q.    And in mid June of 2016, she went on to

12  say, that if they're not having an affair, one's

13  going to happen?

14    A.    I don't recall that.

15    Q.    And did you tell her, Commissioner,

16  stop making statements like that?

17    A.    Yes.

18    Q.    Did you tell her that it's wrong for

19  her to make statements like that?

20    A.    Yes.

21    Q.    Did you tell her that it's going to get

22  us in a lawsuit if she continues to make statements

23  like that?

24    A.    I would say, not quite to that level

25  but yes.

37

1      Q.     After that occurred, did you instruct

2  or advise Steve Stoud to the contact the CCAP

3  Attorney, to tell him, you know, what's happening?

4      A.     I don't --

5          MR. KARAM:  We might as well put

6          this on the record, it was Mike Donohue

7          who, for the record, is in Jamie's

8          office who we have waived any conflict

9          issues and that's already been resolved

10          between Attorney Hailstone and myself.

11          THE WITNESS:  I don't recall that.

12  BY MR. KARAM:

13      Q.     Do you recall ever talking to the Steve

14  Stoud where he indicated, I talked to Mike Donohue

15  about this?

16      A.     I don't recall Mike Donohue's name

17  coming up.

18      Q.     Now, it's mid July, 2016, and Steve

19  Stoud, his position is still I believe the Chief

20  Clerk and he also held the position of Director of

21  Public Safety, correct?

22      A.     Yes.

23      Q.     And the salary he was receiving at the

24  time was based on him doing both positions?

25      A.     Correct.

**KEYSTONE COURT REPORTING AGENCY, INC.**

38

1    Q.    And in mid July of 2016, do you recall
2    Commissioner Warren approaching you with a desire to
3    eliminate the Director of Public Safety position?
4    A.    Her comment was that she didn't know if
5    we really needed a full-time Public Safety Director.
6    Q.    But you didn't have a Full-Time Public
7    Safety Director because he was also Chief Clerk?
8    A.    But we did when he first started.
9    Q.    But in July of 2016 he was performing
10    both duties?
11    A.    Right.
12    Q.    So it would be impossible for him to be
13    doing Director of Public Safety full-time?
14    A.    Right.
15    Q.    By the way, do you know where Steve
16    Stoud's wife works?
17    A.    I don't think she works.  She used to
18    work at the County.
19    Q.    When did she leave the County, do you
20    recall?
21    A.    I can't recall.  I think it was before
22    Mr. Stoud came -- I can't recall.
23    Q.    So she --
24    A.    She didn't work for the Commissioners.
25    Q.    But she knows a lot of the County

39

1    employees, would that be fair to say?

2         A.     That would be fair to say.

3         Q.     October, 2016, there was an issue with

4    Commissioner Arnold and Steve Stoud regarding the

5    scheduling of a Penn State appointment that resulted

6    in you and Commissioner Arnold and Mike Giangrecco

7    having an animated discussion about it, do you recall

8    that?

9         A.     Yes.

10        Q.     Can you tell me about it?

11        A.     Apparently what I know, Commissioner

12   Arnold went in to Mr. Stoud's office, there was a

13   confrontation that occurred.  And I was not in the

14   office at the time or in the area.  It came back to

15   me there was an issue.  I met with our Solicitor, Mr.

16   Giangrecco, and talked to him.  So the two of us

17   talked to Commissioner Arnold about protocol and

18   about the temperament of conversation.

19        Q.     Would it be fair to say that you and

20   Solicitor Giangrecco indicated to Commissioner Arnold

21   that the way she was handling things was affecting

22   the entire Commissioners' staff?

23        A.     That would be true.

24        Q.     In a negative way, correct?

25        A.     Correct.

40

1      Q.    And she was told this?

2      A.    Yes.

3      Q.    And she was told to refrain from making

4 the comments she was making to Steve Stoud and

5 underlings for lack of a better term?

6      A.    She was told to reframe from making the

7 comments and also going around his office and

8 breaking the chain of command.

9      Q.    And do you recall Solicitor Giangrecco

10 drafting a letter to Commissioner Arnold?

11     A.    Yes, I do.

12     Q.    And what did that letter indicate?

13     A.    If I recall in that letter, again it

14 was a letter telling her to cease and desist the way

15 she was handling things before it gets the County in

16 anymore trouble, and I was just paraphrasing, I can't

17 remember.

18     Q.    Sure.  How many letters did Mike

19 Giangrecco write to Commissioner Arnold telling her

20 that she has to stop this conduct?

21     A.    I know of one.  I don't know if there

22 was others.  I do know of the one.

23     Q.    If I told you that we believe there's

24 two.

25     A.    There could be.  I can't recall.

**KEYSTONE COURT REPORTING AGENCY, INC.**

41

1          MR. KARAM:  Jamie, do you have

2     those?

3          MR. HAILSTONE:  I only have one.

4     If there is another one, I don't have

5     it.

6          MR. KARAM:  Would I be able to get

7     a copy of the one you have?  Do you have

8     it with you?

9          MR. HAILSTONE:  No.

10   BY MR. KARAM:

11        Q.   Was Commissioner Arnold told both by

12   you and Giangrecco that her actions were harassing

13   and retaliatory?

14        A.   I'd have to look at the letter I wrote

15   and the letter that he wrote to see what is in there.

16   I can't remember exactly.

17        Q.   How about in your conversations with

18   her when you were telling her to stop, did you not

19   tell her, you're harassing him?

20        A.   I don't think I used the word

21   harassing.  I said that -- and I was pretty blunt:

22   You need to stop doing this immediately before we get

23   in more trouble.

24        Q.   And can we assume that you felt you

25   were going to get in more trouble because what she

42

1   was doing was wrong, in your mind?

2       A.      Yeah, correct.

3       Q.      Even if you didn't say it to her with

4   the knowledge that you have, would you believe her to

5   be harassing Steve Stoud?

6               MR. HAILSTONE:   I object to the

7       form.

8               THE WITNESS:  You're asking my

9       personal opinion?

10              MR. KARAM:  Your personal opinion?

11              THE WITNESS:  Well, definitely

12      Commonwealth Arnold and Commissioner

13      Warren have a different management style

14      than mine.

15  BY MR. KARAM:

16      Q.      Would you believe the course of conduct

17  that Commissioner Arnold pursued against Steve Stoud

18  was harassing in nature?

19              MR. HAILSTONE:  Same objection.

20              THE WITNESS:  You know, again, I

21      would say that my personality and my

22      experiences and the way I manage is

23      entirely different than the way they do.

24      What I think is acceptable and what I

25      think is not acceptable might be

43

1          entirely different to them.

2     BY MR. KARAM:

3          Q.     Was the way she handled things in the

4     workplace with Steve Stoud and Maggie McNamara

5     acceptable to you?

6          A.     I wouldn't handled the things the way

7     she did.

8          Q.     Could I take that to mean that it

9     wouldn't be acceptable to you?

10         A.     Well, I wouldn't do it that way.

11         Q.     Who's Lisa Kowalewski?

12         A.     She was the IT Director at the County.

13         Q.     And tell me what you know about Lisa

14    Kowalewski and Steve Stoud?

15         A.     Lisa was hired as the IT Director for

16    the County, came in, went to work, things started out

17    fine.  She had some medical issues, had to take some

18    time off, came back.  When she came back, there was a

19    difference in personality.  And I remember that she

20    -- I didn't witness it.  My understanding is that she

21    came into the office area and there was a big

22    confrontation in the Commissioners' office and

23    Mr. Stoud.

24         Q.     And was the HR Director present when

25    this happened as well to your knowledge?

44

1      A.     My understanding, the HR Director,

2  Jeanne Conklin, was there at that time.

3      Q.     And is it fair to say that the

4  HR Director's interpretation and viewpoint of what

5  happened there, was that Mr. Stoud did nothing wrong?

6      A.     Yes.

7      Q.     And that was a personnel issue that was

8  handled internally?

9      A.     Yes.

10     Q.     And there come a point in time then,

11 after this incident, that Commissioner Arnold looked

12 into it on her own?

13     A.     I can't answer that, I'm not sure

14 exactly.  If you can rephrase the question?

15     Q.     Well, did there come a point in time

16 then when Commissioner Arnold went into the IT

17 office, wherever that IT office is, to talk to the

18 other employees about the incident?

19     A.     She could have.

20     Q.     You're not aware of it?

21     A.     I'm not aware of it.

22     Q.     Were you aware Commissioner Arnold's

23 stating to the other employees that it was Stoud's

24 fault and we girls have to stick together?

25     A.     I did hear that.  I didn't witness but

**KEYSTONE COURT REPORTING AGENCY, INC.**

45

1    I hear that.

2           Q.     Did there come a point in time

3    subsequent to November 3rd, 2016, and I'm submitting

4    that Kowalewski occurred on November 3rd, 2016.  Did

5    there come a point from time when Kowalewski

6    retrieved all of the E-mails between Maggie McNamara

7    and Steve Stoud to your knowledge?

8           A.     Yes.

9           Q.     How did that occur?

10          A.     Commissioner Warren and Commissioner

11   Arnold wanted to know what was in those E-mails?

12          Q.     Why?

13          A.     I have no idea.  I refrained and I

14   said:  I'm not involved in it.  If you two want to

15   team up and do this, you're on your own.

16                 I brought our Solicitor in and he told

17   them not to do it also.

18          Q.     Who was your Solicitor?

19          A.     Michael Giangrecco.

20          Q.     And so against your advice, against the

21   Solicitor's advice, they decided to retrieve all

22   County E-mails between Maggie McNamara and Steve

23   Stoud?

24          A.     Correct.

25          Q.     Any other employees?

KEYSTONE  COURT  REPORTING  AGENCY,  INC.

46

1     A.     There has been others in the past but

2   employees that have left the County.

3     Q.     But at this stage, did they want to

4   retrieve any other employees besides Stoud and

5   McNamara?

6     A.     No.

7     Q.     And then who did they contact to do

8   this?

9     A.     That went through the -- I believe the

10  New Chief Clerk and I believe IT Director.

11    Q.     Ms. Kowalewski?

12    A.     Yes.

13    Q.     And they did it?

14    A.     And they did it.

15    Q.     And they found nothing?

16    A.     My knowledge.

17    Q.     And did there come a point in time when

18  you became aware that Kowalewski was conducting her

19  own separate investigation into Steve Stoud?

20    A.     Yes.

21    Q.     Tell me what you know about that?

22    A.     Apparently my understanding was, was

23  that in getting the E-mails for the other two

24  Commissioners, she came across an E-mail about

25  something, and then started doing a background check

47

1    on Mr. Stoud which led to accusations of some

2    wrongdoing by Mr. Stoud.

3         Q.     That he was committing some type of

4    fraud or kickback with a County Vendor?

5         A.     That's correct.

6         Q.     And Commissioner Arnold knew about

7    this, correct, knew about this private investigation

8    that Kowalewski was conducting?

9         A.     All the Commissioners did.

10        Q.     And knew about the allegations against

11   Steve Stoud that Kowalewski was making?

12        A.     Correct.

13        Q.     Wasn't indeed Arnold part of that

14   investigation, she was, you know, she was

15   side-by-side with Kowalewski in conducting this

16   investigation?

17        A.     That I do not know.

18        Q.     Kowalewski was certainly keeping her up

19   to date on everything she was doing though?

20        A.     If she was, it wasn't to my knowledge.

21        Q.     And as a result of this investigation,

22   it was brought to the District Attorney's attention

23   of Susquehanna County?

24        A.     Correct.

25        Q.     And at the time Steve Stoud was the

**KEYSTONE COURT REPORTING AGENCY, INC.**

48

1    Director of Public Safety in Susquehanna County and a

2    part-time County Detective?

3         A.    Correct.

4         Q.    And because the Commissioners now,

5    not you, but the other two, brought this to the

6    attention of the District Attorney's office, Steve

7    Stoud was suspended by the District Attorney's office

8    in his position as County Detective.

9         A.    I'd have to check with the District

10   Attorney's office, I don't recall.

11        Q.    I'm saying that he was.

12              So are you familiar with what the

13   results of this investigation were?

14        A.    Yes.

15        Q.    What were they?

16        A.    That it was unfounded.  That the

17   information that was there had to deal with something

18   many years ago and it wasn't with him.  It was his

19   son I believe it was, some business or something that

20   he had.  That there was nothing there which resulted

21   in the IT Director being terminated.

22        Q.    Who voted on the IT Director being

23   terminated?

24        A.    That was a decision made by the Chief

25   Clerk, the HR Director and the three Commissioners.

**KEYSTONE COURT REPORTING AGENCY, INC.**

49

1       Q.    Attorney Robin Reed was the CCAP

2  Attorney at one point?

3       A.    Yes.

4       Q.    Did she come in at any point in time

5  and tell Commissioner Arnold, you need to treat

6  Stoud a little more professionally?

7       A.    Yes.

8       Q.    McNamara takes the job in the DA's

9  office, right?

10      A.    Yes.

11      Q.    After she took the job in the DA's

12  office, were the Commissioners continuing to complain

13  about her?

14      A.    My understanding, there was comments

15  with the District Attorney, and I wasn't privy what

16  was going on with that.

17             (At this time there was a brief

18              discussion held off the record.)

19        MR. KARAM:  For the record, the

20          caption is Robert Stoud but he is

21          commonly called Steve, so for the

22          purposes of the deposition we are

23          calling him Steve.

24             (At this time there was a brief

25              recess taken.)

**KEYSTONE COURT REPORTING AGENCY, INC.**

50

1   BY MR. KARAM:

2         Q.    Commissioner, did there ever come a

3   point where you were so concerned about the conduct

4   of Commissioner Arnold towards Steve Stoud or Maggie

5   McNamara that you ended up writing her a letter?

6         A.    Yes.

7         Q.    And what did you say in that letter?

8         A.    Oh boy, I can't recall the exact

9   wording, but the gist of it was, she needed to follow

10  the chain of command, needed to be professional.

11        Q.    Did part of it talk about the County

12  can't run if a Commissioner doesn't communicate with

13  the Chief Clerk, I'm paraphrasing?

14        A.    I think what was in that one was, we

15  have 8:15 briefing every morning, part of that was

16  telling her that she needed to at the 8:15 briefing

17  because she wasn't coming in, and in order for the

18  Commissioners to know what was going on and to give

19  direction to the Chief Clerk and the people that need

20  direction can't do if you're not there.  And I think

21  it went on to say that she needed to communicate with

22  the Chief Clerk because he is the person in charge of

23  running the County.

24        Q.    And was she refusing to communicate

25  with the Chief Clerk at that point?

**KEYSTONE COURT REPORTING AGENCY, INC.**

51

1          A.      I would say pretty much, yes.

2          Q.      And do you believe that was because of

3     her personal animus against the Chief Clerk?

4          A.      I don't know her exact feelings but I

5     know she was not communicating with him.

6          Q.      And would the Chief Clerk not being

7     able to communicate with one of the Commissioners, in

8     your opinion would that hamper the Chief Clerk's

9     ability to do his job to his fullest extent?

10         A.      Well, it makes it more difficult when

11    all three are not informed and on the same page.  I

12    mean, you don't expect all the Commissioners to agree

13    all the time.

14             MR. KARAM:  Jamie, would I be able

15         to get a copy of that, a copy of these

16         letters for tomorrow?

17             MR. HAILSTONE:  I can bring them

18         with me.  And when you were asking

19         earlier about two letters from Mike

20         Giangrecco.  And I think what the

21         confusion was, there's one from Mike and

22         one from Commissioner Hall.  I don't

23         think there's two from Mike.  I will go

24         back and check.  I only have one.

25    BY MR. KARAM:

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

52

1        Q.      Did you write any other letters?

2        A.      I can't recall.  I know there was one.

3   I don't know if there was a second or not, there may

4   have been two, I don't know.

5        Q.      Maggie McNamara and Steve Stoud filed

6   an EEOC Complaint, I believe it was September 2016,

7   around, I could be wrong about that, and I know you

8   don't want to use the words harassing or retaliatory.

9                Did the improper conduct towards Steve

10  Stoud and Maggie McNamara continue after they filed

11  their EEOC Complaint?

12       A.      Correct.

13       Q.      And is it fair to say that Arnold and

14  Warren were not happy with what Stoud and McNamara

15  were saying, that they were working in a hostile work

16  environment and being retaliated against?

17       A.      I can't recall the exact conversations

18  on that.

19       Q.      When you would confront Arnold about

20  doing -- about improperly dealing with Stoud, what

21  was her response?

22       A.      I'm a Commissioner, I'll do what I want

23  to do.

24       Q.      Did you talk to her that she was

25  exposing the County to unnecessary litigation?

**KEYSTONE COURT REPORTING AGENCY, INC.**

53

```
 1                 MR. HAILSTONE:  I object to the
 2         form.
 3    BY MR. KARAM:
 4         Q.     Did you warn her that she's exposing
 5    the County to a lawsuit and hostile work environment
 6    complaints and retaliation complaints.
 7         A.     I warned her that her actions could
 8    lead to legal liabilities for the County.
 9         Q.     And what was her response to that?
10         A.     She really didn't say much to me.
11         Q.     She didn't say much to you?
12         A.     No.
13         Q.     How do you get along with Commissioner
14    Arnold?
15         A.     Hot and cold.
16         Q.     And now I'm going to get into a little
17    bit of politics  because I don't understand much of
18    it up there.
19                When you run as a Commissioner, I know
20    the first time you ran you said you ran on your own?
21         A.     Yes.
22         Q.     The next time you ran, did you run as a
23    team?
24         A.     No.
25         Q.     You always run on your own?
```

**KEYSTONE  COURT  REPORTING  AGENCY,  INC.**

54

1       A.      Yes.

2       Q.      Historically in Susquehanna County, is

3   that how it's been, people running on their own for

4   Commissioner?

5       A.      Yes.

6               MR. KARAM:  That's it.

7               MR. HAILSTONE:  No questions.

8               I just want to clarify on the

9           record, that I represent the Defendants,

10          Susquehanna County.  I don't remember

11          Commissioner Hall outside of his

12          position as Commissioner.  And the

13          statements he made today, personal

14          opinions, don't reflect on the

15          Defendant, Susquehanna County.

16              MR. KARAM:  Well, I disagree, that

17          it doesn't reflect on the Defendant,

18          Susquehanna County, but I agree that

19          Jamie is here just representing the

20          County of Susquehanna, Susquehanna

21          County.

22

23              (At this time the deposition

24               in the above-captioned matter

25               was concluded.)

**KEYSTONE COURT REPORTING AGENCY, INC.**

<u>C E R T I F I C A T E</u>

I, Kathleen Hughes, a Notary Public in and
for Luzerne County, Pennsylvania, do hereby certify
that the deposition was reported in machine
shorthand by me, that the said witness was duly
sworn/affirmed by me, that the transcript was
prepared by me or under my supervision and
constitutes a complete and accurate record of same.

I further certify that I am not an attorney
or counsel of any parties, nor a relative or
employee of any attorney or counsel connected with
the action, nor financially interested in the
action.

_____

KATHLEEN HUGHES
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507