# Exhibit B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT STOUD                )   CIVIL ACTION - LAW
324 Maple Street            )
Montrose, PA 18801          )
                            )   JURY TRIAL DEMANDED
            Plaintiff       )
                            )
                            )
-vs-                        )
                            )
SUSQUEHANNA COUNTY          )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
COMMISSIONER ELIZABETH      )
ARNOLD                      )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
COMMISSIONER MARYANN        )
WARREN                      )
P.O. Box 218                )
31 Lake Avenue              )
Montrose, PA 18801          )
                            )
            Defendants      x

---

DEPOSITION TESTIMONY OF

**MARYANN WARREN**

THURSDAY, AUGUST 16, 2018

321 SPRUCE STREET
SCRANTON, PENNSYLVANIA

CHRISTINE A. MESSNER
COURT STENOGRAPHER

KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PA  18507
(570) 558-3011     (800) 570-3773
FAX  (570) 558-3014



2

C O U N S E L   P R E S E N T:

On behalf of the Plaintiff:
        MAZZONI, KARAM, PETORAK, VALVANO
        BY:  GERALD KARAM, ESQ.
        321 Spruce Street, Suite 201
        Bank Towers Building
        Scranton, Pennsylvania 18503

On behalf of the Defendant:
        KREDER, BROOKS, HAILSTONE, LLP
        BY:  A. JAMES HAILSTONE, ESQ.
        220 Penn Avenue, Suite 200
        Scranton, Pennsylvania 18503


### STIPULATIONS

    It was agreed by and between counsel that all
objections, except as to the form of the question,
will be reserved until the time of trial.
    It was further agreed that the reading, signing,
sealing and filing of the deposition transcript will
be waived.

3

## INDEX OF WITNESSES

EXAMINATION                                          PAGE NUMBER

MaryAnn Warren

By Mr. Karam                                              4-64

## INDEX OF EXHIBITS

FOR PLAINTIFF
EXHIBIT          DESCRIPTION                      MARKED

Exhibit 1       Letter                              48

-o00o-

4

1      MARYANN WARREN was called, and having been duly

2      sworn, was examined and testified as follows:

3                  **EXAMINATION**

4

5      BY MR. KARAM:

6          Q.     Would you please state your name for

7      the record.

8          A.     MaryAnn Warren.

9          Q.     And your current occupation?

10         A.     County commissioner in Susquehanna

11    County.

12         Q.     Do you mind if I call you Commissioner?

13         A.     No, that's fine.  Thank you.

14         Q.     And when were you elected?

15         A.     November 2003.

16         Q.     Okay.  And so I'm going to be asking

17      you a bunch of questions.  This is not adversarial.

18      This is going to be more conversational here.  If at

19      any point in time you don't hear what I'm saying or

20      you don't understand what I'm saying or you don't

21      understand the question, please let us know.  If you

22      don't let us know, we're going to assume that you've

23      heard the question and understood the question.

24         A.     Okay.

25         Q.     Also we have a stenographer here who is

5

1    taking down everything we say.  She can only take

2    down the verbal word.  She can't take down a nodding

3    of the head or any type of hand gestures, so that I

4    would ask that all of your responses be verbal --

5              A.    Okay.

6              Q.    -- responses.  And then finally you

7    will have every opportunity to answer and explain a

8    question.  I would just ask that you let me finish

9    the question and then you can fully answer as you

10   deem fit.  Okay?

11             A.    Understood.

12             Q.    So what's your educational background?

13             A.    Two years of business school.  I

14   dropped out of college.

15             Q.    And what's your date of birth?

16             A.    3/5/57.

17             Q.    That makes you?

18             A.    Old, 61.

19             Q.    Okay.  Sorry, I don't like asking that

20   but I have to.  And how about your work history?

21             A.    My work history?

22             Q.    Yes.

23             A.    How far back, beginning to end?

24             Q.    Yeah, if you can.

25             A.    My first job ever was an assistant

6

1    manager for Gertrude Hawk Candies retail store, their

2    first retail store in Sugarman's.  And I was the

3    assistant manager for the deli department for the

4    Grand Union in Vestal, New York.  I was the assistant

5    manager for Paps Country Market in Lakewood,

6    Pennsylvania.  And then had children, stayed home

7    with them and was hired as the director of the

8    Susquehanna County Chamber of Commerce and was there

9    for six years prior to becoming commissioner.

10            Q.    Okay.  And are you married?

11            A.    Yes.

12            Q.    And how long are you married?

13            A.    Forty years.

14            Q.    Okay.  I hope you got that right.

15    Children?

16            A.    Yes, two.

17            Q.    Okay.  And I'm assuming they're

18    adult --

19            A.    Yes.

20            Q.    -- children?  Okay.  We're here today

21    because Steve Stoud; I'm going to call him Steve, I

22    know his official name is Robert; but we'll call him

23    Steve today has filed, and Maggie McNamara, have

24    filed claims against Susquehanna County, and you are

25    a commissioner of Susquehanna County and so we have

7

1    some questions regarding the claims that they have.

2    So I'm going to try to be as brief as possible with

3    these questions to get you out of here, but you know

4    there may be a lot that we have to go through.  So I

5    ask for some patience --

6          A.     Okay.

7          Q.     -- there.  Who are the current county

8    commissioners right now?

9          A.     Alan M. Hall, Elizabeth M. Arnold,

10    MaryAnne Warren.

11         Q.     And the political affiliations of each?

12         A.     Alan M. Hall republican, Elizabeth M.

13    Arnold republican, MaryAnn Warren democrat.

14         Q.     Okay.  And you know Commissioner Hall

15    was here yesterday answering some questions and he

16    indicated that you don't run as a team --

17         A.     That's correct.

18         Q.     -- in terms of republicans versus

19    democrats, but you all ran on your own.  Is that

20    accurate?

21         A.     It is.

22         Q.     And how about governing, how do you

23    govern?  Do you usually govern as per party,

24    political party or do you govern as to what each of

25    your individual choices are?

8

1          A.     As long as I've been in office, it has

2     never been political party sides.   It has always been

3     what's in best interest of county residents.

4          Q.     Okay.   That's something that we here in

5     Lackawanna County are unfamiliar with.   So do you

6     know Steve Stoud?

7          A.     I do.

8          Q.     How do you know Steve?

9          A.     Steve was our -- he held many positions

10    at the county.   He was our Public Safety director.

11    He was an acting chief clerk.   He was a chief clerk.

12    He was a part-time Public Safety director and he was

13    the chief detective in the District Attorney's

14    Office.

15         Q.     Okay.   And he also was a deputy chief

16    clerk, correct?

17         A.     Yes, I believe so.

18         Q.     He was -- you demoted him?

19         A.     Yes, that is correct.

20         Q.     And you demoted him and -- from chief

21    clerk to deputy chief clerk?

22              MR. HAILSTONE:   Object to the

23         form.

24    BY MR. KARAM:

25         Q.     Correct?

9

1              MR. HAILSTONE:  You can answer.

2              THE WITNESS:  Yes.

3    BY MR. KARAM:

4         Q.    In a -- at a commissioner meeting, is

5    that accurate?

6         A.    Correct.

7         Q.    And you then hired Lana Adams?

8         A.    Yes.

9         Q.    As chief clerk?

10        A.    Yes.

11        Q.    And so Lana Adams then would be his

12   supervisor?

13        A.    On paper, yes.

14        Q.    Okay.  Well, she was the chief clerk,

15   correct?

16        A.    Yes.

17        Q.    And he was the deputy chief clerk?

18        A.    Yes, on paper, yes.

19        Q.    Well, we'll get into abilities and

20   duties and everything.  But the reality is he had to

21   report to Lana Adams?

22        A.    Correct.

23        Q.    And before he was a direct report to

24   the commissioners?

25        A.    Yes.

10

1      Q.      So it was a demotion?

2      A.      Of title, yes.

3      Q.      Well, and of reporting as well, right?

4      A.      Yes.

5      Q.      So why don't we get right into the

6   chain of command.  Does Susquehanna County have a

7   policy as it relates to chain of command?

8      A.      In writing I do not believe so.  I

9   believe it changes as people are hired.

10     Q.      Okay.  How about in practice?  And well

11  let's talk about chain of command as it relates to

12  commissioners.  I'm assuming chain of command as it

13  relates to employees, you just -- you report to your

14  immediate supervisor?

15     A.      Correct.

16     Q.      So chain of command as it relates to

17  the commissioners, what's your understanding of that

18  policy?

19     A.      Could you rephrase that please?

20     Q.      How does -- what -- how does the chain

21  of command work downward in terms of how a

22  commissioner is supposed to perform their job?

23     A.      The commissioners are at the top and

24  the elected officials are under them, but they have

25  1620 rights, so they really do not report to the

11

1    commissioners.

2            Q.      Okay.

3            A.      The rest of the department heads report

4    to the chief clerk except when there's exceptions,

5    such as the Public Safety director was a direct

6    report to the commissioners and the human service

7    director was a direct report for a short time.

8            Q.      Okay.  So I guess what I'm getting at

9    is let's take a department IT, okay, that falls under

10   the purview of the commissioners?

11           A.      Correct.

12           Q.      IT has a supervisor and then they have

13   employees.  If somebody called you up about an issue

14   with an employee, one of your constituents called up

15   about an issue with an IT employee, how would you

16   handle that issue in terms of chain of command going

17   down?

18           A.      I would go to the chief clerk and say

19   there is a concern in the IT department and the chief

20   clerk should talk to the supervisor in IT.

21           Q.      So you would go down the chain of

22   command as it goes downward?

23           A.      Correct.

24           Q.      You wouldn't go directly to that IT

25   employee and confront the IT employee or start

1  interrogating the IT employee?

2          A.      No, sir.

3          Q.      Do you know Richard Ely?

4          A.      Yes.

5          Q.      How do you know Richard?

6          A.      He was hired first as our human

7  services or human resource director, and then he was

8  a human resource director/deputy clerk and then he

9  took a position as the Veterans Affairs

10 director/human resources support.

11         Q.      Did there come a point in time when you

12 became aware of a complaint made by Maggie McNamara

13 against Richard Ely?

14         A.      Yes.

15         Q.      How did you become aware of it?

16         A.      I don't recall whether it was

17 Commissioner Hall or the chief clerk that contacted

18 me.

19         Q.      And what do you recall you were told?

20         A.      I was told that, was told the situation

21 that had happened inside of the building with

22 Christmas hugs and that Maggie had remained at her

23 desk and did not partake in that and everyone had

24 left.

25                 Maggie had left the building, gone out

13

1    to her car.  Rich had gone out after her and was told

2    that he went over to her window and knocked on her

3    window, she rolled it down and he proceeded to, I

4    don't know, make a kissy face look or something and

5    try to kiss her on the cheek, attempted to.

6         Q.    And did it come to you then?  Did you

7    ask that the incident be investigated?

8         A.    Yes.

9         Q.    And who did you ask to investigate the

10   situation?

11        A.    The deputy chief clerk Steve Stoud.

12        Q.    Okay.  And did he investigate it?

13        A.    Yes.

14        Q.    And he reported back to you?

15        A.    Yes.

16        Q.    And did you make a conclusion as to

17   discipline of Richard Ely?

18        A.    Yes.

19        Q.    What was your conclusion?

20        A.    It was that a letter -- he would be

21   reprimanded with a letter that he had no more

22   chances, that it was a final letter in his file.

23        Q.    And you concluded that his conduct was

24   inappropriate, correct, with that letter?

25        A.    Absolutely.

14

1        Q.    And he admitted that his conduct was

2  inappropriate?

3        A.    Not to me.

4        Q.    He didn't appeal the letter, did he?

5        A.    No.  I think he wrote a letter.

6        Q.    In response?

7        A.    In response, yes.

8        Q.    But there's avenues to appeal

9  disciplinary action, correct?

10       A.    Yes.

11       Q.    And he didn't do that?

12       A.    That is correct.

13       Q.    Getting back to the chain of command,

14  do you believe that Commissioner Arnold handles the

15  chain of command the same way you described your

16  handling of it?

17       A.    No.

18       Q.    Okay.  Why is that?

19       A.    Can you rephrase?

20       Q.    Well, how does she handle chain of

21  command differently than you do?

22       A.    She goes directly to employees and asks

23  for opinions, comments and then brings them to others

24  and/or runs to our solicitor in anger without it

25  being investigated.

15

1    Q.    In the business world that would be

2  said to be undermining the authority of the

3  supervisors and the people above the individual in

4  the chain of command?

5                MR. HAILSTONE:  Object to the

6        form.

7  BY MR. KARAM:

8    Q.    Would you agree with that, that that's

9  not following the chain of command and that manner

10  undermines the supervisors?

11                MR. HAILSTONE:  You can answer.

12  BY MR. KARAM:

13    Q.    No, no, that's --

14    A.    Yes.

15    Q.    And can we -- would it be fair to say

16  that Commissioner Arnold frequently did that and

17  frequently undermined the supervisors within the

18  county?

19    A.    Yes.

20    Q.    And had she been warned to stop doing

21  that to your knowledge?

22    A.    Yes.

23    Q.    How many times?

24    A.    Numerous, more than one occasion,

25  perhaps three.

16

1          Q.    Did you ever have a conversation with

2  her about it?

3          A.    Conversation, yes.

4          Q.    And tell me about that conversation.

5          A.    I asked her why she goes to employees,

6  why we can't work as a team, why things aren't

7  brought before the commissioners before there's a

8  blow-up.

9          Q.    And what was her response?

10         A.    I was not the boss of her.

11         Q.    Do you know if other people brought it

12  to her attention?

13         A.    Yes.

14         Q.    Who?

15         A.    Commissioner Hall.  I think that he

16  wrote a letter to her on two occasions I believe and

17  our solicitor Michael Giangrieco spoke to her.

18         Q.    And did they in essence just tell her

19  her behavior regarding her chain of command was not

20  appropriate?

21         A.    That's my understanding.

22         Q.    How would you view Commissioner

23  Arnold's -- strike that.  Following Maggie McNamara

24  making the complaint against Richard Ely, did you see

25  Commissioner Arnold have an increasing personal

17

1    animus towards either or both Steve Stoud and/or

2    Maggie McNamara?

3        A.    I will say that I did not see it

4    increase.  It was a constant.  I've witnessed a few.

5        Q.    A personal animus?

6        A.    I can't answer that.

7        Q.    Well, how do you believe -- were there

8    times when you saw -- are there any occasions where

9    you saw Commissioner Arnold treat either Steve Stoud

10   or Maggie McNamara in an inappropriate manner?

11       A.    Yes.

12       Q.    Can you tell me when?

13       A.    I don't know.  I don't recall the date.

14   But I was standing in Steve's office getting my mail

15   from my box and had my back to Steve's desk.  And

16   Commissioner Arnold came in and was flipping out

17   about a meeting that she didn't know about, if I

18   remember correctly, and that it was his

19   responsibility to alert her or remind her or inform

20   her of this and that she was not happy.  But she was

21   screaming and I never turned around.  I just stood

22   there very uncomfortably and listened and then she

23   stormed out.

24       Q.    And did you say anything to Steve Stoud

25   after she stormed out?

18

```
 1          A.     Absolutely.

 2          Q.     What did you say?

 3          A.     I said oh, my gosh, what the heck

 4   happened here.

 5          Q.     Did you see Steve do anything to

 6   provoke that?

 7          A.     Absolutely not.

 8          Q.     Did there come a point in time that day

 9   when you knew she came back in to see Steve, did you

10   hear about that?

11          A.     No, I don't.

12          Q.     Did there come a point in time when you

13   reported that to somebody else other than Steve

14   Stoud?

15          A.     Yes, I did.

16          Q.     Who did you report it to?

17          A.     To our solicitor Michael Giangrieco and

18   to Alan Hall.

19          Q.     And what did they indicate?

20          A.     That it was unacceptable.

21          Q.     And did there come a point in time

22   where another attorney or somebody else indicated

23   that you shouldn't be saying that these things are

24   inappropriate and that it shouldn't happen, you

25   should just keep quiet about them?
```

19

1       A.      I don't recall that.

2       Q.      You don't recall that.  So have you

3   ever been in Commissioner Arnold's presence when she

4   was complaining that Steve Stoud and Maggie McNamara

5   brought up that they worked in a hostile work

6   environment?

7       A.      No.

8       Q.      You never heard Arnold complain about

9   complaints McNamara and Stoud were making about their

10  work environment?

11      A.      No.

12      Q.      Did you ever hear Arnold complain about

13  McNamara and Stoud in general?

14      A.      Yes.

15      Q.      When and about what?

16      A.      In my office perhaps in May of 2016.

17  It was stated that there were rumors everywhere that

18  Stoud and McNamara were having an affair and that it

19  was not appropriate for them to be working together.

20      Q.      And did she then indicate we have to do

21  something to separate them?

22      A.      Yes.

23      Q.      Did she have any facts to base doing

24  something?

25      A.      Not that she shared.

20

1      Q.     And what was your response to that when
2  she said it?
3      A.     My response immediately was further
4  conversation that did not have to do with personal
5  lives but with work ethics.
6      Q.     So what work ethics were you talking
7  about then?
8      A.     Being accountable for your work,
9  proofreading, making sure that agendas and minutes
10  were correct.
11     Q.     Okay.  And I'm assuming that that was
12  directed at Maggie McNamara?
13     A.     Yes.
14     Q.     Right.  And then in turn Steve Stoud as
15  her supervisor I guess.  But it was Maggie McNamara's
16  work product that you were talking about?
17     A.     Correct.
18     Q.     So why don't you -- what issues did you
19  have with Maggie McNamara's work product?
20     A.     It's always been since I have been
21  commissioner to proofread the agenda prior to because
22  no one else really took the time to do that, and I
23  had a responsibility to be accountable to the
24  taxpayers to pay our salaries.
25              So I would go over the agendas and make

21

1    corrections and send them back.  And I believe that

2    we originally had gotten agendas on Fridays and then

3    moved it to Monday to make sure that we got a more

4    complete agenda draft prior to the meeting on

5    Wednesday.

6            Q.    Okay.  And so how does that relate to

7    Maggie McNamara?

8            A.    Maggie would type up the agendas with

9    Steve or Steve would type them up with her help.

10           Q.    Okay.

11           A.    And the agenda would be sent to the

12   commissioners by Maggie and copied Steve also, so

13   then the corrections went back to Maggie.

14           Q.    Okay.  You would make corrections?

15           A.    Yes, sir.

16           Q.    And how frequently did you make

17   corrections?

18           A.    Quite frequently.

19           Q.    And what were the corrections on?

20           A.    Spelling, grammatical.  Sometimes

21   corrections that had been just because it was done in

22   the past, it wasn't appropriate at that time to

23   continue a bad practice of having what was on the

24   agenda, so we would change it.

25           Q.    Okay.  So why don't we talk about that

22

1      a little bit.  You were a commissioner well before

2      Maggie McNamara --

3              A.      Correct.

4              Q.      -- right?  How many years before?

5              A.      Ten.

6              Q.      Ten years before?

7              A.      Ten years.

8              Q.      And who was in charge of the agendas

9      before that?

10             A.      The chief clerk.

11             Q.      Okay.  And were you reviewing the

12     agendas then?

13             A.      Yes.

14             Q.      And you would make corrections to what

15     the chief clerk sent you then?

16             A.      Yes.

17             Q.      And you would send it back and

18     ultimately that would end up being the agenda and

19     what was put on the agenda?

20             A.      Sometimes more corrections needed to be

21     made.

22             Q.      Okay.  And you would make them?

23             A.      Yes.

24             Q.      But ultimately what was put on the

25     agenda was something that you approved?

23

1       A.      Yes.

2       Q.      And did you ever complain to the other

3  commissioners about mistakes on the agenda before

4  Maggie McNamara got there?

5       A.      Yes.

6       Q.      Who was the chief clerk then?

7       A.      Sylvia Beamer.

8       Q.      Okay.  Did you ever attempt to demote

9  her because of her mistakes?

10      A.      No.

11      Q.      Did you ever attempt to discipline her

12  because of her mistakes?

13      A.      She was spoken to about them numerous

14  times.

15      Q.      Okay.  Was she ever disciplined because

16  of it?

17      A.      No, sir.

18      Q.      But ultimately what was put on those

19  agendas, was something that you approved?

20      A.      The content, yes.

21      Q.      The ultimate agenda was something you

22  approved?

23      A.      Yes.

24      Q.      So if Maggie McNamara was using the

25  exact verbiage from old agendas to put on her agendas

24

1    as a boilerplate to use, that language was something

2    that you had already approved?

3         A.    Yes.

4         Q.    And if I were to tell you that that

5    language you had already approved of that she used

6    was the same language you complained to Steve Stoud

7    and Maggie McNamara about, would that surprise you?

8         A.    As I said, things that were done in the

9    past were not done correctly all the time, so we were

10   trying to improve and approve them.

11        Q.    But it was you approved it?

12        A.    Yes.

13        Q.    In the past?

14        A.    Yes.

15        Q.    Okay.  And you kind of made a big deal

16   out of it, about Maggie McNamara making these

17   grammatical and spelling errors, did you not, with

18   the other commissioners?

19        A.    No.  I approached them.

20        Q.    And what did you say?

21        A.    I said that other people needed to look

22   at it because the more I corrected it, the more that

23   I felt disrespected because they were angry I was

24   making the corrections.

25        Q.    Well, if they were using your approved

1   boilerplate prior agendas and then you came back to

2   her and started complaining about your language,

3   meaning MaryAnne Warren's language and agendas,

4   doesn't that tell you that it's something more than

5   the work product, that it's probably personal against

6   Maggie McNamara?

7                   MR. HAILSTONE:  I'm going to

8           object to the form.  I'm also going to

9           object that you're also putting facts in

10          the record that haven't been

11          established.

12                  MR. KARAM:  You guys have the

13          minutes.  You guys have the agendas.

14                  MR. HAILSTONE:  They are public.

15                  MR. KARAM:  Yeah, you know they're

16          there.

17                  MR. HAILSTONE:  You can answer if

18          you can.

19                  THE WITNESS:  Can you repeat it

20          please?

21   BY MR. KARAM:

22          Q.    Is it understandable how Maggie

23   McNamara would feel that it's personal against her

24   when you're complaining to her about agendas that she

25   prepared using the same verbiage that you have

26

1      approved of in the past?

2             A.     I don't believe that she complained.

3             Q.     No, no.  What I'm saying is it

4      understandable that she believed your complaints are

5      personal against her rather than professional?

6             A.     If that was her belief.  We were just

7      changing them though.

8             Q.     Okay.  Well, didn't you tell the other

9      commissioners that you wanted Maggie terminated?

10            A.     I did not bring up the subject.

11            Q.     Didn't you say to the other

12     commissioners that you wanted Maggie terminated?

13            A.     They were not my words.

14            Q.     Well, tell me what your words were.

15            A.     I was asked if I thought that Maggie

16     should be terminated and I said yes.

17            Q.     Who asked you that?

18            A.     Commissioner Arnold.

19            Q.     Why would you believe Maggie McNamara

20     should be terminated?

21                   MR. KARAM:  Off the record.

22                   (Whereupon a recess took place.)

23     BY MR. KARAM:

24            Q.     Okay.  So this meeting, and I'm going

25     to submit to you it was on June 7, 2016, does that

27

1    coincide with your memory?

2         A.    It could have been.

3         Q.    Early June 2016?

4         A.    It could have been, I don't know.

5         Q.    Okay.  And it would have been you,

6    Commissioner Arnold, Commissioner Hall and chief

7    clerk or Steve Stoud, whatever his position was at

8    that point in time?

9         A.    Yes.

10        Q.    Okay.  And did you turn to Steve in

11   that meeting and say to him I want her terminated?

12        A.    I did not.

13        Q.    You did not.  Okay.  Did -- so if Steve

14   had contemporaneous notes from that meeting and it

15   indicated that you turned to him and said you wanted

16   Maggie terminated, would that refresh your

17   recollection?

18        A.    No, sir.

19        Q.    Do you recall Commissioner Arnold

20   saying I want her terminated?

21        A.    Yes.

22        Q.    And you agreed with that?

23        A.    Yes, sir.

24        Q.    And what are the reasons why you

25   believe Maggie McNamara should be terminated?

28

1          A.      I had believed there was an expectation

2     of employees to do their work and get it correct.

3          Q.      Okay.   Other -- so let's put aside the

4     agendas.   Okay.   Other than the agendas, what

5     evidence was there that Maggie McNamara wasn't doing

6     her work?

7          A.      The minutes of the previous meetings.

8          Q.      What about the minutes?

9          A.      The minutes were incorrect sometimes.

10         Q.      Sometimes.   So sometimes the minutes

11    were incorrect.   Let me ask you this:   Did you ever

12    ask that she be written up?

13         A.      No, sir.

14         Q.      Did you ever ask that she be

15    disciplined?

16         A.      No, sir.

17         Q.      Are you aware of her ever being

18    disciplined in any way?

19         A.      Not until she was -- can I retract what

20    I said?   If we're talking about the letter that the

21    commissioners asked.

22         Q.      Well, let's --

23         A.      That's the only time I know.

24         Q.      Okay.   Before June of 2016, were you

25    aware of her being disciplined in any way?

29

1      A.      No, sir.

2      Q.      Did you speak to her supervisor

3   regarding her work product and work ethic?

4      A.      Yes.

5      Q.      What was the response that you got from

6   her supervisor?

7      A.      Essentially that there was a lot of

8   work to be done and people make mistakes.

9      Q.      Well, did he not say she is a very good

10  employee and she hasn't done anything wrong?

11     A.      Yes, he also stated that.

12     Q.      And he told you there's, you know, that

13  it's outrageous to even think of terminating her?

14     A.      Prior to June 2016 it was never

15  discussed.

16     Q.      Well, but I'm talking about when it was

17  discussed, he said this is outrageous, you shouldn't

18  think of terminating her?

19     A.      Yes.

20     Q.      And he was her immediate supervisor?

21     A.      Yes, sir.

22     Q.      So why else did you feel she should be

23  terminated; the minutes, the agenda?

24     A.      Well, it was a lack of an eye for

25  detail and getting things done.

1   Q.    What didn't she get done?

2   A.    I don't recall at this time.

3   Q.    Now I'm not asking about you, I'm

4   asking about Commissioner Arnold now.   Why did

5   Commissioner Arnold want her terminated?

6   A.    I don't believe I can answer that.

7   Q.    Did Commissioner Arnold indicate that

8   part of the reason she wanted her terminated was

9   because she was having an affair with Steve Stoud?

10  Was that part of her thinking?  You are under oath

11  here.

12  A.    I understand that.  I -- can you just

13  repeat that, I'm sorry?

14  Q.    Was part of the reason Commissioner

15  Arnold wanted Maggie McNamara terminated because she

16  believed she was having an affair with Steve Stoud?

17          MR. HAILSTONE:  I'm just going to

18          object.  Are you asking her opinion

19          because she testified that she doesn't

20          know why Arnold wanted Maggie.  Are you

21          asking for what she thinks or are you

22          asking for something that she knows

23          that --

24          MR. KARAM:  I'm asking both.

25          MR. HAILSTONE:   -- Arnold told

1    her.

2              MR. KARAM:   I'm asking both.   Did

3    Arnold --

4              MR. HAILSTONE:   She already

5         testified she didn't hear anything.

6    BY MR. KARAM:

7         Q.    Did Arnold verbalize that?

8         A.    She did make that statement.   I don't

9    know if that's why she wanted her terminated.

10        Q.    And she made that statement in the same

11   conversation that she indicated she wanted her

12   terminated, correct, this conversation in early June

13   of 2016?

14        A.    Yes, sir.

15        Q.    Did you ever indicate to Steve Stoud

16   that McNamara spends too much time in his office?

17        A.    I did.

18        Q.    And did you tell him that it doesn't

19   look right?

20        A.    I did.

21        Q.    Why doesn't it look right?

22        A.    Because people were talking.   And when

23   it was extended periods of time, there was a lot of

24   laughing and giggling going on and no one thought

25   that county work was being done.

1          Q.     Well, can you give an example of work

2     not getting done?

3          A.     I don't have a particular item that I

4     can talk about right now.

5          Q.'    And she's the deputy chief clerk,

6     right?

7          A.     Yes, sir.

8          Q.     And he's the chief clerk, correct?

9          A.     Yes.

10          Q.     She's a direct report to Steve Stoud,

11     correct?

12          A.     Yes.

13          Q.     He supervises her?

14          A.     Yes.

15          Q.     He gives her all her work that she's

16     supposed to do?

17          A.     Yes.

18          Q.     She assists him on his own work?

19          A.     Yes.

20          Q.     The room she's in, the room that

21     they're in is a room with windows or glass that you

22     can see in to?

23          A.     Yes.

24          Q.     But you felt somehow that there was

25     something inappropriate with them meeting there?

33

1          A.      Not so much inappropriate.   It was the

2   perception of giggling and laughing going on for over

3   an hour that had concerns.

4          Q.      And did you relate to Steve Stoud that

5   people were talking about it?

6          A.      Yes.

7          Q.      What people were talking about it?

8          A.      Employees.

9          Q.      What employees were talking about it?

10         A.      Do you want specific names?

11         Q.      Yes, I do.

12         A.      Jean Conklin.

13         Q.      Jean Conklin said it was inappropriate

14   for them to be in that room laughing?

15         A.      She didn't use the word inappropriate.

16         Q.      She did?

17         A.      She had concerns.

18         Q.      She had concerns that they were in the

19   room together too long?

20         A.      And that there was a lot of laughing

21   and giggling going on.

22         Q.      You keep on using the word giggling.

23   Who was giggling?

24         A.      It was brought to my attention that it

25   was Maggie.

34

1          Q.     Maggie is giggling, Steve is laughing;
2     is that how it works?
3          A.     I assume so, sir.
4          Q.     And if it was Alan Hall and Steve Stoud
5     in the room together for an hour and they were
6     laughing about things, would that be inappropriate?
7                 MR. HAILSTONE:  Object to the
8          form, but you can answer.
9                 THE WITNESS:  No, sir.
10    BY MR. KARAM:
11         Q.     It wouldn't be inappropriate.  But
12    somehow because it's a female with Steve Stoud in the
13    room and they are laughing, it's inappropriate?
14         A.     That's not correct.  It had nothing to
15    do with gender.
16         Q.     What did it have to do with?
17         A.     What I was being told is Friday
18    afternoons, and I wasn't usually there on a Friday
19    afternoon.
20         Q.     And you were being told by who?
21         A.     Told by Jean Conklin, Mary Noldy, Terry
22    Goulig, Richard Ely.
23         Q.     Okay.
24         A.     That Friday afternoons were spent in
25    Steve's office with Maggie McNamara and sometimes

35

1    Michelle Graziano.

2            Q.      Okay.   And who is Michelle Graziano?

3            A.      She's our director of Children and

4    Youth Services.

5            Q.      And that something was wrong about

6    that?

7            A.      People questioned why there wasn't

8    anything for them to do.

9            Q.      Okay.   So did anybody question Steve

10   Stoud about this?

11           A.      I did not.

12           Q.      Did you direct somebody to question

13   Maggie McNamara about it?

14           A.      I did not.

15           Q.      Yet you agreed with Commissioner Arnold

16   that she should be terminated from her position

17   without any investigations?

18           A.      My decision was not wholly based on

19   that.

20           Q.      But it was partly based on that?

21           A.      Yes, sir.

22           Q.      Based on rumors you were hearing from

23   other county employees, not based on your own visual

24   evidence?

25           A.      I witnessed it other times, not Friday

36

1  afternoons though.

2         Q.    But you never questioned what are you

3  in there for, what are you doing?

4         A.    I did not because Maggie when I

5  arrived, Maggie usually got up and left.

6         Q.    But you had the right to ask that to

7  Steve Stoud, right?  That would have been within your

8  chain of command and if you had a concern about it,

9  it would have been appropriate for you to ask Steve

10 what were you in there with Maggie about?

11        A.    Yes.

12        Q.    And there's -- I'm assuming you agree

13 there could be dozens of reasons why he's in there

14 with his assistant going over things?

15        A.    Yes.

16        Q.    Do you know if Commissioner Arnold

17 spoke to other people about her belief that an affair

18 was going on between Steve Stoud and Maggie McNamara?

19        A.    Only through rumors that I heard.

20        Q.    And what rumors were they?

21        A.    That Commissioner Arnold had frequented

22 other offices and mentioned that.

23        Q.    So she was basically, to your

24 understanding, going around the county telling the

25 county and spreading the rumor that Steve Stoud and

37

1   Maggie McNamara were having an affair?

2                   MR. HAILSTONE:  Objection to

3            spreading rumor, again you're putting

4            facts in the record.  You're putting

5            words in the mouth of my client.

6                   MR. KARAM:  I'm repeating what

7            your client said.

8                   MR. HAILSTONE:  She never said

9            anything about spreading a rumor.

10  BY MR. KARAM:

11          Q.    She's going around to various county

12  offices telling them what I will submit to you is a

13  falsehood that Steve Stoud and Maggie McNamara were

14  having an affair?

15          A.    It was rumored.

16          Q.    And she was going around telling that

17  rumor, correct?

18          A.    Making that statement.

19          Q.    Making that statement.  And would you

20  agree that when she makes that statement, it

21  undermines the authority of Steve Stoud?

22          A.    Yes.

23          Q.    Because it would be inappropriate for

24  the chief of staff to have an affair with the deputy

25  chief of staff, wouldn't it?

38

1      A.     Yes, sir.

2      Q.     And it undermines his credibility and

3  it undermines his authority, correct?

4      A.     Yes.

5      Q.     And it undermines Maggie McNamara as

6  well, doesn't it?

7      A.     Yes, sir.

8      Q.     Would you agree that it's just not

9  right to spread a rumor like that?

10      A.     That is correct, sir.

11      Q.     So after that meeting, the initial

12  meeting in June 2016, was there a followup-up meeting

13  with the commissioners I believe the next day where

14  you came up with a list of complaints that you wanted

15  Steve Stoud to address with Maggie McNamara?

16      A.     As I recall, yes.

17      Q.     Do you recall what the complaints were

18  about Maggie McNamara?

19      A.     I do not.

20      Q.     Did you ever see Maggie McNamara become

21  enraged, angry?

22      A.     Not angry.

23      Q.     Not angry?

24      A.     Not angry.

25      Q.     Not enraged?

39

1      A.      Not that I recall.

2      Q.      Did you ever see her be disrespectful

3  to department heads, and if so what department heads?

4      A.      Yes.

5      Q.      Okay.

6      A.      Mary Noldy director of assessments.

7      Q.      Did you talk to Mary Noldy about it?

8      A.      Mary Noldy came to me afterwards.

9      Q.      After what?

10      A.      After the incident happened.

11      Q.      And what did she say to you?

12      A.      She said that Maggie was disrespectful

13  and that she talked down to her, that she seemed like

14  she was a second-class citizen in Maggie's eyes.

15      Q.      And what did you indicate to her?

16      A.      And I asked her if she talked to Steve

17  and she said no, that she probably wouldn't and I

18  said well I will.

19      Q.      Okay.

20      A.      And I brought it to Steve's attention.

21      Q.      And was that one of the matters that

22  came up at the September 8th or the June 8th meeting

23  amongst the commissioners that you wanted addressed

24  to Maggie?

25      A.      I don't recall, sir.

40

1       Q.    Any other department heads that you

2 know that or you feel she may have been disrespectful

3 to?

4       A.    I don't know, sir.

5       Q.    We talked about Maggie McNamara's work

6 product and you gave your feelings on that.  How

7 about Steve Stoud's work product?

8       A.    Every job that Steve was given, he

9 performed well at.  He wrote excellent letters.  He

10 picked up the slack when needed.

11      Q.    He was a good chief of staff?

12      A.    Yes, sir.

13      Q.    Never written up?

14      A.    No, sir.

15      Q.    No disciplinary action against him?

16      A.    Not that I recall.

17      Q.    Yet he was demoted to deputy chief of

18 staff why?

19      A.    He was because Commissioner Hall told

20 me that he wanted to advertise for a chief clerk

21 because Steve was going back to Public Safety, and

22 the position would not be an open position was my

23 understanding from Commissioner Hall is why he was

24 doing it.

25      Q.    But it takes two votes.  And did you

41

1 speak to Steve about him being demoted?

2       A.     I did, sir.

3       Q.     And what did you say to Steve?

4       A.     I asked him why he was doing it and why

5 he wanted to be, and he told me that Alan directed

6 him or asked him, I'm not really sure what the word

7 was that was used, that he would be the deputy chief

8 clerk so that we would have that open position to be

9 able to advertise for. And I asked him if he was

10 okay with it and I don't really think he answered me,

11 but I think his body language suggested no.

12       Q.     And Lana Adams was hired?

13       A.     Yes, sir.

14       Q.     And Steve's supervisory, essentially

15 Steve's supervisory duties were taken over by Lana?

16       A.     Yes.

17       Q.     And it was a unanimous vote?

18       A.     Yes.

19       Q.     Do you ever recall Commissioner Arnold

20 indicating to you that she felt she had to break up

21 Steve Stoud and Maggie McNamara in order to save

22 Stoud's marriage?

23       A.     Yes.

24       Q.     Tell me about that.

25       A.     They were her exact words and then she

42

1   made comment that it happened to her.  And I didn't

2   ask any questions.  I just -- that was the end of the

3   conversation.

4          Q.    Did anybody -- are you aware of anybody

5   telling Commissioner Arnold hey, stop saying this --

6          A.    Yes.

7          Q.    -- about the affair, it is not

8   appropriate, it's slanderous, it's retaliatory, it's

9   creating a hostile work environment?

10          MR. HAILSTONE:  I'm going to

11          object.  You can ask her what she heard.

12          But you're giving her lines of, several

13          lines of questioning here.

14   BY MR. KARAM:

15          Q.    Did anybody say any of that to her?

16          A.    Yes.

17          Q.    Who said it?

18          A.    Our Solicitor Michael Giangrieco, Alan

19   Hall.

20          Q.    Were you present when it was said ever?

21          A.    Once, yes.

22          Q.    And what was her reply?

23          A.    That she was a commissioner and she

24   could pretty much do what she wanted.

25          Q.    Steve Stoud was also the director of

43

1     Public Safety?

2          A.     Yes.

3          Q.     Did there come a point in time when you

4     approached him and told him that you wanted to

5     eliminate the director of Public Safety position?

6          A.     I don't believe it was to eliminate.

7     It was to make it a part-time position.

8          Q.     Well, wasn't it part time already?

9          A.     He was --

10         Q.     Wasn't he doing both chief of -- chief

11    clerk and director of Public Safety?

12         A.     Prior to that he was the director of

13    Public Safety.

14         Q.     Okay.  But at a point in time when he

15    was the chief clerk and the director of Public

16    Safety?

17         A.     Yes.

18         Q.     Or maybe it's my understanding, and you

19    correct me if I'm wrong because you were there, I

20    wasn't; the evolution of Steve's position were chief

21    clerk/director of Public Safety.  Then he was demoted

22    to deputy chief clerk, but he maintained the director

23    of Public Safety position.  Then he took a position

24    with the district -- Susquehanna District Attorney's

25    Office as a county detective but he also kept the

44

1    director of Public Safety position?

2         A.    All of those statements are correct,

3    sir.

4         Q.    Okay.  So during some point in time

5    when he was in one of those three variances, did you

6    approach him and tell him you wanted to eliminate the

7    director of Public Safety position?

8         A.    Not that I recall, sir.

9         Q.    Getting back to that, the incident

10   where you were in Steve's office when Commissioner

11   Arnold came in and I'll describe what you -- blew her

12   top or whatever, became angry and agitated.

13   Subsequent to that occurring, do you recall being in

14   a meeting or being in the presence of Commissioner

15   Arnold when she indicated that she wanted to have the

16   personnel responsibilities removed from Steve Stoud?

17        A.    Did you state personnel

18   responsibilities?

19        Q.    Any duties or responsibilities removed

20   from Steve Stoud.

21        A.    Yes.

22        Q.    Tell me about that.

23        A.    She stated that he had too much control

24   and that the commissioners needed to control more of

25   the personnel happenings in the county.

45

1        Q.      And she wanted to take those away from

2    Steve?

3        A.      Yes.

4        Q.      And what was the response of the other

5    commissioners?

6        A.      My response?

7        Q.      Between you and Commissioner Hall.

8        A.      I don't know what Commissioner Hall's

9    response was.  Well, essentially it was no because it

10   didn't happen.  But my response was that I felt that

11   Steve treated employees fair and he negotiated well

12   for the county and needed to stay there.

13       Q.      Were there points in time where you

14   were aware that Commissioner Arnold refused to

15   interact with Steve Stoud?

16       A.      Yes, sir.

17       Q.      Can you tell me about that?

18       A.      Steve would try to text her or call her

19   to tell her information and she would not reply to

20   him.  He would say good morning to her and she would

21   dis him.  It was uncomfortable.

22       Q.      And in your mind as a fellow

23   commissioner, would that treatment of treating Steve

24   that way, did that undermine his authority?

25       A.      Yes.

46

1        Q.     Did it affect his ability to do his --

2  perform his job to the best of his capabilities?

3        A.     Yes, because he was frustrated in

4  trying to please her.

5        Q.     Let's face it, part of his job -- well,

6  let me ask you this.  Is part of his job to report

7  and interact with all three commissioners?

8        A.     Yes, sir.

9        Q.     And when one of the -- if one

10 commissioner refuses to interact with him, that's

11 essentially taking some of his responsibilities,

12 correct?

13       A.     Yes.

14       Q.     Yes?

15       A.     Yes.

16       Q.     Okay.  Let's talk about Lisa

17 Kowalewski.

18       A.     Okay.

19       Q.     Do you know who she is?

20       A.     Yes.

21       Q.     Who is she?

22       A.     She was employed as our IT director for

23 a short time.

24       Q.     And do you recall any incidents or

25 interactions that she may have had with either Steve

47

1    Stoud or Maggie McNamara?

2            A.    With Steve Stoud.

3            Q.    Okay.  Can you tell me about it?

4            A.    I don't recall how it came about, but

5    she was in his office.  I don't know if he initiated

6    it or if she did.  She was in his office she was

7    insubordinate.  She walked out midstream of

8    conversation of him talking to her.

9            Q.    And did Jean Conklin witness this?

10           A.    Yes.

11           Q.    And she's the head of HR?

12           A.    Yes.

13           Q.    And do you recall Commissioner Arnold's

14   reaction to this incident?

15           A.    No, I don't, sir.

16           Q.    Do you recall Commissioner Arnold ever

17   going to the people in IT saying we girls have to

18   stick together, Steve Stoud was wrong here?

19           A.    That statement, yes, came back that it

20   was said.  I don't believe in IT, it was said in the

21   register and recorder's office.

22           Q.    Okay.  Do you know if Commissioner

23   Arnold was ever told that she should not ignore Steve

24   Stoud because he's a direct report to her?

25           A.    Yes, sir.

48

1        Q.      Who told her that?

2        A.      Commissioner Hall.

3        Q.      Do you know if Attorney Robin Reed told

4    her that as well?

5                MR. HAILSTONE:  I'm going to

6        object, attorney/client privilege.

7    BY MR. KARAM:

8        Q.      If you know.

9        A.      I don't know, sir.

10       Q.      Okay.  I'm going to hand you what we'll

11   mark as Plaintiff's Exhibit Number 1.

12               (Whereupon Plaintiff's Exhibit 1

13       was marked for identification.)

14               MR. HAILSTONE:  I'm going to put

15       an objection on the record.  This is an

16       attorney/client privilege document

17       between the commissioners of Susquehanna

18       County and their solicitor at the time

19       of November 1, 2016 directed to one of

20       the commissioners.

21               I provided it in good faith to

22       Attorney Karam with the understanding he

23       would understand that this was an

24       attorney/client privilege document.  I

25       will allow questions for this

49

1       deposition, but going forward I'm

2       putting on the record my objection of

3       this being used outside of this

4       deposition.

5               MR. KARAM:   Understood.

6   BY MR. KARAM:

7       Q.     So let's go through this.   Have you

8   seen this document before?

9       A.     I believe I have.

10      Q.     Okay.   Do you want to take some time

11  to --

12      A.     Please.

13      Q.     -- go through?   If you need water,

14  there's water there.   Why don't we take a little

15  break.

16      A.     Thank you.

17             (Whereupon a recess took place.)

18  BY MR. KARAM:

19      Q.     Are we all set?

20      A.     Ready.

21      Q.     So can you describe Plaintiff's Exhibit

22  1 to me?

23      A.     It's a letter from our solicitor going

24  to Commissioner Arnold discussing some of the things

25  that were witnessed between Commissioner Arnold and

50

1    Steve Stoud and.

2         Q.    Okay.  So let's focus on that first

3    paragraph there.  And it says the conversation has

4    been described by others to have been unprofessional

5    and upsetting to not only Mr. Stoud but to other

6    employees who witnessed your interaction with

7    Mr. Stoud.  Do you know who the other employees are?

8         A.    I do not, sir.

9         Q.    Were you aware that other employees

10   witnessed the interaction?

11        A.    I'm not really sure what interaction

12   this one was.

13        Q.    What one do you think it is?

14        A.    That one that I was there.

15        Q.    Okay.  So it would have been you.  And

16   then I would submit to you that later on that day

17   when you weren't there, somebody else was with Steve

18   Stoud and she came in again.

19        A.    Okay.  I don't know that.

20        Q.    That you weren't present.  So then

21   let's go down to the middle of paragraph two.

22   Mr. Stoud as -- the employees who witnessed your

23   interaction with Mr. Stoud have deemed your contact

24   with Mr. Stoud very unprofessional, angry,

25   retaliatory and created a hostile work environment

51

1   and which now has been or will be determined to be

2   retaliatory for his complaint to the EEOC.

3           Do you recall Commissioner Hall using

4   those same or very similar terms in speaking with

5   Commissioner Arnold?

6           A.    I do, sir.

7           Q.    Did you ever use those words in

8   speaking with Commissioner Arnold --

9           A.    No, sir.

10          Q.    -- regarding this incident?

11          A.    No, sir.

12          Q.    Okay.  That's it for that.  Okay.

13  Let's go to the beginning of January 2017.  This is

14  at a time period when Maggie McNamara has left the

15  position of deputy chief clerk and is now working in

16  the District Attorney's Office.

17          A.    Okay.

18          Q.    Okay.  You recall her transferring to

19  the DA's Office, correct?

20          A.    Yes, sir.

21          Q.    Did you continue to inquire about

22  Maggie McNamara after her transfer to the District

23  Attorney's Office?

24          A.    I did not, sir.

25          Q.    Did you continue to complain about

52

1   Maggie McNamara after her transfer to the District

2   Attorney's Office?

3        A.    I did not, sir.

4        Q.    Did you ever have conversations with

5   Commissioner Hall after Maggie McNamara's transfer to

6   the District Attorney's Office concerning Maggie

7   McNamara?

8        A.    Yes, sir.

9        Q.    Tell me about those.

10       A.    It was a conversation that I said I was

11  going to approach District Attorney Robert Klein and

12  express that I was not happy with her work in the

13  Commissioners' Office and he said -- I said what do

14  you think about talking to him and he said well go

15  talk to him and I did.

16       Q.    So after she was hired by the District

17  Attorney's Office, you went to the District Attorney

18  and told the District Attorney you didn't believe she

19  was a good worker, is that fair to say?

20       A.    She had not transferred in yet.

21       Q.    So --

22       A.    I believe it happened the day of the

23  meeting.

24       Q.    So this was prior to her being hired by

25  the District Attorney's Office when she was just an

53

1    applicant for the position?

2        A.    Yes, sir.

3        Q.    You went to the District Attorney

4    himself and said to him that you had problems with

5    her work and she wasn't a good worker?

6        A.    That's not what I said, sir.

7        Q.    Well, what did you say?

8        A.    That I had concerns about her accuracy

9    in dealing with victim witnesses and getting

10   statements correct and that was the end of that and

11   his reply is that.

12       Q.    What was his reply?

13       A.    His reply was he was glad that I came

14   to him and I expressed concerns, and he thought

15   Maggie would be a good fit and at that time I said

16   okay, Bob, so I wish you both well and we shook hands

17   and I left.

18       Q.    Subsequent to that, did you then make a

19   request that you wanted to see all the e-mails

20   between Steve Stoud and Maggie McNamara since she

21   left the Commissioner's Office?

22       A.    No, sir.

23       Q.    You never made that request?

24       A.    No, sir.

25       Q.    Did you ever make any request to see

54

1   e-mails of Maggie McNamara?

2        A.     Yes, sir.

3        Q.     Tell me about it.

4        A.     When our new chief clerk had been hired

5   Lana Adams, Lana had expressed that the deputy chief

6   clerk had little or no communication with her to be

7   able to help her and I talked to Alan about it.

8        Q.     The deputy chief clerk meaning Steve

9   Stoud?

10       A.     Yes, I'm sorry, yes.

11       Q.     Okay.

12       A.     And I talked to Commissioner Hall and

13   Commissioner Arnold about it and I asked Lana -- Lana

14   asked me if there was a way that she could figure out

15   how to communicate with him better or what was, you

16   know, how the future was going to hold, what was

17   happening there.  And I said I couldn't think of

18   anything.  She said -- I said do you think that the

19   e-mails between the deputy chief clerk and the chief

20   clerk prior to would help you get through some of

21   your struggles, and she said that would be a great

22   thing, Commissioner, if you could do that.

23         So then I went to Commissioner Arnold

24   and Commissioner Hall and asked if that could happen.

25   Commissioner Arnold said yes immediately.  Mr. Hall

55

1   hemmed and hawed and then he said no, he would not

2   allow it to happen.  And I think it was brought

3   before our solicitor also if it could happen and he

4   said he didn't really think it was a good idea, but

5   it would go before Robin Reed to make a decision and

6   Robin Reed said yes.

7        Q.    So your solicitor said he didn't think

8   it was smart?

9        A.    That's correct.

10       Q.    And this is the reason you're

11  requesting this is because the chief clerk is saying

12  to you -- well, you say it, I don't want to.  What is

13  the chief clerk saying to you, why is this being

14  done?

15       A.    That the chief clerk or that the deputy

16  chief clerk Steve Stoud was not communicating with

17  her, so she was trying to figure out how to do things

18  when she had lists.  She said she had made numerous

19  phone calls to him which he did not reply to her.

20       Q.    Was he disciplined for this?

21       A.    No, sir.

22       Q.    She was his boss, correct?

23       A.    That's correct.

24       Q.    And again he's the deputy chief clerk,

25  not the chief clerk at this stage?

56

1        A.    Correct.

2        Q.    She's his boss, cannot she order him to

3 come and communicate with me?

4        A.    I believe she could have.

5        Q.    But instead of doing that, you decided

6 to retrieve e-mails between he and Maggie McNamara?

7        A.    Yes, sir.

8        Q.    Was it ever discussed why don't you

9 order Steve into your office --

10       A.    Well, I --

11       Q.    -- and talk to him?

12       A.    Yes.

13       Q.    Did you say that?

14       A.    Yes, sir.

15       Q.    And what was the response?

16       A.    She felt that Steve was not

17 communicating because he was demoted and she wasn't

18 going to get anywhere because our solicitor also was

19 not helping her.

20       Q.    Did Commissioner Arnold ever come to

21 you and indicate that anyone, any other individual

22 was upset with you for backing up Steve Stoud's

23 account of what happened in his office when Arnold

24 came in in an angry fashion?

25       A.    I'm sorry, could you repeat that?

57

1      Q.     Did Arnold ever tell you that she was

2   upset because Attorney Reed yelled at her because of

3   what you put in in a letter backing up Steve Stoud or

4   put in writing backing up Steve Stoud?

5      A.     I don't recall, sir.

6      Q.     Did you ever tell Commissioner Arnold

7   that her conduct was such that it warranted her

8   resigning from her party?

9      A.     No, sir.

10      Q.     Okay.  Tell me how the e-mails were

11   retrieved between McNamara and Stoud.

12      A.     I don't, I don't recall how it was

13   initiated.  But Stephen Janoski was asked to I

14   believe transfer those to Lana Adams' e-mail account.

15      Q.     Who is Stephen Janoski?

16      A.     He's the director of IT.

17      Q.     Was he the director then?

18      A.     I don't recall.

19      Q.     Could Lisa Kowalewski have been the

20   director then?

21      A.     I don't recall, sir.

22      Q.     Is it possible that it was -- that Lisa

23   Kowalewski was the director of IT at the time this

24   request was made?

25      A.     It's possible, I don't recall.

58

1        Q.    One second.   Did you become familiar

2    with Lisa Kowalewski using these e-mails for personal

3    use?

4        A.    No, sir.

5        Q.    Did you ever hear of Lisa Kowalewski

6    using e-mails between Steve Stoud and Maggie McNamara

7    as a basis for her to conduct an unauthorized, a

8    county unauthorized investigation into Steve Stoud?

9        A.    No, sir.

10        Q.    Did you ever hear about allegations

11    that were made against Steve Stoud regarding

12    kickbacks from county vendors?

13        A.    I did, sir.

14        Q.    Tell me what you heard about that and

15    who made them.

16        A.    I heard that Lisa Kowalewski had done a

17    background check on her own computer at home and had

18    used Steve's name and address and had pulled up

19    things that she had assumed were about Steve and

20    stated that they were kickbacks.

21              And when it was questioned, it had

22    nothing to do with Robert S. Stoud.   It was his son

23    had prior before working for the county had worked

24    for a gas company or done research or something to

25    that effect.

59

1        Q.    But nonetheless she made these

2  complaints?

3        A.    Yes, sir.

4        Q.    And were you aware as a result of these

5  complaints that Steve was suspended with his position

6  in the DA's Office?

7        A.    Yes, sir.

8        Q.    And what was the end result of -- and

9  there was an investigation that was done based on

10  these complaints against Steve Stoud, is that

11  correct?

12        A.    Correct.

13        Q.    And let me ask this:  What knowledge do

14  you have of Commissioner Arnold being involved with

15  Kowalewski at any point in time during the making of

16  these complaints by Kowalewski?

17        A.    Personally I didn't witness any, but it

18  was rumored.

19        Q.    What was rumored?

20        A.    That she was friends with Lisa.

21        Q.    What was the end result of the

22  investigation?

23        A.    There were no findings and Steve

24  returned to his position.

25        Q.    Okay.  And the suspension was lifted?

60

1      A.      Yes.

2      Q.      In April of 2017 Commissioner Arnold

3   went to subordinates in the Department of Public

4   Safety asking if Steve Stoud's position was really

5   needed.  Were you aware of that?

6      A.      Yes, sir.

7      Q.      Tell me how you were aware.

8      A.      One of the employees told Commissioner

9   Hall and Commissioner Hall came to me.

10     Q.      Okay.  And again as the director of

11  Public Safety when a commissioner goes to a

12  subordinate and says hey, is that guy's, is your

13  boss' job really needed, does that undermine his

14  authority?

15     A.      Yes, sir.

16     Q.      Then there came a point when Steve

17  transferred to the DA's Office.  Did you ever

18  complain about the salary he was receiving over there

19  or have conversations about the salary he was

20  receiving over there?

21          MR. HAILSTONE:  Objection.  That's

22      two different things.  You have to

23      clarify.

24  BY MR. KARAM:

25     Q.      Okay.  Did you complain --

61

1   A.    No, sir.

2   Q.    -- about the salary?  Did you have any

3   conversations about the salary?

4   A.    Yes, I did.  Bob Klein, District

5   Attorney Bob Klein stated that this is what he wanted

6   to pay him.  And while it wasn't a complaint, I said

7   does that warrant, you know, does that position

8   warrant that much money and he said yes, I feel it

9   does and it went to the salary board.

10   Q.    And my understanding, and you correct

11   me if I'm wrong, my understanding is you followed the

12   DA's advice or his recommendation on it but that

13   Commissioner Arnold strongly disagreed; is that

14   accurate?

15   A.    I don't really know that, sir.

16   Q.    Do you know Robert Thatcher, Jr.?

17   A.    Yes, sir.

18   Q.    Who is he?

19   A.    He was our emergency management

20   coordinator.  Prior to that he was our emergency

21   management training and OPS person I believe.

22   Q.    And he would be in the DA?  Would he

23   come under the DA's chain of command?

24   A.    Public Safety.

25   Q.    Public Safety.  Were you aware of

62

1    Commissioner Arnold going to him?

2        A.    Yes, sir.

3        Q.    Tell me about that.

4        A.    She frequented his office many times, I

5    witnessed it.  I would walk through the county office

6    building and see her in there and it was brought to

7    our attention by other employees.

8        Q.    Let's get back to Maggie McNamara for a

9    little bit.  So at the time Maggie made her complaint

10   against Rich Ely, Rich -- what position was Rich Ely

11   in then?  Was he HR or was he Veterans Affairs?

12       A.    I believe he was the director of

13   Veterans Affairs.

14       Q.    Okay.  And there came a point in time

15   where Commissioner Hall came to you I believe after

16   the complaint was made and said that Maggie is

17   uncomfortable doing work at Veterans Affairs, is that

18   accurate?

19       A.    No, it's not, sir.

20       Q.    Okay.  Tell me about it then.

21       A.    I don't.

22       Q.    You don't.  Do you recall having a

23   conversation with Commissioner Hall about Maggie

24   working in Veterans Affairs?

25       A.    I do remember that, sir.

63

1        Q.    Okay.  Tell me about that.

2        A.    The conversation was that we needed

3  someone in there to help, and I don't recall the

4  dates, I don't recall if it was prior to the incident

5  or not.

6        Q.    Do you recall Commissioner Hall telling

7  you Maggie felt uncomfortable?

8        A.    No, sir.

9        Q.    Getting back to Arnold, who do you know

10  she talked to about Stoud and McNamara having an

11  affair?

12        A.    I don't know for sure.  As I said it

13  was all a rumor --

14        Q.    Right.

15        A.    -- that she entered offices and talked.

16        Q.    Steve is no longer with the county?

17        A.    Correct.

18        Q.    You're aware of that.  Prior to him

19  leaving the county, did he come and talk to you about

20  being named director of Public Safety again?

21        A.    I believe so.

22        Q.    And what was your response?

23        A.    That we did not have a full-time

24  position in Public Safety for a director, it was only

25  part time.

64

1          Q.      And did you then go on and hire a

2    director of Public Safety subsequent to that

3    conversation?

4          A.      A part time.

5          Q.      And when did you make that hire?

6          A.      I don't recall, sir.

7          Q.      Do you know if Rich Ely spent time

8    behind closed doors with females?

9          A.      I do not, sir.

10         Q.      Okay.  We're done.

11              MR. HAILSTONE:  No questions.

12              (Whereupon the deposition of

13         MaryAnne Warren concluded at 11:08 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

I, Christine Messner, a Notary Public in and for Wyoming County, Pennsylvania, do hereby certify that the deposition was reported in machine shorthand by me, that the said witness was duly sworn/affirmed by me, that the transcript was prepared by me or under my supervision and constitutes a complete and accurate record of same.

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Christine Messner
KEYSTONE COURT REPORTING AGENCY, INC.
4099 BIRNEY AVENUE, SUITE 9
MOOSIC, PENNSYLVANIA 18507