**Exhibit C**

I received an email earlier last the week from Cassie Troup regarding the two open employment cases being handled by CCAP. I was asked to call her to answer questions regarding a position statement written by Robin Read that had already been shared before we'd gotten a copy of it. When we were alerted that it had already been shared, Commissioner Alan Hall requested copies and there were many inaccuracies in it.

During my conversation, Thursday, June 8th, for approximately 1 hour and 23 minutes, I expressed many times that I thought this was a waste of time as my individual statement was already taken by Robin Read on Thursday, December 8, 2016 and then, there was a later meeting with her, the three Commissioners and our solicitor, Michael Giangrieco.

We first discussed the McNamara case. In regard to the Rich Ely incident, there was never any mention in the statement of me talking to McNamara asking her if she was comfortable with our decision and continuing to work in the same vicinity of the Courthouse as Ely was. She said she was okay with that. Next discussed was her retaliation claim. In regard to a sentence that stated Commissioner MaryAnn Warren had many problems with Claimant's sloppy work. Someone else's words. I never made that exact statement, what I did say is that she lacked an attention for detail and had many grammatical and clerical errors in regard to Commissioners' minutes and agendas. Next was, "Because Claimant did not improve her work, Commissioner Warren stopped correcting Claimant's work." Was never said by me. That is not a true statement, as I never said that. I told of one occasion that I tried to interrupt the Chief Clerk and Deputy Chief Clerk as they worked on the agenda and it was stressed to me that they were working on the agenda that "I" was expecting it at noon. It was approximately 11:52 AM, so I walked out and never did get what I needed. As I walked to my office quite annoyed, I'd made up my mind that I would not review the draft agenda and I did not. Never made a statement or thought that publically embarrassing the Claimant would improve her work. Again, I did not say that.

*Was never aware of official complaints regarding Claimant's condescending and rude behavior.

*I believe Commissioner Arnold was made aware of the sexual harassment claim by our solicitor, Michael Giangrieco in March of 2016.

*I was repeatedly questioned regarding the 'power' of Stoud and the chain of command. I repeatedly answered that it was, in fact, the way the majority of Commissioners wanted the Courthouse run. It had worked for years, why would we change it?!?!

*When asked if I ever witnessed Stoud not answering Commissioner Arnold, I said, "No." Commissioner Hall and I had directed Stoud not to repeat what was discussed in the daily 8:15 AM briefings as it was up to her to attend them. It was not up to an employee to have to repeat discussions as there was entirely too much to do, to take time with each Commissioner.

*The paragraph regarding the Victim Witness Coordinator position opening is not accurate. I knew the position was open as the previous employee had been terminated. It was brought to my attention by Commissioner Hall that McNamara was interested in applying for it. When it was confirmed that she'd applied and I believe was interviewed, I spoke with Commissioner Hall about me talking with McNamara and asking for reconsideration in her staying as I would work with her more closely to get the minutes and agendas correct. We had no further discussion; I read that she was transferring when I received the draft agenda.

In the Stoud position statement, the paragraph regarding his alleged demotion as I know it, was that Commissioner Hall asked him to go from Chief Clerk/Director of Public Safety to Deputy Chief Clerk/Director of Public Safety. I asked Commissioner Hall as to 'why' and he replied it would allow us to advertise for a Chief Clerk. As I stated, when I asked Stoud, he said Commissioner Hall asked him to, there was never any mention about not working with Commissioner Arnold. I never heard him make that statement. There were conversations with Stoud as to "how" to work with Commissioner Arnold as she had no respect for him. He said he'd tried all sorts of strategies and nothing seemed to work as she either ignored him or yelled at him.

Before the phone conversation ended I expressed many times that I has to share

a disturbing event that happened when Robin Read met with the Commissioners and our Solicitor. There had been a recent incident between Commissioner Arnold and Deputy Chief Clerk Stoud that I had been witness to. Robin Read questioned me about it and when I told the truth of what I'd witnessed, she yelled at me for siding with Stoud. I had only told the truth and obviously, that was not what she was looking for with the tone that she addressed me with.

MaryAnn Warren