```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   ROBERT STOUD,              :
                               :IN THE COURT OF COMMON
 4      Plaintiff             :PLEAS OF LACKAWANNA
                               :COUNTY
 5      vs.                    :
                               :JURY TRIAL DEMANDED
 6   SUSQUEHANNA COUNTY,        :
     COMMISSIONER ELIZABETH    :NO. 3:17-CV-2183
 7   ARNOLD, AND               :
     COMMISSIONER MARYANN      :
 8   WARREN                    :
                               :
 9      Defendants            :

10                      - - -

11              DEPOSITION OF ALAN HALL

12          Thursday, December 10, 2020

13                      - - -

14

15          The deposition of ALAN HALL, called as a
     witness by the Plaintiff, pursuant to notice and
     the Pennsylvania Rules of Civil Procedure
16   pertaining to the taking of depositions, taken
     before me, the undersigned, Trisha Sims, a Notary
17   Public in and for the Commonwealth of
     Pennsylvania, at the offices of Mazzoni, Karam,
18   Petorak & Valvano, Bank Towers, Suite 201,
     321 Spruce Street, Scranton, Pennsylvania  18503,
19   on Thursday, December 10, 2020, commencing at
     10:31 a.m., the day and date above set forth.

20

21                      - - -

22

23              NETWORK DEPOSITION SERVICES
                SUITE 1101, GULF TOWER
24                 707 GRANT STREET
            PITTSBURGH, PENNSYLVANIA  15219
25                  412-281-7908
```

```
 1    APPEARANCES:

 2
          MAZZONI, KARAM, PETORAK & VALVANO
 3        BY:  GERARD M. KARAM, ESQUIRE
          Bank Towers
 4        Suite 201
          321 Spruce Street
 5        Scranton, Pennsylvania  18503
          (570) 348-0776
 6        gmk@mkpvlaw.com

 7        -- Representing the Plaintiff

 8
          KREDER, BROOKS, HAILSTONE, LLP
 9        BY:  A. JAMES HAILSTONE, ESQUIRE
          220 Penn Avenue
10        Suite 200
          P.O. Box 956
11        Scranton, Pennsylvania  18503
          (570) 346-7922
12        jhailstone@kbh-law.com

13        -- Representing the Defendants

14

15

16    ALSO PRESENT:

17        Robert Stoud

18

19

20

21

22

23

24

25
```

```
 1                      INDEX

 2   Witness                              Page

 3   ALAN HALL

 4      By Mr. Karam ......................    4

 5

 6                      * * *

 7

 8              INDEX TO EXHIBITS

 9   Plaintiff's
     Exhibit          Description         Page
10
     Exhibit 1   Letter written by Alan Hall     6
11
     Exhibit 2   Letter written by MaryAnn        9
12               Warren

13   Exhibit 3   Letter dated 5/13/17 written    10
                 by Robin A. Read, Esquire
14
     Exhibit 4   Letter dated 6/15/17 from       21
15               Jeanne Conklin

16   Exhibit 5   Complaint                       22

17

18

19

20

21

22

23

24

25
```

```
 1                    *  *  *
 2             (It is stipulated by and between
 3    counsel for the respective parties that the
 4    reading, signing, certification, sealing and
 5    filing of the deposition is waived and that all
 6    objections, except as to the form of the question,
 7    are reserved until the time of trial.)
 8                    *  *  *
 9                    ALAN HALL,
10    having been duly sworn or affirmed, was examined
11    and testified as follows:
12                         EXAMINATION
13    BY MR. KARAM:
14         Q.    Would you state your name for the
15    record?
16         A.    Alan Hall, A-L-A-N, H-A-L-L.
17         Q.    And, Mr. Hall, how are you employed?
18         A.    County commissioner, Susquehanna
19    County.  Plus, I'm a real estate agent.
20         Q.    Okay.  And how long have you been a
21    county commissioner for Susquehanna County?
22         A.    Nine years now.
23         Q.    I'm going to be asking you some
24    questions.  We've done this before in terms of me
25    taking your deposition.  It's going to be the same
```

1    thing.

2            If you don't hear my question, let me

3    know.  If you don't understand my question, let me

4    know.  Otherwise, I'm going to assume that you've

5    heard and understood the question.

6            Okay?

7       A.   Okay.

8       Q.   We have the stenographer here, and the

9    stenographer is going to take down everything that

10   we say.  She can't take down a nod of the head or

11   any physical gestures.  So I'd ask that all your

12   responses be verbal.

13      A.   All right.

14      Q.   We're here just for a narrow purpose

15   today, in that we've already taken your

16   deposition; and that narrow purpose is, there was

17   a complaint that was filed in the United States

18   District Court for the Middle District of

19   Pennsylvania by Michael Giangrieco --

20      A.   Okay.

21      Q.   -- that alleged that falsehoods were

22   being filed and falsehoods were being portrayed by

23   representatives of Susquehanna County.  That's

24   what we're here for today.

25            Okay?

```
 1      A.    Okay.

 2      Q.    So I'm going to hand you what --

 3 something that was sent to me yesterday by

 4 Attorney Hailstone.  We're going to mark this as

 5 Plaintiff's Exhibit 1, and I'm going to give that

 6 to you.

 7            (Plaintiff's Exhibit 1, Letter written

 8 by Alan Hall, was marked for identification.)

 9 BY MR. KARAM:

10      Q.    And are you familiar with that

11 document?

12      A.    I have to read it now and let you know.

13      Q.    Okay.  Take your time.

14            (Pause in proceedings.)

15            THE WITNESS:  Okay.

16 BY MR. KARAM:

17      Q.    Are you familiar with that document?

18      A.    Yes, I am.

19      Q.    Do you know who the author of that

20 document is?

21      A.    I am.

22            MR. HAILSTONE:  Before we get into it,

23 just for the record, I object to the use of this

24 document.  It's attorney work product,

25 attorney-client work product, and it's privileged;
```

1    and I need to put that objection on the record.

2              I also note that when I sent it to

3    Attorney Karam, I noted that there was an

4    objection to the use of these documents; but I

5    think out of a need to get to the bottom and be

6    done with this issue, I sent it anyway.

7              MR. KARAM:  And that's accurate.  So we

8    can proceed.

9    BY MR. KARAM:

10        Q.    Who did you send this to?

11        A.    It originally was sent to the CCAP

12   claims adjuster.

13        Q.    Do you know the CCAP claims adjustor's

14   name?

15        A.    There was three of them.  The two of

16   them I remember was Cassie Troup and Jennifer

17   Ulsh.

18        Q.    And you don't recall the third one?

19        A.    I don't recall the third.

20        Q.    And was this also sent to Attorney

21   Robin Read?

22        A.    I did not send it to Robin Read.

23        Q.    And I take it that if you authored this

24   and this was sent to the CCAP adjustors that you

25   believe everything contained in this is truthful?

1    A.    My opinion, yes.

2    Q.    What caused you to write this letter?

3    A.    The position -- as it says in the first

4  paragraph, the position paper that was drafted by

5  Robin Read I didn't agree with.  I felt that it

6  left out certain facts and was misleading.

7    Q.    Okay.  When did you send this?

8    A.    I can't recall the exact date.  It was

9  probably within a month after she filed the

10  position paper.

11    Q.    And by what means did you send this to

12  the claims adjustors at CCAP?

13    A.    By personal email.

14    Q.    So this was an email message?

15    A.    Yes.

16    Q.    Are you aware of any other emails that

17  you may have sent to CCAP as it relates to either

18  Robert Stoud or Maggie McNamara?

19    A.    Not that I can recall.

20    Q.    Did you discuss this email with anyone

21  else prior to sending it or subsequent to sending

22  it?

23    A.    Discussion was with our Solicitor

24  Giangrieco and Commissioner Warren.

25    Q.    And can you tell me about those

1  discussions?

2          MR. HAILSTONE:  Object to any

3  discussion with former Solicitor Giangrieco as

4  privileged.

5  BY MR. KARAM:

6      Q.    You can go ahead.

7      A.    As far as Commissioner Warren, it

8  was -- both of us had prepared documents, and we

9  reviewed each other's documents to make sure that

10  they were accurate in what we thought was the

11  basis.

12      Q.    When you say "documents," you're

13  talking about this email?

14      A.    This email, yes.

15      Q.    So I'm going to show you what we're

16  going to mark as Plaintiff's Exhibit 2.

17          (Plaintiff's Exhibit 2, Letter written

18  by MaryAnn Warren, was marked for identification.)

19  BY MR. KARAM:

20      Q.    And I would ask that you take the time

21  to review that and let us know if you're familiar

22  with that document.

23          (Pause in proceedings.)

24          THE WITNESS:  Okay.  Yes.

25  BY MR. KARAM:

1      Q.     Are you familiar with that document?

2      A.     Yes, I am.

3             MR. HAILSTONE:  Same objection as the

4      other document.

5      BY MR. KARAM:

6      Q.     Can you tell me what it is?

7      A.     This was the letter in response to the

8      position paper that MaryAnn Warren wrote.

9      Q.     And you've reviewed it here today?

10     A.     Uh-huh.

11     Q.     And do you have any opinion on the

12     truthfulness of that document?

13     A.     My opinion is that she wrote the

14     document based on her opinion as to the facts, as

15     well as I did.

16     Q.     Okay.  Okay.  I'm going to hand you

17     what we're going to mark as Plaintiff's Exhibit 3.

18            (Plaintiff's Exhibit 3, Letter dated

19     5/13/17 written by Robin A. Read, Esquire, was

20     marked for identification.)

21     BY MR. KARAM:

22     Q.     And I will say to you that this was a

23     May 13, 2017, letter that was sent and filed with

24     the EEOC in response to Robert Stoud's EEOC

25     complaint.

1     A.    Uh-huh.  Yes.

2     Q.    Are you familiar with that document?

3     A.    Yes, I am.

4     Q.    Okay.  And is that the document that

5  your email is responding to?

6     A.    Yes.

7     Q.    And is that the document that your

8  email is indicating there's been falsehoods made?

9     A.    I think I said -- my correct words

10  were, I said it's to clarify and correct

11  statements that have been made.

12     Q.    In other words, there's incorrect

13  statements in Plaintiff's Exhibit No. 3, the

14  response?

15     A.    Correct.

16     Q.    The purpose of your email was to

17  correct inaccuracies or the incorrect statements

18  that were made in the May 13, 2017, response?

19     A.    Correct.

20     Q.    Outside of these emails and letters,

21  who did you talk to concerning the inaccuracies in

22  Plaintiff's Exhibit No. 3?

23     A.    It was our Solicitor Mike Giangrieco,

24  Commissioner MaryAnn Warren, a brief conversation

25  with the HR director Jeanne Conklin and Jennifer

1    Ulsh and Cassidy Troup from CCAP.

2        Q.    Can you tell me about your

3    conversations with Jennifer Ulsh and Cassidy Troup

4    from CCAP?  When did they occur, and what was the

5    context?

6        A.    The conversation that myself and

7    Attorney Giangrieco had with Jennifer and Cassidy

8    about the position paper and that we felt that the

9    position paper needed to be clarified and that we

10   felt that there were statements in there that

11   didn't -- weren't accurate and needed to be

12   corrected.  So that's pretty much what the

13   conversation was.

14       Q.    What was their response?

15       A.    Their response was -- at that time was

16   to -- they understood that we had a difference of

17   opinion and they felt, in their words, that their

18   attorney did what they were supposed to do and

19   they said that we should go along with the

20   document.

21       Q.    Was it let known to Cassidy or --

22   Jennifer and Cassidy that you and MaryAnn

23   constituted a majority of the county commissioners

24   of Susquehanna County?

25       A.    Yes.

1      Q.     And that as a majority -- well, what

2   does that mean to you, that a majority of the

3   county commissioners were indicating to CCAP that

4   a document was filed on behalf of the County of

5   Susquehanna that contained inaccuracies and needed

6   to be corrected?

7      A.     Ask that question again.

8      Q.     What does it mean to you -- strike all

9   that.

10            In the County of Susquehanna, if a

11  majority of the commissioners decide to handle a

12  legal case in a certain way and the minority wants

13  to handle it in a different way, who prevails, to

14  your understanding?

15            MR. HAILSTONE:  I object.  You're

16  asking questions about the authority of the

17  commissioners, the county commissioners.  They

18  vote in public meetings.  The majority wins out at

19  public meetings.  We're not talking about a public

20  meeting or anything where votes were held.

21            MR. KARAM:  Votes are held in executive

22  sessions on legal matters as well.

23            MR. HAILSTONE:  Legal matters -- okay.

24  Have we established that there was a vote in an

25  executive session?

```
 1          MR. KARAM:  No.  I'm not there yet.

 2    I'm not there yet.  What I'm establishing is that

 3    two county commissioners contacted CCAP and told

 4    them that they filed a false document and that

 5    CCAP is telling the county commissioners we really

 6    don't care because we're just going to listen to

 7    the minimum majority.

 8          MR. HAILSTONE:  You're misinterpreting

 9    what he said.

10    BY MR. KARAM:

11          Q.   Let me ask you that.

12          A.   Let me clarify.  First of all, this

13    isn't a county commissioners' decision.  It's the

14    insurance company's decision.  They're the ones

15    that handled this.  That's what they're paid for,

16    not the county commissioners.

17          Q.   Well, who --

18          A.   You've got to let me finish.

19          Q.   I want you to.

20          A.   Okay.  So the county commissioners are

21    under contract with CCAP.  CCAP handles our

22    insurance, which this falls under our insurance.

23          When they have handle those, it's our

24    responsibility to allow them to handle the cases

25    the way they see fit.
```

```
 1          We are responsible to provide them the
 2   information they request, any support; but come to
 3   the end of the road, CCAP has a decision to make
 4   as to how the case is done.
 5          Q.    And you have no role or input in how
 6   CCAP handles the case?
 7          A.    Correct.  Our role would be, if we
 8   wanted to have control of the case, then CCAP
 9   would bow out and the county commissioners would
10   have to take full responsibility for the case.
11          Q.    And how about settlement of cases?  Who
12   controls the settlement of cases?  CCAP or the
13   county commissioners?
14          A.    In the settlement, it depends on the
15   issue itself.  In this case, in the original
16   agreement that CCAP made when we first started it
17   back in 2016 or '17, CCAP was paying for the whole
18   thing.
19          Q.    So would the county commissioners have
20   input into whether a case would settle or not?
21          A.    Only if the County Commissioners
22   Association came us to and asked us to pony up and
23   spend money.
24          Q.    And are you aware if they did that in
25   this case?
```

1    A.    My understanding -- I was not involved

2   in the last negotiations.  So I don't know what

3   happened.  That was long before me.

4    Q.    Why weren't you involved in the last

5   one?

6    A.    Because there was a change in the

7   chairman at the County; and when the chairman

8   shift changed, the new chairperson decided that

9   they needed to be involved in it instead of me.

10    Q.    But you're still a commissioner,

11   correct?

12    A.    One out of three, yes.

13    Q.    So let's get back to your conversation

14   with the CCAP people.  Did they tell you that they

15   didn't believe what you wrote in your email?

16    A.    I can't -- the exact words I can't tell

17   you; but the summary of it was that they

18   understand our position, but they believe that the

19   position that the attorney wrote was accurate.

20    Q.    Did you ever talk to the attorney and

21   let her know that you believed her response was

22   inaccurate?

23    A.    No, I did not.

24    Q.    When you were talking to CCAP, it was

25   just you, Mike Giangrieco and the two adjustors,

 1    claims adjustors?

 2        A.    Well, there was somebody else from

 3    CCAP.  I don't know who else was on the phone, and

 4    I can't remember if MaryAnn was with me at that

 5    time or not.

 6        Q.    And how many times did you talk to CCAP

 7    about this case?

 8        A.    About that incident, once.

 9        Q.    Did they ask you to sign off on their

10    position?

11        A.    No.  I've never signed off on anything.

12        Q.    There came a point in time when Robin

13    Read, who was the counsel of record for the EEOC,

14    was relieved of her responsibilities of

15    representing Susquehanna County.

16        A.    Uh-huh.

17        Q.    Do you know why that happened?

18        A.    Well, that was a decision CCAP made.

19    She was employed by CCAP.  So they're the ones

20    that made the decision to remove her.

21        Q.    Did you have any input into that?  Did

22    you make any recommendations to that?  Did you

23    have any conversations concerning that?

24        A.    We did have a conversation with, again,

25    those individuals I mentioned before, Cassidy and

1 Jennifer, that we didn't feel that she was

2 representing our county's best interest and we

3 wanted somebody else on the case.

4 Q. And why didn't you feel she was

5 representing your county in its best interest?

6 A. Because she had written a position

7 paper for the county that we weren't entirely

8 100 percent agreeing upon, nor did we ever see it

9 before she filed it.

10 Q. And what was Cassidy and Jennifer's

11 response to that?

12 A. They said at the time in the

13 conversation that they would review it; and then

14 later, we were notified that Attorney Hailstone

15 was running the case.

16 Q. So we just got these letters yesterday.

17 Prior to yesterday, can you tell me the entire

18 universe of people who were aware of your email

19 and MaryAnn Warren's email, or letter, whatever it

20 is? I'm assuming Mike Giangrieco was one.

21 A. Yes.

22 Q. Who else in the universe of people knew

23 about these letters?

24 A. Well, again, I couldn't answer that

25 question. I don't know who tells who and who

 1    Giangrieco told or anybody else.

 2        Q.    Just in terms of people you talked to

 3    or communicated to anywhere, any time, from the

 4    date you sent the email until today.

 5        A.    Well, of course, the people at CCAP and

 6    Attorney Hailstone.

 7        Q.    Attorney Hailstone knew about these

 8    letters?

 9        A.    Yes.

10        Q.    When did he find out about the letters?

11        A.    I can't tell you the exact date.

12        Q.    Well, was it a week ago, a month ago, a

13    year ago?

14        A.    It was awhile ago.  I can't remember

15    the exact date.

16        Q.    Was he given a copy of the letters?

17        A.    He was sent an email with the

18    information.

19        Q.    Who sent him the email?

20        A.    I did.

21        Q.    You sent him an email with a copy of

22    your email?

23        A.    Yes.

24        Q.    How about MaryAnn Warren's?

25        A.    No.  I didn't send hers.

1      Q.    To be fair, this was an email that was
2  sent to CCAP?
3      A.    Right.
4      Q.    It wasn't sent to Robin Read?
5      A.    Correct.
6      Q.    And it was from you, as a county
7  commissioner, to CCAP?
8      A.    Correct.
9      Q.    Other than Attorney Hailstone -- and,
10 again, this email was sent over a year ago?
11     A.    I don't know the exact date.
12     Q.    And are you able to retrieve that
13 email?
14     A.    Yes.
15     Q.    During any of these meetings, do you
16 recall anybody taking notes?  When I say
17 "meetings," during your conversations with CCAP,
18 did anybody take notes?
19     A.    Our conversations with CCAP were over
20 the phone.  So I don't know what they were doing.
21     Q.    But you didn't take notes?
22     A.    No.
23     Q.    Okay.  And you're not aware of MaryAnn
24 Warren taking notes?
25     A.    No.

1      Q.    In terms of Jeanne Conklin and MaryAnn

2   Warren, did you ever have any conversations with

3   them where they indicated that they felt they were

4   being pressured to lie?

5      A.    No.  I think they're -- I think if you

6   look at their letters -- I mean, if you look at

7   MaryAnn's letter, it would pretty much tell you

8   how she felt about it.

9      Q.    I'm going to show you what we have

10  marked as Plaintiff's Exhibit 4, and I'm going to

11  purport to you that this is a letter or an email

12  dated June 15, 2017, from Jeanne Conklin.  I would

13  ask that you review that.

14          (Plaintiff's Exhibit 4, Letter dated

15  6/15/17 from Jeanne Conklin, was marked for

16  identification.)

17          (Pause in proceedings.)

18          THE WITNESS:  Okay.

19  BY MR. KARAM:

20     Q.    Is there anything in that document that

21  you have knowledge is inaccurate?

22     A.    I believe this represents Jeanne's

23  opinion, yes.

24     Q.    But do you have any knowledge of any

25  inaccuracies contained in that letter?

1      A.      Not to my knowledge.

2      Q.      Can we say the same about MaryAnn

3    Warren's letter?

4      A.      What's that?

5      Q.      That you're not aware of any

6    inaccuracies in MaryAnn Warren's letter, which

7    would be Plaintiff's Exhibit No. 2?

8      A.      I believe both of them represent their

9    opinion of the facts that occurred.

10      Q.      And you do not have any knowledge of

11    any inaccuracies in either of those letters?

12      A.      Well, there's certain things in their

13    letters I wasn't a part of.  So I wouldn't have

14    knowledge of those issues.

15      Q.      So you have no knowledge of any

16    inaccuracies?

17      A.      I have no knowledge of any

18    inaccuracies.

19              (Plaintiff's Exhibit 5, Complaint, was

20    marked for identification.)

21    BY MR. KARAM:

22      Q.      Okay.  I'm going to show you what we

23    have marked as Plaintiff's Exhibit No. 5.  I'm

24    going to indicate to you that this is a complaint

25    that Michael Giangrieco filed against Susquehanna

1    County, Elizabeth Arnold and Judith Herschel.

2            I'm going to call your attention to

3    paragraph No. 11.  It states:  During Arnold's

4    first term as county commissioner, Mr. Giangrieco

5    spoke to her repeatedly about actions she was

6    taking that were not only contrary to Susquehanna

7    policy, but potentially exposed Susquehanna County

8    to liability and did ultimately cause the county

9    liability.

10           Do you have any knowledge regarding the

11   truthfulness of that allegation?

12           MR. HAILSTONE:  I'm going to object.

13   This is not what Judge Mannion's order allowed.

14   Judge Mannion's order was very clear about the

15   allegations -- I think they're in 15 through 18 --

16   regarding his claim that he was told to lie or

17   Commissioner Arnold told him to lie.

18           This is clearly information that County

19   Solicitor Giangrieco should not be sharing because

20   it's protected by attorney-client privilege.  He

21   had no right to do that.

22   BY MR. KARAM:

23       Q.    You can answer.

24       A.    What was your question?

25       Q.    Is paragraph 11 true to your knowledge?

1       A.      I would say that you need to talk to

2    Mr. Giangrieco about that.

3       Q.      Well, let me ask this:  Were you aware

4    that Attorney Giangrieco spoke to her regarding

5    actions she was taking that were contrary to

6    Susquehanna County policy?

7       A.      That's in the first deposition that we

8    did.

9       Q.      Is that a yes?

10      A.      The first deposition that you took from

11   me, we made a statement in there that, you know,

12   she had been given letters saying that, you know,

13   she needed to follow policies and not expose the

14   county to risk.

15      Q.      Okay.  Paragraph 15:  The attorney for

16   the county's insurance company prepared documents

17   in response to the EEOC complaint which were false

18   and inaccurate and did not reflect the facts given

19   to her by Mr. Giangrieco and others.

20              To your knowledge, is that a truthful

21   statement?

22      A.      Well, if Mr. Giangrieco feels that way,

23   it may be truthful to him.

24      Q.      Well, let's take Mr. Giangrieco out of

25   that and let's put Commissioner Hall in the place

1    of Mr. Giangrieco's name.  Would that be an

2    accurate statement?

3         A.    The statement was?

4         Q.    The attorney for the county's insurance

5    company prepared documents in response to the EEOC

6    complaint which were false and inaccurate and did

7    not reflect the facts given to her by Commissioner

8    Hall.

9         A.    I would say that the attorney for the

10   county's insurance company prepared the documents

11   in response to the EEOC complaint and that I felt

12   that they needed to be clarified and correct

13   statements needed to be made.

14        Q.    Paragraph 17 indicates:  Mr. Giangrieco

15   and other employees were asked to lie.

16             Are you aware of anyone, other than

17   Mr. Giangrieco, who was an employee of Susquehanna

18   County that was asked to lie?

19        A.    Well, I guess the definition of lie

20   would be correct because you have Jeanne Conklin's

21   response here that said she was pressured in the

22   statement.  You have MaryAnn Warren's saying that

23   she was pressured, and you had my statement that I

24   said that they told us that we needed to go along

25   with what they wanted to do.

 1      Q.    Anybody other than those three?

 2      A.    No.

 3            MR. KARAM:  Okay.  Let's take a

 4      couple-of-minute break, and I think we're close to

 5      the end.

 6            (A brief recess was taken.)

 7      BY MR. KARAM:

 8      Q.    Did Attorney -- are you aware or did

 9      you have any discussions with Attorney Giangrieco

10      about him sending a letter or email similar to the

11      one that you sent and MaryAnn Warren sent and that

12      Jeanne Conklin sent?

13      A.    The conversations that I recall with

14      him was that he had told us that -- I told him I

15      was thinking about writing a letter in response to

16      what we had found.

17            MR. HAILSTONE:  Before you answer, I'm

18      going to put another objection on the record.

19      This is a discussion between an attorney and his

20      client, and you shouldn't be asking questions

21      regarding that.  I object to it.  You can answer.

22            THE WITNESS:  So in that conversation,

23      I said, you know, I think I need to write a

24      letter; and Giangrieco, our solicitor at the time,

25      said, well, you guys should all write letters if

1    you disagree.  He said -- I can't remember at that

2    point whether he said he was going to or he wasn't

3    going to -- I'm trying to think that he said he

4    wasn't going to because he was a solicitor, but he

5    may have.  I don't have any knowledge of it.

6                MR. KARAM:  Okay.  I have nothing else.

7                MR. HAILSTONE:  No questions.

8                (Witness excused.)

9                (Deposition concluded at 11:13 a.m.)

10                        * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2   COMMONWEALTH OF PENNSYLVANIA  )
                                   )   SS:
 3   COUNTY OF MONROE              )

 4
             I, Trisha Sims, do hereby certify
 5   that before me, a  Notary Public in and for the
     Commonwealth aforesaid, personally appeared ALAN
 6   HALL,who then was by me first duly sworn or
     affirmed to testify the truth, the whole truth,
 7   and nothing but the truth in the taking of his/her
     oral deposition in the cause aforesaid; that the
 8   testimony then given by him/her as above set forth
     was by me reduced to stenotypy in the presence of
 9   said witness and afterwards transcribed by means
     of computer-aided transcription.
10
             I do further certify that this
11   deposition was taken at the time and place in the
     foregoing caption specified, and was completed
12   without adjournment.

13           I do further certify that I am not a
     relative, counsel or attorney of either party or
14   otherwise interested in the event of this action.

15
             IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my seal of office on this
     29th day of December, 2020.
17

18

19   _____

20           Trisha J. Sims, Notary Public
     In and for the Commonwealth of Pennsylvania
21        My commission expires June 6, 2024

22

23

24

25
```